## UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF NEW JERSEY

PALLADIN PARTNERS I, L.P., PALLADIN
OVERSEAS FUND, LTD., PALLADIN MULTI-
STRATEGY PARTNERS, L.P., CHEYENNE, L.L.C.,
PALLADIN OPPORTUNITY FUND, L.L.C.,
PALLADIN OVERSEAS MULTI-STRATEGY
FUND, LTD.,

               Plaintiffs,

        -against-

ISAAC J. GAON, RAYMOND R. KOCH, MARK J.
HIRSCHHORN, WILLIAM J. ADAMS, DAVID M.
MILCH, ROBERT H. FRIEDMAN, WALTER
GROSSMAN, MARK BERENBLUT, AND OLIVER
MAGGARD.

               Defendants.

Case No. 05-3305 (WJM)

**COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Palladin Partners I, L.P., Palladin Overseas Fund, Ltd., Palladin Multi-Strategy

Partners, L.P., Cheyenne, L.L.C., Palladin Opportunity Fund, L.L.C., Palladin Overseas Multi-

Strategy Fund, Ltd. (collectively "Plaintiffs" or "Palladin Investors"), through their attorneys

Dewey Pegno & Kramarsky LLP and Skoloff & Wolfe P.C., allege as follows as and for their

Complaint against Defendants Isaac J. Gaon, Raymond R. Koch and Mark J. Hirschhorn,

William J. Adams, David M. Milch, Robert H. Friedman, Walter Grossman, Mark Berenblut and

Oliver Maggard:

### NATURE OF THE ACTION

1.     This is an action about Defendant's participation in Datatec Systems Inc.'s

pervasive scheme to grossly misrepresent itself in order to procure financing that was desperately

needed for its survival. Here, the victim was the Palladin Investors, who entered into a Note

Purchase Agreement with Datatec on July 3, 2003 based on Datatec's representations that it was

a high-tech, high-growth company with a strong financial position and a promising future. In truth, however, Datatec's financial condition was dismal and was buoyed only by the invention and implementation of a fraudulent invoicing scheme by which Datatec obtained revenue-based financing from its primary lender, IBM Credit, as well as the on-going misrepresentation of the development status and capabilities of its products and it fraudulent accounting for its long-term contracts. Thus, mere months after the Note Purchase Agreement was executed, news broke that Datatec's financial statements—on which the Palladin Investors had relied—were completely unreliable and that IBM had cancelled its credit facility. To date, the Palladin Investors have not received any of the scheduled payments on the Note in cash, nor has Datatec been able to make the monthly payments in shares of its common stock.

## JURISDICTION AND VENUE

2.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, and 1367 and 15 U.S.C. § 78aa.

3.      The claims asserted herein arise under Sections 10(b), 20(a) and 18 of the Securities Exchange Act (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a), 78r and Rule 10b-5 promulgated there under (17 C.F.R. § 240.10b-5)).

4.      Venue in this judicial district is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. § 1391(b). Substantial acts in furtherance of the alleged fraud, including the preparation and dissemination of materially false and misleading information, and/or its effects have occurred within this District. In addition, Datatec was headquartered in Fairfield, New Jersey, within this District, at all times relevant to this litigation.

5.      In connection with the acts and omissions alleged in this complaint, Defendants, directly or indirectly used the means and instrumentalities of interstate commerce, including, but

not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

### A.    Plaintiffs

6.     Plaintiffs Palladin Partners I, L.P., a Delaware limited partnership, Palladin Multi-Strategy Partners, L.P., a Delaware limited partnership, Cheyenne L.L.C, a New York limited liability company, Palladin Opportunity Fund, L.L.C., a Delaware limited liability company, Palladin Overseas Fund, Ltd., a Cayman Islands corporation, and Palladin Overseas multi-Strategy Fund, Ltd., a Cayman Islands corporation are funds managed by The Palladin Group, L.P., a Texas Limited Partnership.

7.     The Palladin Investors entered into a Note Purchase Agreement with Datatec Systems Inc. ("Datatec") dated July 3, 2003[1] pursuant to which the Palladin Investors advanced Datatec $4.9 million (the "Note Purchase Agreement").

### B.    Defendants

8.     Defendant Isaac J. Gaon is an individual who was Chairman of the Datatec Board of Directors since December 1997 and Director since 1992 and served as the Chief Executive Officer ("CEO") since October 1994.  An accountant, Defendant Gaon served as Chief Financial Officer from April 1992 until 1994.  Defendant Gaon resigned from his positions at Datatec on December 5, 2003.

9.     Defendant Gaon signed numerous statements filed with the Securities and Exchange Commission ("SEC") that contained materially false statements and material

---

[1] Cheyenne L.L.C. was not an original party to the July 3, 2003 Note Purchase Agreement.  Instead, the original parties were DeAm Convertible Arbitrage Fund, Ltd., Palladin Partners I, L.P., Palladin Multi-Strategy Partners, L.P., and Palladin Overseas multi-Strategy Fund, Ltd., along with Datatec.  Subsequent to the signing of the Agreement, however, DeAm Convertible Arbitrage Fund, Ltd. transferred part of its investment to Cheyenne and the rest to Palladin Opportunity Fund.

omissions, including Forms 10-K and 10-Q. Further, from at least January 31, 2000, Defendant Gaon participated in, and caused, the issuance of many press releases that Datatec issued at the end of each quarter, which purported to outline Datatec's operating results for the preceding quarter. Those press releases contained numerous false statements and made numerous material omissions. Defendant Gaon further made numerous false representations and material omissions, as detailed below, pursuant to the Note Purchase Agreement dated July 3, 2003 between Datatec and the Palladin Investors about the financial condition of Datatec. This Agreement was an attachment to the July 3, 2003 8-K that Datatec filed with the SEC.

10.     As of September 10, 2002, Defendant Gaon was the beneficial owner of 1,838,424 shares of Datatec common stock, and as of July 23, 2003, he was the beneficial owner of 2,271,758 shares, which amounted to 4.9% of Datatec's common stock.

11.     On May 1, 2003, Defendant Gaon entered into an employment contract with Datatec under which he would receive an annual base salary of $400,000 and incentive compensation of up to 25% of his base salary based upon Company profits, stock market returns and Board discretion.

12.     Defendant Raymond R. Koch is an individual who became Datatec's Chief Operating Officer ("COO") in July 2001. Prior to that, he was the Chief Operating Officer and Executive Vice President of Datatec from 1996 to 2000. As of September 10, 2002, Defendant Koch was the beneficial owner of 75,000 shares of Datatec common stock, and as of July 23, 2003 Defendant Koch was the beneficial owner of 149,998 shares of Datatec common stock.

13.     Defendant Koch received a base salary of $225,000, plus a bonus of up to 25% of his base salary based upon the achievement of certain performance goals.

4

14.     Defendant Mark J. Hirschhorn became Datatec's Chief Financial Officer ("CFO") in March 2003.  Defendant Hirschhorn signed numerous materially false statements that Datatec filed with the SEC, including Forms 10-K and 10-Q.  He also signed the Form 8-K filed on July 3, 2003, which announced the issuance to the Palladin Investors of $4.9 million principal amount of Subordinated Secured Convertible Notes and warrants to purchase an aggregate of 875,000 shares of Datatec's common stock, and to which the Note Purchase Agreement was attached as an exhibit.  As of July 23, 2003, Defendant Hirschhorn was the beneficial owner of 45,000 shares of Datatec common stock.

15.     In his position as CFO, Defendant Hirschhorn received an annual base salary of $250,000, and a bonus of up to 25% of his base salary.

16.     Defendant William J. Adams, Jr. became a director of Datatec in April 2000.  As of September 10, 2002, Defendant Adams was the beneficial owner of 48,000 shares of Datatec common stock and as of July 23, 2003 he was the beneficial owner of 72,000 such shares.  Defendant Adams signed Datatec's 10-K for the fiscal year ended April 30, 2002.

17.     Defendant David M. Milch became a director of Datatec in October 1996.  As of September 10, 2002, Defendant Milch was the beneficial owner of 1,007,305 shares of Datatec common stock.  As of July 23, 2003, Defendant Milch was the beneficial owner of 1,025,305 shares of Datatec common stock.  Defendant Milch resigned from his position on or about December 6, 2004.

18.     Defendant Robert H. Friedman became a director of Datatec in August 1994 and resigned on or about November 11, 2004.  He was the beneficial owner of 170,946 shares of Datatec common stock as of September 10, 2002.  As of July 23, 2003, he was the beneficial

owner of 194,946 shares of Datatec common stock.  Defendant Friedman signed Datatec's 10-K for the fiscal year ended April 30, 2002.

19.     Defendant Walter Grossman became a director of Datatec in May 2001 and resigned on or about November 10, 2004.  He was the beneficial owner of 679,975 shares of Datatec common stock as of September 10, 2002.  As of July 23, 2003, he was the beneficial owner of 705,975 shares of Datatec common stock.  Defendant Grossman signed Datatec's 10-K for the fiscal year ended April 30, 2002.

20.     Defendant Mark L. Berenblut served as a director of Datatec beginning June 2001 through December 2003.  As of July 23, 2003 he was the beneficial owner of at least 48,000 shares of Datatec common stock.  Defendant Berenblut signed Datatec's 10-K for the fiscal year ended April 30, 2002.

21.     Defendant J. Oliver Maggard became a director of Datatec in May 2003 and resigned on or about March 17, 2005.  He was the beneficial owner of 8,000 shares of Datatec common stock as of July 23, 2003.

## RELATED NON-PARTIES

22.     At all relevant times, Datatec was a Delaware corporation with its principal place of business in Fairfield, New Jersey.  In or about December 2004 Datatec filed voluntary petitions for relief under Chapter 11 of Title 11 of the United States Code, 11 U.S.C. §§ 101 et seq. (the "Bankruptcy Code").

23.     Each of the Defendants, by reason of his Datatec stock ownership, management position and/or membership or representation on Datatec's Board of Directors, and/or his signature on and preparation and dissemination of the false and misleading statements of Datatec's financial condition, including SEC filings, was a controlling person of Datatec

6

pursuant to Section 20(a) of the Exchange Act and had the power to influence, and exercised such power and influence, to cause Datatec to engage in the violations of law complained of herein.

24.     As senior executive officers and/or directors of Datatec, Defendants Gaon, Koch, and Hirschhorn directly participated in the management of Datatec and were directly involved in the day-to-day operations of Datatec at the highest levels, and were privy to confidential and proprietary information concerning Datatec, its operations, finances, financial condition, and present and future business prospects. Because of their positions with Datatec, all Defendants had access to non-public information about its business, finances, products, markets and present and future business prospects via access to internal corporate documents, conversations with corporate officers and employees, attendance at management and/or board of directors meetings and committees thereof and via reports and other information provided to them in connection therewith. The Defendants had the power, influence and authority to direct or cause the direction of management and policies of Datatec, and, therefore, to cause or prevent the wrongful conduct and practices complained of herein, and, in fact, directed and caused, in whole or in material part, such management and policies of Datatec, so as to cause, and fail to prevent, the wrongful conduct alleged herein.

## FACTS

25.     In the several years prior to the July 3, 2003 execution of the Note Purchase Agreement by which the Palladin Investors advanced Datatec $4.9 million dollars, Defendants attempted to portray Datatec as a successful, rapidly growing advanced technology company. As such, Datatec's Form 10-K for the fiscal year ending April 30, 2002 described Datatec and its subsidiaries as entities

7

in the business of providing rapid and accurate technology services and licensing software tools designed to accelerate the delivery and management of complex Information Technology ("IT") solutions for technology providers, primarily Original Equipment Manufacturers ("OEMs"), systems integrators, independent software vendors, telecommunications carriers and service providers . . . as well as to a select number of "Fortune 2000" customers in the United States and Canada.

26.     In truth, however, the story of Datatec is one of deception and misrepresentations in which a company grossly overstated its revenues, capabilities and products to obtain financing just to stay afloat.

27.     Defendants portrayed Datatec as a high growth, high-tech, financially sound business. That was manifestly false, and the Palladin Investors were injured as a result of the gross misstatement of the nature and profitability of Datatec by Defendants.

A.     **IBM Credit Facility**

28.     IBM Credit, LLC ("IBM Credit") entered into an Inventory and Working Capital Financing Agreement ("Financing Agreement") with Datatec on November 10, 2000. Under this facility, Datatec had a revolving loan that provided for maximum borrowings of $23 million, which was increased from $16 million on January 15, 2003. (10-Q March 17, 2003).

29.     The borrowings under the revolving line of credit were based on a formula of 85% of eligible receivables and 25-35% of eligible inventory. (10-K for the fiscal year ended April 30, 2002).

30.     Datatec also had a $3.0 million term loan with IBM Credit that was due in February 2003, but was extended to June 30, 2003. (10-Q March 17, 2003).

31.     Although Datatec had been in default of certain financial covenants in the Financing Agreement beginning with the fiscal quarter ended January 31, 2001, through and including the fiscal quarter ended July 31, 2003, IBM Credit had a practice of providing Datatec with written default waivers. For example, Datatec and IBM entered into a waiver agreement on

8

April 14, 2003 whereby IBM Credit agreed to amend the Financing Agreement to "(i) extend the expiration date of the facility to August 2004 from August 2003; (ii) provide a maximum availability of (a) $29 million until May 31, 2003; (b) $25 million until December 31, 2003; (c) $20 million until March 31, 2004; and (d) $15 million until August 1, 2004; (iii) lower the charges to prime plus 1.75% from prime plus 4.25% and (iv) alter certain financial covenants." (Form S-1A, filed 10/2/03).

32.     As of June 2003, Datatec had borrowed the maximum available under its Financing Agreement from IBM. (Form S-1A, filed 10/2/03).

## B.     The Palladin Investors' Note Purchase Agreement

33.     A second source of funding for Datatec was the Palladin Investors. On July 3, 2003, the Palladin Investors entered into the Note Purchase Agreement with Datatec pursuant to which Datatec received an aggregate of $4.9 million.

34.     This funding was evidenced by a Subordinated Secured Convertible Note (the "Note") and a Stock Purchase Warrant (the "Warrant") to purchase an aggregate of 875,000 shares of Datatec common stock. These securities were exempt from registration under Regulation D of the Securities Act of 1933.

### i.     The Note

35.     The Note was originally due on October 3, 2004, and Datatec agreed to make ten monthly payments in equal amounts on the Note beginning January 1, 2004. The Note was secured by all of Datatec's assets, as well as all the assets of the following Datatec wholly owned subsidiaries: IIII Communications of Illinois, Inc.; Datatec Systems Inc. (Canada); eDeploy.com; and Millennium Care Inc. (Security Agreement dated July 3, 2003 at Section 1.1).

36.    Pursuant to a July 28, 2003 Amendment and Waiver Agreement, however, the parties agreed that Datatec would extend the maturity date of the Note six months, from October 3, 2004 to April 3, 2005, and the loan would be repaid over sixteen equal monthly payments rather than ten.[2] Also pursuant to the Amendment and Waiver Agreement, Datatec agreed to issue an aggregate of 700,000 additional warrants to the Palladin Investors.

37.    At Datatec's option, payments on the Note were to be made in either cash or common stock, subject to various listing and registration requirements. The conversion price of the warrants, had Datatec elected to pay the monthly installments in common stock, would be the lower of $1.40 per share or 90% of the volume weighted average price of the common stock on the date of conversion.

38.    Under the terms of the Note, the Palladin Investors also retained the option to convert the Note at any time into shares of Datatec's common stock at a conversion price equal to $1.40 per share. The Note amount committed by each Palladin Investor is summarized below:

| Investor | Note Amount |
|---|---|
| Palladin Partners I, L.P. | $750,000 |
| Palladin Multi-Strategy Partners, L.P. | $250,000 |
| Cheyenne, L.L.C. (from DeAM) | $500,000 |
| Palladin Overseas Fund, Ltd. | $750,000 |
| Palladin Opportunity Fund, L.L.C. | $1,500,000 |
| (from DeAM) | $900,000 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $250,000 |
| Total | $4,900,00 |

39.    On May 26, 2004 Datatec sold one of its subsidiaries, Millennium Care, Inc. and repaid $800,000 of the Notes, pro rata. The principal amount of the Note thereafter outstanding was:

---

[2] In July 2003, Datatec asked the Palladin Investors to waive their right of first refusal under the Note Purchase Agreement so that it could raise additional capital by selling stock in a public offering. In exchange for the waiver, Datatec agreed to amend certain terms of the Notes.

10

| Investor | Note Amount |
|---|---|
| Palladin Partners I, L.P. | $627,300 |
| Palladin Multi-Strategy Partners, L.P. | $209,100 |
| Cheyenne, L.L.C. (from DeAM) | $418,200 |
| Palladin Overseas Fund, Ltd. | $627,300 |
| Palladin Opportunity Fund, L.L.C. | $2,009,000 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $209,100 |
| Total | $4,100,000 |

### ii.    The Warrants

40.    In addition to the Note, the Palladin Investors received Warrants to purchase an aggregate of 875,000 shares of Datatec common stock. The number of shares that each respective Palladin Investor was entitled to purchase under its Warrant is summarized below:[3]

| Investor | Warrant Amount |
|---|---|
| Palladin Partners I, L.P. | 133,929 shares |
| Palladin Multi-Strategy Partners, L.P. | 44,643 shares |
| Cheyenne, L.L.C. (from DeAM) | 89,286 shares |
| Palladin Overseas Fund, Ltd. | 133,928 shares |
| Palladin Opportunity Fund, L.L.C. | 267,857 shares |
| (from DeAM) | 160,714 shares |
| Palladin Overseas Multi-Strategy Fund, Ltd. | 44,643 shares |

### iii.    The Registration Rights Agreement

41.    As part of the Note Purchase Agreement, Datatec and the Palladin Investors entered into a Registration Rights Agreement ("RRA"), dated July 3, 2003. By its terms, the RRA was created "[t]o induce the Investors to execute and deliver the Purchase Agreement".

42.    The RRA provided that Datatec would, no later than August 2, 2003, file a registration statement with the SEC covering the resale of the common stock issuable under the Note and the Warrants.

43.    Pursuant to the RRA, Datatec filed a registration statement with the SEC registering the shares of common stock underlying the Notes and warrants ("Registration

---

[3] These amounts were subsequently increased pursuant to the Amendment and Waiver Agreements.

Statement"). Although first declared effective on October 31, 2003, the Registration Statement was rendered ineffective on December 17, 2003 because of Datatec's failure to timely file its 10-Q. This default under the RRA has continued uninterrupted since that date.

44.     Datatec did not make any of the scheduled monthly amortization payments on the Note in cash. In addition, because the Registration Statement was declared ineffective, Datatec was unable to make the monthly payments in shares of its common stock, and the Palladin Investors were prevented from exercising their right under the Note to convert the Notes into common stock and sell the resulting shares into the market.

### iv.     Sale of the Notes

45.     On December 7, 2004, shortly before Datatec filed for bankruptcy, each Palladin Investor sold its Note, and assigned its rights under the Note Purchase Agreement and RRA, to Eagle Acquisition Partners, Inc., a Delaware corporation formed by the current president of Datatec, for a purchase price equal to about 57% of face value, as follows:

| Investor | Sale Price |
| --- | --- |
| Palladin Partners I, L.P. | $359,550 |
| Palladin Multi-Strategy Partners, L.P. | $119,850 |
| Cheyenne, L.L.C. | $239,700 |
| Palladin Overseas Fund, Ltd. | $359,550 |
| Palladin Opportunity Fund, L.L.C. | $1,151,500 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $119,850 |
| Total | $2,350,000 |

## C.     Datatec Induces the Palladin Investors to Enter into Agreements with Datatec by Painting a False Picture of its Finances

46.     At the time that the Palladin Investors entered into the Agreement, Datatec painted itself in its public statements, the Note Purchase Agreement's representations and warranties, and in its SEC Filings as a company that was not simply stable financially, but that was growing at a rapid clip.

### i.    Public Statements

47.    Throughout the period immediately prior to the signing of the Note Purchase Agreement, Datatec consistently made public statements touting the strength of its business.

48.    In a press release dated May 2, 2003, just two months prior to the execution of the Note Purchase Agreement, Datatec announced that it had acquired 100% of Millennium Care.  According to Datatec, the acquisition "extend[ed] Datatec's influence beyond deployment services and provide[d] [it] with a major competitive advantage in the information technology infrastructure space." (May 2, 2003 press release, attached as exhibit to May 2, 2003 8-K).

49.    This positive forecast persisted, and in a June 6, 2003 press release Datatec reported that for Fiscal Year 2003,[4] it would report $125.1 million in revenues and $1.4 million in income, or $0.04 per share.

50.    In the same press release, Datatec stated that Fiscal Year 2004 would be even better:

> For fiscal 2004, Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 to $125 million and earnings per share will be between $0.14 and $0.16.  The Company expects to be profitable in all four quarters.  Any Governmental sales in the year would be incremental to both the top and bottom line forecast.

51.    Chairman and CEO Isaac Gaon stated that Datatec would achieve these expectations "by taking a more selective approach to project opportunities, adjusting its sales mix and continuing to focus on expense control."  Moreover, Gaon announced that Datatec's recent acquisition of Millennium Care, combined with Datatec's Asset Guardian software-enabled services, was also expected to contribute to the gross margin improvement.

---

[4] Datatec's fiscal year began on May 1, and thus its quarters ("Q") break down as follows: Q1 is May 1 to July 31; Q2 is August 1 to October 31; Q3 is November 1 to January 31; Q4 is February 1 to April 30.

### ii.    SEC Filings

52.    The data reported in Datatec's SEC filings similarly portrayed a robust financial status. Datatec's Form 10-K statement for Fiscal Year 2002, which was signed and certified by Defendant Gaon and signed by Defendants Adams, Berenblut, Friedman and Grossman, reported (i) total stockholders' equity of $2,279,000; (ii) assets equaling $34,619,000; and (iii) revenue of $70,277,000.

53.    Similarly, Datatec's Form 10-Q statement for the quarterly period ended January 31, 2003 reported (i) assets as of such date equaling $61,287,000 and total stockholders' equity as of such date equaling $6,949,000; (ii) for the three months ended January 31, 2003, revenue of $35,275,000, and for the nine months ended January 31, 2003, revenue of $91,550,000; and (iii) for the nine months ended January 31, 2003, net income of $2,550,000 and earnings per share of $0.07. The 10-Q was signed by Defendant Hirschhorn and certified as true and correct pursuant to Section 302 of the Sarbanes-Oxley Act by Defendants Gaon and Hirschhorn.

### iii.    Representations and Warranties in the Note Purchase Agreement

54.    The Note Purchase Agreement into which the Palladin Investors entered with Datatec was also laden with assurances of Datatec's financial well-being.

55.    Datatec represented to the Palladin Investors in the Note Purchase Agreement that during the three years prior to the Agreement, documents filed with the SEC "(a) complied in all material respects with the requirements of the Exchange Act, and rules and regulations of the SEC promulgated thereunder, and (b) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading." Note Purchase Agreement at ¶ 4.5.

56.     In addition, the Note Purchase Agreement specifically warranted that "[t]he financial statements of the Company included in the SEC Documents complied in all material respects with applicable accounting requirements and the published rules and regulations of the SEC or other applicable rules and regulations . . . and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of operations and cash flow for the periods then ended." *Id.*

57.     Datatec further warranted that it was in full compliance with "all covenants in favor of the IBM Lender relating to all indebtedness owed by it to the IBM Lender", and that "the Company reasonably and in good faith believes that it can maintain compliance with those covenants for the foreseeable future based on the Company's conservative projections as disclosed to the Investors." *Id.* at ¶ 4.33.

58.     Moreover, pursuant to Sections 2.1(e)(iii) and 2.1(e)(xv) of the Note Purchase Agreement, Datatec's President or Chief Executive Officer, then Defendant Gaon, was required to execute certificates dated as of the closing date stating that:

    (i)     the representations and warranties of the Company in the Transaction Documents shall be true and correct as of the date when made and as of the Closing Date as though made at that time;

    (ii)    the Company is not in default to the IBM Lender and the Company reasonably expects to remain in compliance with its loan covenants for the foreseeable future; and

    (iii)   since April 30, 2002, (i) no Material Adverse Effect has occurred or exists with respect to the Company, except as disclosed in any SEC documents filed at least five (5) days prior to the Closing Date and available on Edgar or otherwise provided to the Investors, and (ii) the Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to the Bankruptcy Code.

15

**D.    Defendants' Fraudulent Schemes to Obtain Financing**

59.    The rosy financial portrait painted by Defendants on which the Palladin Investors relied, however, was a far cry from Datatec's true financial reality.  Contrary to all of Datatec's representations, the truth was that Datatec was so desperately short of cash that it resorted to fraud just to pay its bills.  To stave off financial disaster, Defendants resorted to at least two major types of financial fraud.

60.    First, Defendants created false and fictitious invoices that permitted Datatec to (i) obtain additional borrowings under its credit facility with IBM, which permitted borrowings based on Datatec's accounts receivable and (ii) to inflate of financial results in its public filings and statements.  Under this scheme, Defendants Gaon, Koch and Hirschhorn caused Datatec employees to post invoices for work that had not been done, which created fictitious accounts receivable that were used as the basis for borrowings from IBM.  Those borrowings, in turn, could be used to alleviate Datatec's acute cash shortage so it could pay its bills.

61.    This fictitious invoicing scheme had the effect of grossly distorting Datatec's accounts receivables as reported to the public and represented to the Palladin Investors prior to its investment.

62.    Second, Datatec materially misrepresented the development status and capabilities of its products.  For example, Datatec's "Asset Guardian" was represented as being in advanced development stages, and that when completed it would manage the entire life cycle of a technology asset from "cradle to grave."  In fact, Defendants knew or recklessly disregarded that Asset Guardian was not in an advanced development stage, and that it was not capable of performing the considerable capabilities it was represented as having.  Nor was it reasonably likely that the product would be developed in the near future.

16

63.     Other products that Defendants knowingly or recklessly touted beyond their capability included eDeploy and IWPS.  Neither product had any reasonable prospect of being successfully marketed, as Defendants knew or should have known.

**E.      Datatec's True Financial Condition is Revealed**

64.     Thus, despite the $4.9 million cash infusion from Palladin and the $28 million from IBM Credit, by the end of 2003, Datatec's financial situation had spun out of control.

65.     On December 5, 2003 Datatec retracted its previously-announced earnings estimate for Fiscal Year 2004 and instead stated that it expected a net loss for the second quarter of Fiscal Year 2004 and an overall loss for all of Fiscal Year 2004.  Datatec also unexpectedly announced that Defendant Gaon had stepped down as Chairman and CEO, and that Mark Berenblut had resigned as a board member.  According to Datatec, Gaon would be replaced by Raul Pupo as Chief Executive Officer.  Datatec said it was "finalizing the terms of [Pupo's] employment", thus implying that the executive search to replace Gaon had begun substantially earlier.  Datatec's stock priced dropped 34%, from $1.16 on December 4, 2003 to close at $0.77 on December 5, 2003.

66.     Though IBM Credit had previously, beginning with the fiscal quarter ended January 31, 2001 through the fiscal year ended July 31, 2003, provided Datatec with written default waivers for its non-compliance with certain financial covenants in the IBM credit facility, on December 12, 2003 IBM Credit informed Datatec that it would not provide it with a written waiver for the fiscal quarter ended October 31, 2003.

67.     The news from there, however, only worsened.  On December 17, 2003, Datatec announced that it expected the loss for the fiscal quarter ended on October 31, 2003 to be approximately $10 million, and that it expected to take a restructuring charge of $4.5 million in

the following fiscal year. Datatec also announced that it would delay the filing with the SEC of

its quarterly report on Form 10-Q and that it had decided to hire outside counsel to conduct an

independent audit of the valuation of its long-term contracts. As a result of the delay in filing its

10-Q, the registration statement that had been declared effective October 31, 2003 registering the

stock underlying Palladin Investors' Note was rendered ineffective.

68.     Datatec also announced on December 17, 2003 that its financing agreement with

IBM was being administered by IBM's troubled loan department and Datatec was unable to

make the scheduled loan payments, causing IBM to refuse to provide a written waiver of existing

defaults. (December 17, 2003 Form 8-K).

69.     Datatec's stock price dropped another 15% on the news from $0.68 in the prior

day's trading to close at $0.58 on December 17, 2003.

70.     On December 23, 2003, Datatec announced that Nasdaq would delist its stock as

of December 31, 2003 because Datatec had failed to file its quarterly report on Form 10-Q for

the period ended on October 31, 2003.  Nasdaq delisted Datatec's stock as announced.

71.     On August 12, 2004, Datatec announced that investors could not rely on *any* of

Datatec's financial statements or SEC filings dating back to fiscal year 2001. This came despite

the fact that Datatec had specifically represented that the documents filed with the SEC during

the three years prior to the Agreement, i.e., documents filed with the SEC beginning July 3,

2000, "did not contain any untrue statement of a material fact or omit to state a material fact

required to be stated therein or necessary to make the statements therein . . . not misleading, "

and that "[f]inancial statements of the Company included in the SEC Documents . . . fairly

present in all material respects the financial position of the Company".  (Note Purchase

Agreement at ¶ 4.5).

72.     In its press release, Datatec stated that:

In connection with completing the financial statements contained in these SEC filings, the Company has continued to review its accounting for recognizing revenue of its customer contracts. As a result of this continuing review, the Company believes that the cumulative amounts of revenue previously recognized on certain contracts have been overstated by between approximately $11 million and $18 million. Therefore, certain prior periods should instead reflect either a loss instead of a profit, or, a larger loss than what was previously reported, however the specific periods to be adjusted and the related amounts have not yet been determined. Accordingly, based upon the current state of our continuing review, financial statements previously filed with the SEC and related financial data previously reported by the Company should not be relied upon by investors for the quarter ended July 31, 2003, the fiscal years ended April 30, 2003, 2002 and 2001 and for the fiscal quarters included therein.

The Company also previously announced that it expected the loss for the fiscal quarter ended October 31, 2003 to be substantially greater than $10 million. As a result of the Company's continuing review, the Company now believes that a significant portion of that loss should be reflected in prior periods.

73.     The closing price of Datatec's common stock on August 26, 2004 plummeted to

$0.35 – an approximate seventy percent decline from its $1.16 share price on December 4, 2003.

74.     The above financial restatements and subsequent collapse of Datatec resulted

from, in material part, the financial situation set forth above relating to Datatec's accounts

receivables and product development.

**F.     Material Misstatements Publicly and in SEC Filings**

**i.     June 26, 2003 Press Release**

75.     The June 26, 2003 press release ("June Press Release") contained several

statements that were materially false and misleading. First, the statements setting forth Datatec's

financial results for its fourth quarter of fiscal 2003 (ending April 30, 2003), as stated above,

were inaccurate and misleading because they failed to disclose not only that that Datatec's results

were based on the practice of generating fictitious invoices to buoy accounts receivable but also

failed to disclose the driving force behind the fraud: Datatec's dire financial condition.

Defendants knew or should have known about both of these factors and their glaring omission in the June Press Release.

76.     Similarly, the statements in the June Press Release setting forth Datatec's positive revenue and earnings guidance for fiscal 2004 lacked any reasonable basis and were materially false and misleading because the Press Release did not disclose Datatec's true financial condition or the scheme to create fictitious invoices in order to alleviate that situation.  Defendants directed and knew about, or recklessly disregarded, Datatec's creation of fictitious invoices and therefore knew or should have known that the revenue and earnings guidance had no basis in reality.

77.     In addition, the statement in the June Press Release that "Datatec's Asset Guardian software-enabled services is expected to contribute to . . . gross margin improvement" was materially false and misleading because Defendants knew or should have known that Asset Guardian was not capable, nor would it be in the near future, of performing the substantial capabilities attributed to it.

### ii.     Form 10-K for the Fiscal Year Ended April 30, 2002

78.     On October 3, 2002, Datatec filed its annual report on Form 10-K for its fiscal year ended April 30, 2002 (the "2002 Form 10-K").  The Form 10-K was signed by William Adams, Mark Berenblut, Robert H. Friedman, Walter Grossman and signed and certified pursuant to Section 302 of the Sarbanes-Oxley Act by Isaac J. Gaon.

79.     The Management Discussion and Analysis ("MD&A") section of the 2002 Form 10-K materially misstated the procedure for accounting for long-term contracts.  The 2002 Form 10-K stated: "The Company recognizes revenue earned under long-term contracts utilizing the percentage of completion method of accounting by measuring direct labor costs incurred to total estimated labor costs.  Under the percentage of completion method of accounting, revenue, costs

and gross margin are recognized as work is performed based on the relationship between direct labor incurred and total estimated labor."

80.     This statement was materially false and misleading because Datatec was booking revenue prior to the completion of any work at all on the long-term contracts, and was also booking revenue on proceeding contracts prior to completion of work that would support the booking of that revenue. Defendants either directly participated in or knew or should have known of the scheme to bolster Datatec's accounts receivable by creating fictitious invoices to recognize revenue well before the performance of the work. Thus, Defendants knew or should have known that Datatec's stated revenue recognition policy was continually being violated and knew or should have known that this fact was omitted when they drafted and/or signed off on this statement.

81.     The MD&A in the 2002 Form 10-K also materially misrepresented Datatec's defaults in its financial covenants with IBM Credit during the fiscal quarters, beginning in the fiscal quarter ended as of January 31, 2001. For example, the 10-K stated that as of January 31, 2002 and April 30, 2002 Datatec was supposed to have maintained a net profit to revenue ratio equal to or greater than 0.1% when in fact the actual ratio was negative 9.0% and negative 10.7%, respectively. Because Datatec had recognized substantial revenues prior to the performance of work, these defaults were in reality much more serious than disclosed in the 10-K.

82.     Similarly, the statement in the 10-K that IBM had waived Datatec's defaults of its financial covenants was also materially false and misleading because Defendants failed to disclose that Datatec was engaged in a massive scheme to generate false invoices for the purposes of fraudulently obtaining funding which, if known to IBM, would have resulted in

IBM's refusal to continue waiving Datatec's defaults, and would have resulted in the termination

of the accounting receivable financing with which Datatec was using to pay its bills.

## G.     The Palladin Investors Relied on Datatec's Representations

83.     It was clearly stated in the Note Purchase Agreement that the Palladin Investors

were relying on the reported financial condition and the SEC filings – and in particular the

accuracy of those reports and filings – for the purpose of determining whether to make the

investment in Datatec. As set forth above, those reports and filings were false.

84.     As a result of Defendants' dissemination of materially false and misleading

information and its failure to disclose material facts, the price of Datatec's securities was

artificially inflated. Unaware that the price of Datatec's securities, assets, profits, net income and

revenue were artificially inflated, and relying directly or indirectly on the false and misleading

statements made by Defendants, upon the integrity of the market on which the securities were

traded, and/or on the absence of material adverse information that was known to, or recklessly

disregarded by, Defendants but not disclosed in public statements by Datatec, the Palladin

Investors entered into their agreements with Datatec, in which they obtained convertible notes

and warrants.

85.     Had the Palladin Investors known of Datatec's true financial condition, the

Palladin Investors would not have made the July 3, 2003 investment.

86.     It was also clearly stated in the Note Purchase Agreement that Datatec was in

good standing with IBM and reasonably expected to remain so. As set forth above, that

statement was false, as Defendants knew or recklessly disregarded. Had the Palladin Investors

known of Datatec's true financial condition they would not have made the July 3, 2003

investment.

87.     The Note Purchase Agreement further articulated that Datatec did not expect to seek bankruptcy protection. Again, the Palladin Investors relied on this representation and would not have entered into the Agreement had they known that Datatec would file for bankruptcy imminently, as Defendants knew would happen once their fraud was revealed.

## H.     The Defendants' Wrongful Actions

### i.     *Scienter*

88.     As a service organization, a key accounting issue for Datatec was its accounting for long-term contracts. Moreover, Datatec's accounts receivable was key to the financial prospects of the firm, especially since it was the basis for borrowings from IBM. And Datatec's product development was central to its publicly announced business prospects.

89.     The Defendants here were all high-level Datatec officers and/or directors who were privy to confidential and proprietary information concerning Datatec, its operations, finances, financial condition, product development, and present and future business prospects. Due to their positions with Datatec, the Defendants had access to material, adverse, non-public information about Datatec's business, finances, products, markets, and present and future business prospects.

90.     Yet, only five months after Datatec declared that its financial health was in excellent condition and the Palladin Investors entered into the Note Purchase Agreement with Datatec, Datatec announced significant losses, that the valuation of long-term contracts was under investigation, and that the loan from IBM was being administered by IBM's troubled loan department. In the months following, it was revealed that previously recognized revenue for long-term contracts had been overstated by between approximately $11 and $18 million, and that the financial statements filed with the SEC for the Fiscal Years ended April 30, 2003, 2002 and

2001 could not be relied upon at all. Datatec's financial fraud, described above, contributed to these announcements.

91.     As controlling members of Datatec, Defendants were directly responsible for the financial condition of Datatec and for ensuring that reports made to the public and to lenders were accurate. Because accounting for long-term contracts was a primary accounting issue in this business, and because of the sheer magnitude of the accounting problem, Defendants either had actual knowledge of the misrepresentations and omissions of material fact set forth in this complaint or acted with reckless disregard for the truth because they failed to either ascertain or disclose to either the Palladin Investors or the general public Datatec's improper accounting for long-term contracts.

92.     Moreover, Defendant Gaon specifically directed that employees engage in the accounts receivables fraud, and Defendants Koch and Hirschhorn followed those instructions. Gaon made numerous false public statements about Datatec's product development, which Koch and Hirschhorn also facilitated and/or in which they participated.

93.     It is evident from these same facts that the Defendants and Datatec also concealed these material adverse facts from IBM, which entered into a waiver of several of the financial covenants of its credit facility with Datatec on March 14, 2003 (10-Q dated March 17, 2003) and which shortly thereafter extended the termination date of the credit facility from August 2003 to August 2004. (8-K dated April 11, 2003).

94.     Moreover, given the falsity of Datatec's financial statements, and its faulty accounting on this key financial issue facing Datatec, and its other financial fraud, Defendants either knew or recklessly disregarded the fact that, once the truth was disclosed, bankruptcy for Datatec was almost a certainty.

24

95.    Thus, it is apparent that Defendants and Datatec had actual knowledge of the misrepresentations and omission of material fact set forth in this complaint, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose such facts, even though such facts were available to them.

ii.    *Motive*

96.    The Defendants' material misrepresentations and omissions were made knowingly or recklessly for the purpose and effect of concealing Datatec's operating condition and future business prospects and supporting the artificially inflated prices of its securities.

97.    Defendants, as controlling persons of a consistently cash-poor company, were motivated to commit the fraud alleged herein to maintain Datatec's financing from lenders such as IBM Credit and the Palladin Investors in order to keep Datatec afloat.

98.    Defendants were further motivated artificially to inflate the value of Datatec shares so that shares of Datatec's stock (nearly 26 million shares) could be sold in the secondary market on behalf of companies that had provided financial advisory services to Datatec and others close to management.

99.    In addition, the performance of Datatec and its stock price was important to the Defendants because they had personal holdings of Datatec's common stock and options.

100.   Moreover, Defendants Gaon and Koch's remuneration was directly tied to Datatec's performance. On May 1, 2003, Gaon entered into an employment contract with Datatec under which he would receive an annual base salary of $400,000 and incentive compensation of up to 25% of his base salary based upon Company profits, stock market returns and Board discretion. Defendant Koch received a base salary of $225,000, plus a bonus of up to 25% of his base salary based upon the achievement of certain performance goals.

## COUNT I

### <u>Violation of Section 18 of the Securities Exchange Act</u>

101.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

102.    This count is asserted against the Defendants for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

103.    As alleged herein, the Defendants and Datatec made or caused to be made statements in documents filed with the SEC pursuant to the rules or regulations of the Exchange Act or undertakings contained in registration statements as provided in subsection (d) of section 15 of the Exchange Act, which statements were, at the time and in light of the circumstances under which made, false or misleading with respect to material facts.

104.    The Palladin Investors or its agents actually read, reviewed and relied on the false and materially misleading statements contained in these documents in making the decision to provide money to Datatec in exchange for warrants and convertible notes.

105.    In ignorance of the falsity of the Defendants' and Datatec's statements or of the true facts, Plaintiffs entered into the Note Purchase Agreement based upon their or their agents' actual reliance upon the Defendants' representations.

106.    Had they known the true facts, Plaintiffs would not have entered into the Note Purchase Agreement, or would have entered into the Agreement on different terms.

107.    Upon disclosure of the true facts, the price of securities that Plaintiffs purchased the right to acquire dropped, and Plaintiffs suffered damages in an amount to be proven at trial.

108.    By reason of the foregoing, the Defendants and Datatec are liable to Plaintiffs for violations of Section 18 of the Exchange Act, 15 U.S.C. §78r.

## COUNT II

### Violation of Section 10(b)of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder

109.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

110.    Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.

111.    As alleged, Defendants and Datatec directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, knowingly or recklessly engaged and participated in a continuous course of conduct to conceal adverse material information about Datatec, including its true financial position, as specified herein.  In violation of Rule 10b-5, Defendants knowingly or recklessly employed devices, schemes, or artifices to defraud Plaintiffs, engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiffs and directly or indirectly employed manipulative or deceptive devices or contrivances.

112.    Defendants and Datatec acted with scienter in that the facts pled herein give rise to a strong inference of conscious misbehavior or recklessness.  Specifically, Defendants prepared, drafted, reviewed and/or approved Datatec's SEC filings and press releases that, as detailed above, materially overstated revenue, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Palladin Investors in an effort to maintain artificially high market prices for Datatec's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

113.    As a direct and proximate result of Defendants' and Datatec's wrongful conduct, the Palladin Investors suffered damages.

## COUNT III

### Violation of Section 20(a) of the Exchange Act

114.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

115.    Each of the Defendants, by reason of his Datatec stock ownership, management position and/or membership or representation on Datatec's Board of Directors, and his signature on and preparation and dissemination of the false and misleading statements, including SEC filings, was a controlling person of Datatec and had the power to influence, and exercised such power and influence, to cause Datatec to engage in the violations of law complained of herein.

116.    The Defendants had the power, influence and authority to direct or cause the direction of management and policies of Datatec, and, therefore, to cause or prevent the wrongful conduct and practices complained of herein, and, in fact, directed and caused, in whole or in material part, such management and policies of Datatec, so as to cause, and fail to prevent, the wrongful conduct alleged herein.

117.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchase of convertible notes and warrants.

118.    By reason of the conduct alleged above, the Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to Plaintiffs for the substantial damages they suffered in connection with their purchases of Datatec's convertible notes and warrants at artificially inflated prices as a result of Datatec's violations of the Exchange Act.

## COUNT IV

### <u>Breach of Fiduciary Duty</u>

119.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

120.    At all relevant times, Datatec was insolvent in that its liabilities exceeded its assets and it was unable to pay its debts as they became due.  Prior to and when the Palladin Investors signed the Note Purchase Agreement and through and including the Petition Date, Datatec remained insolvent, and its financial condition worsened.

121.    During the period of insolvency, Defendants, as officers and directors of Datatec, owed a fiduciary duty: (a) to exercise due care to the Palladin Investors, (b) to act in the best interest of the Palladin Investors, and (c) to preserve the assets of Datatec for the Palladin Investors.

122.    In connection therewith, the Defendants had a fiduciary duty not to allow Datatec to report false financial information to the Palladin Investors, to the SEC, to the investing public, and to trade creditors.  By allowing the wrongful conduct set forth above, the Defendants breached their fiduciary duty and duty of care to the Palladin Investors.

123.    Defendants further breached their fiduciary duty to the Palladin Investors by failing to carry out their duties with due care and prudence.

124.    As a consequence of their violations of fiduciary duty and duty of care to the Palladin Investors during the period of insolvency, the Palladin Investors entered into a transaction that they otherwise would not have entered and suffered damages in an amount to be determined at trial.  Defendants further caused damage to the Palladin Investors by failing to exercise due care in the management and operations of Datatec.

## COUNT V

### Negligent Misrepresentation

125.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

126.    Defendants acted recklessly and/or negligently in connection with their oversight of Datatec's business and in the creation and dissemination of financial statements and data to the public and to the Palladin Investors.

127.    As is evident from the Note Purchase Agreement, Defendants knew and intended that the Palladin Investors would rely on Datatec's statements of financial health in order to decide whether to enter in to the Note Purchase Agreement. Moreover, Defendants knew or should have known that those statements were materially false and misleading.

128.    In particular, Defendant Gaon made numerous representations, including those set forth in and made pursuant to the Note Purchase Agreement (Agreement at ¶ 2.1(e)(iii), (xv)), about the financial condition of Datatec for the purpose of inducing the Palladin Investors to enter into the Agreement. Additionally, Defendant Gaon was required to execute a certificate stating that "Since April 30, 2002, (i) no Material Adverse Effect has occurred or exists with respect to the Company, except as disclosed in any SEC documents filed at least five (5) days prior to the Closing Date . . . , and (ii) the Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to [the Bankruptcy Code]". *Id.* at ¶ 2(e)(xv). Defendant Gaon knew at the time he made these representations that they were false, that they would be delivered to the Palladin Investors, and that the Palladin Investors would rely on these statements to determine whether to enter into the Note Purchase Agreement. Defendants Koch and Hirschhorn were aware of and facilitated and/or caused the forgoing

30

statements to be made. All Defendants knew or should have known that such statements were being made, and approved of them.

129.    The Palladin Investors did, in fact, rely on Datatec's statement of good financial health and, based on these representations, entered into the Note Purchase Agreement whereby the Palladin Investors agreed to invest $4.9 million in Datatec.

130.    Shortly after entering into the Agreement, the Palladin Investors learned of the material misstatements contained in the financial statements upon which they relied. The Palladin Investors never received any of the monthly payments scheduled to be paid under the Agreement.

131.    Had the Palladin Investors known of the true financial condition of Datatec, they would not have agreed to invest in Datatec. The Palladin Investors were therefore damaged in an amount to be determined at trial.

## PRAYERS FOR RELIEF

132.    WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, as follows: (a) awarding Plaintiffs compensatory and punitive damages to the extent permitted by law, including interest; (b) awarding Plaintiffs their costs and expenses incurred in this action, including reasonable attorney's and expert's fees and other costs and disbursements; and (c) such other and further relief as the Court may deem just and proper.

31

## JURY TRIAL DEMANDED

134.   Plaintiffs hereby demand a trial by jury.


Dated: June 30, 2005

**SKOLOFF & WOLFE, P.C.**

Jonathan W. Wolfe (JW-7070)
293 Eisenhower Parkway
Livingston, NJ  07039
(973) 992-0900

*Attorneys for Plaintiffs Palladin
Investors*


OF COUNSEL:
**DEWEY PEGNO & KRAMARSKY LLP**
Thomas E. L. Dewey
David S. Pegno
Tamara L. Bock
220 East 42nd Street
New York New York 10017
(212) 943 9000

32