Jonathan W. Wolfe (JW-7070)
Skoloff & Wolfe, P.C.
293 Eisenhower Parkway
Livingston, NJ 07039
(973) 992-0900
*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY
ECF CASE

| | |
|---|---|
| PALLADIN PARTNERS I, L.P., PALLADIN OVERSEAS FUND, LTD., PALLADIN MULTI-STRATEGY PARTNERS, L.P., CHEYENNE, L.L.C., PALLADIN OPPORTUNITY FUND, L.L.C., PALLADIN OVERSEAS MULTI-STRATEGY FUND, LTD., <br><br> Plaintiffs, <br><br> -against- <br><br> ISAAC J. GAON, RAYMOND R. KOCH, WILLIAM J. ADAMS, DAVID M. MILCH, ROBERT H. FRIEDMAN, WALTER GROSSMAN, MARK BERENBLUT, OLIVER MAGGARD, DELOITTE & TOUCHE LLP <br><br> Defendants. | Case No. 05-3305 (WJM) <br><br> **AMENDED COMPLAINT** <br><br> **JURY TRIAL DEMANDED** |

Plaintiffs Palladin Partners I, L.P., Palladin Overseas Fund, Ltd., Palladin Multi-Strategy Partners, L.P., Cheyenne, L.L.C., Palladin Opportunity Fund, L.L.C., Palladin Overseas Multi-Strategy Fund, Ltd. (collectively "Plaintiffs" or "Palladin Investors"), through their undersigned attorneys, as and for their Amended Complaint against Defendants (i) Isaac J. Gaon, Raymond R. Koch (collectively, the "Executive Defendants"), (ii) William J. Adams, David M. Milch, Robert H. Friedman, Walter Grossman, Mark Berenblut, J. Oliver Maggard (collectively, the "Director Defendants") and (iii) Deloitte & Touche LLP, ("Deloitte") allege as follows on

the basis of personal knowledge as to their own acts and upon information and belief as to the acts of others:

## <u>NATURE OF THE ACTION</u>

1.      This is an action about Defendants' participation in Datatec Systems Inc.'s ("Datatec" or the "Company") pervasive scheme to grossly misrepresent itself in order to procure investments that were desperately needed for its day-to-day survival.  Here, the victims were the Palladin Investors, who made investments of $4.9 million in Datatec in July 2003 (and increased that investment on July 28, 200) based on Datatec's representations that it was a company in the midst of a transformation into a profitable venture with adequate credit and a promising future.  Only a short time following that investment, however, Datatec began to reveal that its previous disclosures concerning its financial results and its access to credit—on which the Palladin Investors expressly relied in making their investments—had been misleading and unjustified.

2.      Thus, the promising financial picture Datatec had painted just months before was destroyed by the truths concerning Datatec's revenue recognition policies, Datatec's level of indebtedness versus its assets, Datatec's creditworthiness and Datatec's viability.  Not only did Datatec lack the ability to repay the Palladin Investors, it lacked the ability to pay *anyone*—it was completely insolvent.  Datatec's financial statements for the fiscal years 2001, 2002 and 2003, which all Defendants were responsible to ensure were not materially false and misleading, in fact were not in compliance with GAAP at all and could not be relied upon.  According to one estimate, Datatec's financial statements had suffered from accounting improprieties amounting to $20 million.

3.      As it turns out, Defendants had engaged in various schemes to give the false appearance to the investing public that Datatec was achieving profitability, that it was in good standing with IBM Credit, that its debt burden was sufficiently collateralized by its assets and that investors such as Plaintiffs could properly rely on the propriety of its financial reporting under GAAP, by, among other things:

- Inflating its internal accounts receivable balances through advance invoices for the sole purpose of obtaining money under its Credit Facility to which it was not entitled and as to which it lacked sufficient collateral, such that the Company's debt burden was much higher than disclosed;

- In the words of Gaon and Koch, "making revenues"—inflating its revenues through advance purchases for materials it did not need to perform its work;

- Failing to disclose that the largest project it had undertaken to date and the most significant component of its revenues was one for IBM Global Services that it could not complete without the financial support of IBM Credit;

- Failing to disclose that the only reason IBM Credit was lending it money was not because it was in "good standing" but was, instead, because IBM Credit wanted to ensure that Datatec did not "close its doors" and walk off the IBM Global project, as Gaon repeatedly threatened to do without such loans;

- Overstating revenues, profits and income and understating expenses and losses—in the total amount of between $15-20 million over a three year period—and failing to disclose that the manner in which it recognized revenues violated both its own stated revenue recognition policy and GAAP.

4.      Likewise, while Datatec's auditor, Deloitte & Touche LLP ("Deloitte"), had obligations to ensure that its audit was performed in accordance with GAAS and Datatec's financial statements complied with GAAP, it turned a blind eye to the numerous "red flags" at Datatec to issue clean opinions for the 2002 and 2003 financial statements.  In the face of many warning signs, Deloitte mechanically went through the motions to complete its audit, and signed off on financial statements that contradicted numerous material facts in its actual possession and as to which it knew.  When the fraud began to be revealed, Deloitte's reaction—consistent with

its willful ignorance of the truth during its audits—was that the best thing for Deloitte would be for Datatec to file for bankruptcy so that Deloitte would not need to worry about being criticized for its role in the misstatements.

5.      The Palladin Investors seek relief against Defendants for their investment losses caused by the fraudulent and wrongful acts alleged herein.

## CONFIDENTIAL WITNESS

6.      Confidential witness ("CW") provided information in connection with Plaintiffs' counsel's investigation into the facts alleged in this Amended Complaint.  CW is a former high-ranking financial officer of Datatec who has personal knowledge regarding (a) the representations (and the falsity thereof) concerning Datatec set forth below on which Plaintiffs' investment was based, (b) Datatec's financial results, (c) Datatec's operational performance, (d) Datatec's sources of capital, and (e) statements and actions by each defendant as set forth below.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331, 1367 and 15 U.S.C. § 78aa.

8.      The claims asserted herein arise under Sections 10(b), 20(a) of the Securities Exchange Act (the "Exchange Act") (15 U.S.C. §§ 78j(b), 78t(a), 78r and Rule 10b-5 promulgated there under (17 C.F.R. § 240.10b-5)).

9.      Venue in this judicial district is proper pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1391(b).  Substantial acts in furtherance of Defendants' fraud, including the preparation and dissemination of materially false and misleading

information, and/or its effects have occurred within this District.  In addition, Datatec was headquartered in Fairfield, New Jersey, within this District, at all times relevant to this litigation.

10.     In connection with the acts and omissions alleged in this Complaint, Defendants directly or indirectly used the means and instrumentalities of interstate commerce, including, but not limited to, the United States mails, interstate telephone communications, and the facilities of the national securities markets.

## THE PARTIES

**A.     Plaintiffs**

11.     Plaintiffs Palladin Partners I, L.P., a Delaware limited partnership, Palladin Multi-Strategy Partners, L.P., a Delaware limited partnership, Cheyenne L.L.C., a New York limited liability company, Palladin Opportunity Fund, L.L.C., a Delaware limited liability company, Palladin Overseas Fund, Ltd., a Cayman Islands corporation, and Palladin Overseas multi-Strategy Fund, Ltd., a Cayman Islands corporation, are funds managed by The Palladin Group, L.P., a Texas Limited Partnership.

**B.     Defendants**

12.     Defendant Isaac J. Gaon is an individual and resides in Canada.  Gaon was Chairman of the Datatec Board of Directors as of December 1997, Director as of 1992 and Chief Executive Officer ("CEO") as of October 1994.  A chartered accountant, Gaon also served as Chief Financial Officer from April 1992 until 1994.  (April 30, 2003 10-K).  Gaon resigned from his positions at Datatec at the request of Datatec's Board of Directors on or about December 5, 2003.

13.     On May 1, 2003, Gaon entered into an employment contract with Datatec under which he would receive an annual base salary of $400,000 and incentive compensation of up to

25% of his base salary based upon Company profits, stock market returns and Board discretion. Gaon's base salary in the years 2000, 2001, and 2002 was $266,000, $346,772, and $350,000, respectively.  (April 30, 2002 10-K; April 30, 2003 10-K).

14.     As of September 10, 2002, Gaon was the beneficial owner of 1,838,424 shares of Datatec common stock, and as of July 23, 2003, he was the beneficial owner of 2,271,758 shares, which amounted to 4.9% of Datatec's common stock.

15.     Defendant Raymond R. Koch is an individual and resides in New Jersey.  Koch became Datatec's Chief Operating Officer ("COO") in July 2001.  Prior to that, he was Datatec's Chief Operating Officer and Executive Vice President from 1996 to 2000.  (April 30, 2003 10-K).

16.     Under a letter agreement dated July 5, 2001, for an unspecified term, Koch received a base salary of $225,000.  Koch was also granted options to purchase an aggregate of 125,000 shares of Common Stock.  Koch was also entitled to a bonus of up to 25% of his base salary and annual option grants to purchase up to 50,000 shares of Common Stock based on the Company achieving certain performance goals.

17.     As of September 10, 2002, Koch was the beneficial owner of 75,000 shares of Datatec common stock, and as of July 23, 2003, Koch was the beneficial owner of 149,998 shares of Datatec common stock.

18.     Defendant William J. Adams, Jr. is an individual and resides in New Jersey.  He became a director of Datatec in April 2000.  (April 30, 2003 10-K).

19.     As of September 10, 2002, Adams was the beneficial owner of 48,000 shares of Datatec common stock, and as of July 23, 2003, he was the beneficial owner of 72,000 such

shares.  On December 13, 2004, the Company announced that Adams was appointed Interim

Chief Executive Officer.  (Form 8-K filed December 15, 2004).

  20. Defendant David M. Milch is an individual and resides in New York.  He was a

director of Datatec from October 1996 through on or about December 6, 2004.

  21. According to Datatec's 2002 10-K, Milch was employed from October 27, 2000,

to October 26, 2002, as the Company's Executive Director, Office of the Chairman.  Milch's

employment agreement provided for an annual base salary of $125,000, and Milch was granted

options to purchase 200,000 shares of Common Stock on March 7, 2001.  (April 30, 2002 10-K).

  22. As of September 10, 2002, Milch was the beneficial owner of 1,007,305 shares of

Datatec common stock, and as of July 23, 2003, Milch was the beneficial owner of 1,025,305

shares of Datatec common stock, or 2.7%.  According to a press release issued by Warp

Solutions on March 6, 2003, which on that date announced Milch's position as Global Head of

Sales and Marketing Strategy for that company, Milch co-founded Datatec in 1992.

(www.warpsolutions.com/News/PR2003/PR03.06.php)

  23. Defendant Robert H. Friedman is an individual and resides in New Jersey.  He is

a partner at the law firm Olshan Grundman Frome Rosenzweig & Wolosky LLP ("Olshan").

Friedman became a director of Datatec in August and resigned on or about November 11, 2004.

(April 30, 2003 10-K).

  24. As of September 10, 2002, Friedman was the beneficial owner of 170,946 shares

of Datatec common stock, and as of July 23, 2003, he was the beneficial owner of 194,946

shares of Datatec common stock.

  25. Defendant Walter Grossman is an individual and resides in Connecticut.  He

became a director of Datatec in May 2001 and resigned on or about November 10, 2004.

According to Datatec's Form 14-A dated April 1, 2003, defendant Grossman was a member of the Audit and Compensation Committees of the Board of Directors.

26.     As of September 10, 2002, Grossman was the beneficial owner of 679,975 shares of Datatec common stock, and as of July 23, 2003, he was the beneficial owner of 705,975 shares of Datatec common stock, , or 1.9%.

27.     Defendant Mark L. Berenblut is an individual and resides in Canada.  He served as a director of Datatec beginning June 2001 through December 2003.  (April 30, 2003 10-K).

28.     According to Datatec's Form 14-A dated April 1, 2003, Berenblut was a member of the Audit and Compensation Committees of the Board of Directors.

29.     As of July 23, 2003, Berenblut was the beneficial owner of at least 48,000 shares of Datatec common stock.

30.     Defendant J. Oliver Maggard is an individual and resides in New York.  He became a director of Datatec in May 2003 and resigned on or about March 17, 2005.  (April 30, 2003 10-K).  According to CW, Maggard joined the Audit Committee upon his arrival at the Company.

31.     As of July 23, 2003, Maggard was the beneficial owner of 8,000 shares of Datatec common stock.

32.     Defendant Deloitte & Touche LLP is an auditing and accounting firm with a principal place of business in New York, New York.  Deloitte is a subsidiary of Deloitte & Touche USA LLP, which is a member firm of the global organization, Deloitte Touche Tohmatsu.

33.     Datatec engaged Deloitte as its principal independent accountants on or about April 11, 2002; Deloitte resigned from the engagement in or about April 2004.

8

## RELATED NON-PARTIES

34.     At all relevant times, Datatec Systems Inc. ("Datatec") was a Delaware corporation with its principal place of business in Fairfield, New Jersey.  Its common stock was publicly traded on NASDAQ.

35.     In or about December 2004, Datatec and its subsidiaries filed voluntary petitions for Chapter 11 relief under the United States Bankruptcy Code, 11 U.S.C. §§ 101 *et seq.*  As a result, Plaintiffs' claims against Datatec are subject to the automatic stay protection afforded by the Bankruptcy Code.

36.     During the Bankruptcy Proceedings, Datatec sold its assets to Eagle Acquisition Partners, Inc. ("Eagle").  Eagle is an investment group made up of individual and institutional investors, including Raul Pupo, who succeeded Gaon as CEO of Datatec in December 2003 ,and Walter Grossman.  (December 9, 2004 8-K).  According to the public court filings made in connection with that sale of assets, approximately 20% of Eagle is owned by Pupo, Grossman and another individual.

## FACTS

### A.     The Palladin Investors' July 2003 Investments In Datatec

#### i.     The Initial Investment

37.     The Palladin Investors entered into a Note Purchase Agreement and related agreements with Datatec on or about July 3, 2003, pursuant to which the Palladin Investors collectively advanced Datatec $4.9 million (the "Note Purchase Agreement").[1]

38.     Pursuant to the Note Purchase Agreement, each of the Palladin Investors purchased a Subordinated Secured Convertible Note (individually, the "Note," collectively, the "Notes") and a Stock Purchase Warrant (individually, the "Warrant," collectively, the "Warrants") and collectively entered into a Registration Rights Agreement.  Through the July 3, 2003 investment, the Palladin Investors collectively purchased warrants for 875,000 shares of Datatec common stock.  These securities were exempt from registration under Regulation D of the Securities Act of 1933.

##### (a)     The Notes

39.     The Notes were to be repaid in ten equal payments January 1, 2004, and were to be repaid by October 3, 20004            .

40.     The Notes were secured by all of Datatec's assets, as well as all the assets of the following Datatec wholly owned subsidiaries: HH Communications of Illinois, Inc.; Datatec Systems Inc. (Canada); eDeploy.com; and Millennium Care Inc.  (Security Agreement dated July 3, 2003 § 1.1).  These assets included, for example, Datatec's accounts receivables and inventory.

---

[1] Cheyenne L.L.C. was not an original party to these July 3 agreements.  Instead, the original parties were DeAm Convertible Arbitrage Fund, Ltd., Palladin Partners I, L.P., Palladin Multi-Strategy Partners, L.P., and Palladin Overseas Multi-Strategy Fund, Ltd., along with Datatec.  Subsequent to the signing of the Agreement, however, DeAm Convertible Arbitrage Fund, Ltd., transferred part of its investment to Cheyenne and the rest to Palladin Opportunity Fund.

41.     At Datatec's option, the monthly payments on the Notes were to be made in either cash or common stock, subject to various listing and registration requirements.  Had Datatec elected to pay the monthly installments in common stock, the per share price of such stock was to be the lower of $1.40 per share or 90% of the volume weighted average price of the common stock on the date of conversion.

42.     Under the terms of the Notes, the Palladin Investors also retained the option to convert the Notes at any time into shares of Datatec's common stock at a conversion price equal to $1.40 per share.  The Note amount committed by each Palladin Investor is summarized below:

| Investor | Note Amount |
|---|---|
| Palladin Partners I, L.P. | $  750,000 |
| Palladin Multi-Strategy Partners, L.P. | $  250,000 |
| Cheyenne, L.L.C. (from DeAM) | $  500,000 |
| Palladin Overseas Fund, Ltd. | $  750,000 |
| Palladin Opportunity Fund, L.L.C. | $1,500,000 |
| (from DeAM) | $  900,000 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $  250,000 |
| Total | $4,900,000 |

### (b)     The Warrants

43.     In addition to the Notes, the Palladin Investors received warrants to purchase an aggregate of 875,000 shares of Datatec common stock.  The number of shares that each respective Palladin Investor was entitled to purchase under its warrants is summarized below:

| Investor | Warrant Amount |
|---|---|
| Palladin Partners I, L.P. | 133,929 shares |
| Palladin Multi-Strategy Partners, L.P. | 44,643 shares |
| Cheyenne, L.L.C. (from DeAM) | 89,286 shares |
| Palladin Overseas Fund, Ltd. | 133,928 shares |
| Palladin Opportunity Fund, L.L.C. | 267,857 shares |
| (from DeAM) | 160,714 shares |
| Palladin Overseas Multi-Strategy Fund, Ltd. | 44,643 shares |
| Total | 875,000 shares |

### (c)      The Registration Rights Agreement

44.      In the RRA, Datatec agreed to file, no later than August 2, 2003, a registration statement with the SEC covering the resale of the common stock issuable under the Notes and the Warrants.

### ii.      The Subsequent and Additional Investment

45.      Less than a month following the closing of the initial July investment in Datatec by the Palladin Investors, Datatec urgently requested a modification of the terms of the investment to permit it to sell stock to Joseph Stevens & Company, Inc.  (July 28, 2003 8-K).  In exchange for agreeing to the requested modification, the Palladin Investors agreed to increase their investment in Datatec.

46.      The Palladin Investors and Datatec modified the terms of the Note Purchase Agreement and the Subordinated Secured Convertible Note issued to each of the Palladin Investors.  The modifications were reflected in a July 28, 2003 Amendment and Waiver Agreement (the "July 28 Amendment").

47.      Pursuant to the July 28 Amendment, the Palladin Investors waived their right of first refusal and their right to an anti-dilution adjustment in exchange for the receipt of warrants to purchase an aggregate of 700,000 shares of common stock with an exercise price of $0.9441 and an expiration date of July 28, 2007.  In addition, the Palladin Investors agreed to amend the maturity date of the Notes to April 3, 2005, from October 3, 2004, and revised the repayment schedule so that principal would be repaid over sixteen equal monthly payments instead of ten. (8-K filed July 28, 2003; July 28 Amendment).

48.      Following the July 28 Amendment, the total additional warrants held by each of the Palladin Investors were as follows:

| Investor | Additional Warrants |
|---|---|
| Palladin Partners I, L.P. | 107,143 shares |
| Palladin Multi-Strategy Partners, L.P. | 35,715 shares |
| Cheyenne, L.L.C. (from DeAM) | 71,428 shares |
| Palladin Overseas Fund, Ltd. | 107,143 shares |
| Palladin Opportunity Fund, L.L.C. | 214,286 shares |
| (from DeAM) | 128,570 shares |
| Palladin Overseas Multi-Strategy Fund, Ltd. | 35,715 shares |
| Total | 700,000 shares |

### iii.    *Repayment on, and Ultimate Sale of, the Notes*

49.    On May 26, 2004, Datatec sold one of its subsidiaries, Millennium Care, Inc., and repaid $800,000 of the Notes, pro rata.  The principal amount of the Notes thereafter outstanding was:

| Investor | Note Amount |
|---|---|
| Palladin Partners I, L.P. | $ 627,300 |
| Palladin Multi-Strategy Partners, L.P. | $ 209,100 |
| Cheyenne, L.L.C. (from DeAM) | $ 418,200 |
| Palladin Overseas Fund, Ltd. | $ 627,300 |
| Palladin Opportunity Fund, L.L.C. | $2,009,000 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $ 209,100 |
| Total | $4,100,000 |

50.    On December 7, 2004, shortly before Datatec filed for bankruptcy protection, each Palladin Investor sold its Note, and assigned its rights under the Note Purchase Agreement and RRA, to Eagle (the subsequent purchaser of Datatec's assets) for a purchase price equal to approximately 57% of face value, as follows:

| Investor | Sale Price |
|---|---|
| Palladin Partners I, L.P. | $ 359,550 |
| Palladin Multi-Strategy Partners, L.P. | $ 119,850 |
| Cheyenne, L.L.C. | $ 239,700 |
| Palladin Overseas Fund, Ltd. | $ 359,550 |
| Palladin Opportunity Fund, L.L.C. | $1,151,500 |
| Palladin Overseas Multi-Strategy Fund, Ltd. | $ 119,850 |
| Total | $2,350,000 |

***iv.*** ***The Palladin Investors Invested in Datatec in Reasonable Reliance to Their Detriment on Datatec's Representations, Specifically Including Those in its Public Statements and SEC filings.***

51.     Datatec made a number of specific representations to the Palladin Investors to induce their investment, including those made in the Note Purchase Agreement.  These included representations concerning the statements made and information contained in Datatec's public documents and SEC filings.

52.     In relevant part, in the Note Purchase Agreement, Datatec warranted that during the three years prior to the Agreement, documents filed with the SEC "(a) complied in all material respects with the requirements of the Exchange Act, and rules and regulations of the SEC promulgated thereunder, and (b) did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading." (Note Purchase Agreement ¶ 4.5).

53.     In addition, Datatec warranted that "[t]he financial statements of the Company included in the SEC Documents complied in all material respects with applicable accounting requirements and the published rules and regulations of the SEC or other applicable rules and regulations . . . and fairly present in all material respects the financial position of the Company as of the dates thereof and the results of operations and cash flows for the periods then ended." (*Id.*)

54.     Datatec further warranted that it was in full compliance with "all covenants in favor of the IBM Lender relating to all indebtedness owed by it to the IBM Lender", and that "the Company reasonably and in good faith believes that it can maintain compliance with those

covenants for the foreseeable future based on the Company's conservative projections as disclosed to the Investors." (*Id.* ¶ 4.33)

55.     Gaon, then Chief Executive Officer, was required to execute certificates on the closing date, pursuant to Sections 2.1(e)(iii) and 2.1(e)(xv) of the Note Purchase Agreement, stating that:

(i)     the representations and warranties of the Company in the Transaction Documents shall be true and correct as of the date when made and as of the Closing Date as though made at that time;

(ii)    the Company is not in default to the IBM Lender and the Company reasonably expects to remain in compliance with its loan covenants for the foreseeable future; and

(iii)   since April 30, 2002, (i) no Material Adverse Effect has occurred or exists with respect to the Company, except as disclosed in any SEC documents filed at least five (5) days prior to the Closing Date and available on Edgar or otherwise provided to the Investors, and (ii) the Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to the Bankruptcy Code.

56.     In making and modifying their investments in Datatec, the Palladin Investors relied on each of these representations and the statements in Datatec's SEC filings.  Their reliance was reasonable and justified.  Had they known that the foregoing representations and warranties were not true, and had they known that Defendants had violated their duties under the securities laws and GAAP, they would not have made their investments in Datatec.

57.     Pursuant to the RRA, Datatec filed a registration statement with the SEC on October 2, 2003, registering the shares of common stock underlying the Notes and warrants ("Registration Statement")  (Form S-1 filed October 2, 2003).  Although first declared effective on October 31, 2003, the Registration Statement was rendered ineffective on December 17, 2003, because of Datatec's failure to timely file its 10-Q.  This default under the RRA has continued uninterrupted since that date.

58.     Datatec did not make any of the scheduled monthly amortization payments on the Note in cash.  In addition, because the Registration Statement was declared ineffective resulting from the revelation of Defendants' false statements, Datatec was unable to make the monthly payments in shares of its common stock, and the Palladin Investors were prevented from exercising their right under the Note to convert the Notes into common stock and sell the resulting shares into the market in an effort to mitigate their losses.  Datatec defaulted on the Notes and the Palladin Investors suffered losses as a result of Defendants' acts.

**B.     Datatec's Public Representations**

59.     As detailed below, prior to both the Palladin Investors' July 3 investment and their July 28 additional investment in Datatec, Datatec made a variety of statements in its public statements and SEC filings, concerning the nature of its business and operations, its viability, financial results and potential profitability, the sources of its capital and the propriety of the reporting of its financial statements.[2]

*i.     Datatec's Credit and Working Capital Sources*

60.     Prior to investing in Datatec, the Palladin Investors sought and obtained assurances from Datatec concerning its ability to repay them.  As evidence of its ability to repay their investment, Datatec referred to the financial support it had obtained from IBM Credit Corporation ("IBM Credit").  In the Note Purchase Agreement, Datatec specifically warranted to the Palladin Investors that it was in good standing with IBM Credit and would remain in good standing for the foreseeable future.  (Note Purchase Agreement ¶ 4.33).

---

[2] Datatec's fiscal year began on May 1.  Thus its quarters break down as follows: Q1 is May 1 to July 31; Q2 is August 1 to October 31; Q3 is November 1 to January 31; Q4 is February 1 to April 30.

61.     On or about November 10, 2000, IBM Credit and Datatec had entered into an Inventory and Working Capital Financing Agreement, which provided for a revolving loan (the "IBM Credit Facility") and a term loan.  (January 31, 2003 10-Q).

62.     The IBM Credit Facility permitted Datatec to make borrowings based on a formula of 85% of eligible receivables and 25-35% of eligible inventory.  (*Id*).

63.     Critically, pursuant to this formula, the amounts available to Datatec—and ultimately borrowed by Datatec—under the IBM Credit Facility consistently were represented to be less than the total value of Datatec's actual, properly recorded, assets, because Datatec was expressly limited to borrowing an amount equal to only 85% of its receivables and 25-35% of its inventory.  (*Id.*).

64.     Although Datatec had been in default of certain financial covenants in the IBM Credit Facility, IBM Credit continued to lend it money thereunder.  Indeed, not only did IBM Credit provide written waivers to Datatec for each of its defaults through July 2003 (*see* Form S-1 filed October 2, 2003), but in fact consistently increased the maximum amount available to Datatec and, ultimately, extended the Credit Facility's expiration date for one year.  (Form S-1A, filed October 2, 2003).

65.     Thus, on or about January 15, 2003, IBM Credit agreed to increase Datatec's maximum amount of borrowing under the IBM Credit Facility to $23 million.  (January 31, 2003 10-Q).

66.     Likewise, on or about April 14, 2003, IBM Credit agreed to increase the available borrowings to $29 million and to extend the expiration date on the Credit Facility from August 2003 to August 2004.  The overall increases to which IBM Credit agreed were accompanied by requirements that the total amounts of Datatec's indebtedness be reduced over time.  Thus,

Datatec could borrow up to $29 million through May 31, 2003, $25 million through December 31, 2003, $20 million through March 31, 2004 and $15 million through August 1, 2004.  (Form S-1, filed October 2, 2003).

67.     Similarly, on or about June 3, 2003, IBM Credit agreed to increase these limits again.  It agreed to lend up to $28 million through August 31, 2003, $25 million through January 14, 2004, $23 million until March 31, 2004 and $20 million through August 1, 2004.  (Form S-1A, filed 10/2/03).

68.     Datatec never publicly disclosed the basis on which IBM Credit repeatedly agreed to issue written waivers and increased the maximum borrowing limits, except to state that the "IBM Credit Corporation has granted the Company additional availability and increased the maximum amount eligible to be borrowed as the Company's accounts receivables and inventory have increased."  (July 31, 2002 10-Q).

69.     Although IBM Credit agreed to increase the total available borrowing limits under the Credit Facility, according to CW, it never agreed to modify the Credit Facility's borrowing formula:  Datatec consistently disclosed that the amounts it was permitted to borrow remained limited to the specified percentages of Datatec's receivables and inventory.

70.     As of June 30, 2003, Datatec represented that it had $27.8 million outstanding under the Credit Facility, as of April 30, 2003, the amount outstanding under the Credit Facility was $28.8 million.  (April 30, 2003 10-K).  As of those dates, Datatec therefore represented that its total assets must have been greater than $27.8 million and $28.8 million, respectively, as it was permitted to borrow only a percentage of those assets, and also represented that the assets against which it had borrowed were, in fact, legitimately recorded inventory or receivable assets.

In other words, Datatec had stated that it was indebted under the Credit Facility only to the specified extent in the borrowing formula.

### ii.      Datatec's Operational and Financial Results; Compliance with GAAP

71.     Datatec painted itself as a company that, while formerly unprofitable, had turned the corner.  For example, in its public filings Datatec represented that, due to dramatically increased demand for Datatec's services coupled with cost-cutting measures implemented over the last two years, "the Company achieved profitability during the fourth quarter of fiscal 2002 and during each of the first three quarters of fiscal 2003."  (January 31, 2003 10-Q, *see also* October 31, 2002 10-Q).

72.     In addition, for the quarter ended January 31, 2003, Datatec reported assets of $61,287,000, compared with $34,619,000 for the 2002 year-end.  For the nine month period ended January 31, 2003, Datatec reported revenue of $91,550,000 and net income of $2,550,000, compared with revenue of $70,277,000 for the 2002 year-end.   At 2003 year-end, Datatec reported assets of $64,727,000, revenue of $125,091,000, net income of $1,417,000 and earnings per share of $0.04.  (*See* April 30, 2002 10-K; January 31, 2003 10-Q; April 30, 2003 10-K). This was the first year-end profit that Datatec ever recorded.

73.     Furthermore, Datatec touted its expansion into products and services areas beyond its core competency: deployment services.

74.     In a May 2, 2003 press release, Datatec announced its acquisition of Millenium Care and described the impact of this acquisition on its operations as follows:

> The acquisition of Millennium Care extends Datatec's influence beyond deployment services and provide[d] [it] with a major competitive advantage in the information technology infrastructure space . . . . By integrating Millennium Care's service chain automation technology with Datatec's industry leading eDeploy and IW2000 web enabled deployment automation tools, we now have the capability to significantly improve our clients' management of their IT investment and reduce

their Total Cost of Technology Ownership. . . .  Our partners and customers will now be able to take advantage of powerful and complementary solutions from a single source, and leverage the data gathered during the deployment stages to significantly improve the efficiency and cost effectiveness of 'Day 2' support activities such as maintenance and Network Operating Centers.  (May 2, 2003 8-K).

75.     Indeed, shortly before the Palladin Investors made thier Investment, and approximately one month before its 2003 10-K was finalized and filed, Datatec publicly previewed its results for Fiscal Year 2003 and provided expectations as to Fiscal Year 2004.  In a June 26, 2003 press release, Datatec stated that it would report $125.1 million in revenues and $1.4 million in income for the fourth quarter of fiscal 2003.

76.     Significantly, Datatec forecast its expected profitability for Fiscal 2004, and significantly higher expected earnings per share.  Thus, Datatec stated:

For fiscal 2004, Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 to $125 million and earnings per share will be between $0.14 and $0.16.  The Company expects to be profitable in all four quarters. . . . (June 26, 2003 8-K).

77.     According to Defendants, then, Datatec was and would be generating increased revenue and increasing its profits.  Defendants did not disclose that the release of the June 26 numbers was the subject of disagreement within Datatec's management as to whether those numbers had been properly substantiated (described below in more detail).  Plaintiffs' July 3 investment followed about a week after this disclosure.

**C.     Contrary to Its Reports of Financial Success, Datatec Was Overleveraged and Insolvent**

78.     The promising financial portrait painted by Defendants in fact was a far cry from Datatec's true financial reality.  As set forth below, contrary to Defendants' public representations, the truth was that Datatec was not the newly profitable and expanding company that it represented itself to be—instead, it was much more leveraged than it revealed, could not

pay any of its bills, and was so desperately short of cash that it resorted to inappropriate and unjustifiable accounting practices, and outright fraud on the Palladin Investors, to obtain funds.

79.     According to CW, since no later than March 2003 and then continually thereafter, including in July 2003 when the Palladin Investors invested $4.9 million in the Company, Datatec had virtually no cash.  It could not pay its payroll or its bills from vendors such as Graybar and Anixter.  Therefore, Datatec was well within the zone of insolvency at the time of the Palladin Investors' investments.  According to CW, although Datatec had been limping along in this position for some time, it was irreparably damaged by its performance on its Home Depot project.

      *i.*     ***Datatec's Tenuous Viability Was Destroyed by the Home Depot project for IBM Global Services.***

80.     Home Depot awarded a $250 million-plus multi-year contract to IBM Global Services ("IBM Global") to act as its general contractor to rewire the computer networking systems and do related work in approximately 1000 Home Depot stores.

81.     Datatec was one of two winning bidders for a subcontract contract on the Home Depot job from IBM Global.  Each subcontractor was to provide services to 500 stores and would be paid $15 million.

82.     According to CW, who became familiar with the history of the IBM Global contract, Koch was responsible for the estimates and business modeling leading up to the bid submitted to IBM Global by Datatec.

83.     Generally speaking, the Home Depot job involved Datatec's unionized electricians to deploy or wire (*e.g.*, string cable) Home Depot stores after hours.

84.     The subcontract with IBM Global was a "fixed-price" contract, as were many of Datatec's service contracts.  That is, regardless of the costs incurred by Datatec, it was entitled contractually to no more than $15 million from IBM Global.

85.     In or about August 2002, IBM Global asked Datatec to take over for the other winning subcontractor, so that Datatec would be the sole subcontractor for the wiring work on all 1000 Home Depot stores.  Accordingly, Datatec's initial $15 million contract thus became a $30 million fixed-price contract overnight.

86.     Because Datatec's contract was a fixed-price contract, it had taken the risk that the costs it budgeted on the original, half-the-scope Home Depot job would be sufficiently low to generate a total profit on the job.  In taking over the whole Home Depot project, Datatec in effect "doubled down" its bet of achieving profitability.  It was a bet Datatec could not afford to lose.

87.     Due to the massive amount of unanticipated and unbudgeted work that the Home Depot project ultimately required, Datatec's costs skyrocketed far beyond those originally estimated by Koch.

88.     A primary source of increased costs was labor.  In order to meet its obligations to IBM Global, Datatec went from a workforce of 280 at the end of its fiscal quarter ended July 2002, to 585 at the end of its fiscal quarter ended October 2002, to 715 at the end of its fiscal quarter ended January 2003.  (*see* July, October and January 10-Qs for the fiscal year 2003).

89.     The almost-tripling of Datatec's workforce to perform the full Home Depot subcontract resulted not only in massive increases in payroll costs (including overtime costs for the union laborers needed to perform the work), but also associated costs of labor such as recruiting, training, health care and workers' compensation.  It also significantly hampered the

Company's ability to move forward with other projects including, for example, any meaningful progress toward becoming an "advanced technology" company.

90.     While in the past Datatec may have made at least some profit on fixed-price work, the Home Depot contract was, according to CW, unlike any of Datatec's previous contracts because of the sheer size and the complexity of the work.  For example, never before had Datatec attempted to wire so many stores throughout the country.  In addition, according to CW, Datatec's previous jobs were much more easy to execute than Home Depot because they involved new retail outlets wherein Datatec simply had to wire an empty space.  In contrast, the Home Depot job required Datatec to lay cable in the midst of already configured and operating stores—many of which had different configurations from one another.

91.     As a result, Datatec encountered many unforeseen difficulties in installing the wiring and performing its obligations.  These difficulties ultimately required unanticipated "site re-visits" by Datatec.

92.     No later than January of 2003, and thereafter through the fall of 2003, Datatec was required to return to Home Depot stores at which it had completed work to fix various problems—all on Datatec's dime as a contractual matter.

93.     These site re-visits took place concurrently while Datatec was working on other Home Depot stores.  Performing both "new" and "re-visit" work required an extensive deployment effort of labor and materials and payments of up-front costs—which payments Datatec could not make without borrowing money.

94.     Despite the unanticipated and skyrocketing costs on the Home Depot contract, (at least a portion of which resulted from work and site re-visits attributable to faulty information provided by IBM Global or Home Depot prior to entry into the fixed-price contract) Koch told

CW that Datatec only approached IBM Global to request payment for the unbilled costs when the work was almost done, and Datatec had therefore lost any negotiating power for such payment that it once may have held.

95.     Indeed, in a telephone conversation in October 2003, Gaon told CW that IBM Canada, aware of Datatec's unanticipated work and costs on the Home Depot stores, told Gaon that IBM always had expected Datatec to submit a bill for more money or otherwise seek to get reimbursed for its costs, and was surprised when Datatec never did so.  By that time, the project was just about complete and Datatec had no leverage with which to demand extra-contractual payment from IBM.

96.     Koch originally projected the gross profit margin on the Home Depot work, the basis of Datatec's periodic revenue recognition on the contract, to be 25-30%.  Despite the facts that, following that initial projection, the scope of the Home Depot job was doubled and the performance of the work generated ever-increasing and unbudgeted costs, all the while remaining a fixed-price contract, Datatec's profit projections remained unrealistically and unjustifiably high.  Datatec's gross profit margins were decreased only gradually throughout the life of the IBM Global contract.

97.     Specifically, CW states that in March 2003, long after the job had doubled in size and Datatec was heavily involved with site re-visits, the estimated gross profit margin employed remained at 25%, at Koch's insistence.  From March to December 2003, the estimated gross margin was only gradually reduced, following pressure from Datatec's finance department personnel, from 25% to 22% (in approximately July 2003) to 19% to 15% to 6% (in October 2003) and ultimately was actually determined to be negative 6% or 10% (in December 2003)—a total loss and fatal blow to the Company.

98.     The Company depended heavily on the outcome of the Home Depot project. Thus, because of the sheer size of the Home Depot work and the impact any failure to achieve projected profits on that project would have on the Company's results, according to CW, Datatec's viability became dependent entirely on the success of the Home Depot contract. This contingency was never disclosed to the Palladin Investors.

99.     Because the gross profit margins, and the percentage of completion estimates used to generate such margins, were unjustifiably and materially overstated, Datatec's costs on the Home Depot job were seriously understated, and Datatec's periodic income and revenues were correspondingly materially overstated, as explained below.

### ii.     IBM Credit's Deference to IBM Global's Home Depot Work Needs Was Never Disclosed

100.    As it publicly disclosed prior to July 3, 2003, the date of the Palladin investments, Datatec had borrowed the maximum limit under the Credit Facility. However, it failed to disclose that it could not cut checks or pay its bills without continually beseeching IBM Credit to lend it more money. It also failed to disclose that, beginning no later than early 2003, the IBM Credit considered the Credit Facility to be a non-performing loan and it was being administered by IBM Credit's version of a "troubled loan division."

101.    Beginning in the spring of 2003, and well before July 3, 2003, members of Datatec's finance department, including CW, Simon Jethwany and Chris Bengyak, were in almost daily contact with IBM Credit, to request that additional money under the Credit Facility be wired to Datatec in order to pay Datatec's bills to enable it to operate.

102.    Beginning in late May or early June 2003, when Gaon was informed that IBM had again refused to lend Datatec any more money, Gaon instructed Datatec financial personnel, including CW, to tell IBM Credit that without additional funds, Datatec would be unable to

perform its obligations to IBM Global on the Home Depot job.  According to CW, Gaon gave this instruction about once every other week, and his employees followed it.  That threat was enough to cause IBM Credit to change its position and to wire additional funds.

103.    Datatec and IBM Credit personnel had at least three in-person meetings to discuss the status of the Credit Facility, IBM Credit's refusals to lend the Company more money and Datatec's desperate need for daily cash infusions.  The first meeting that CW attended, in or about April 2003, was held at Datatec's office.  Gaon and CW represented Datatec.  The second meeting, in or about early July 2003, was held at IBM Credit's Armonk, New York, office and was attended by Gaon, Koch and CW from Datatec, Michael McGovern and another representative from IBM Credit, and a representative of IBM Global.  The third meeting, in or about August 2003, also was held at IBM and was attended by CW and McGovern, as well as the IBM Global representative.

104.    According to CW, in each of those meetings, IBM Credit expressed its significant frustration with Datatec and adamantly refused to lend Datatec any more money.  IBM Global, on the other hand, would play "good cop" and would explain in the Datatec personnel's presence that Datatec was doing good work on the Home Depot project, and would provide estimates for completion dates and would substantiate the upfront costs Datatec needed to pay in order to finish its work.  Then, Gaon threatened that, without money from IBM Credit, Datatec would have no choice but to "close its doors" and stop its work on the Home Depot project for IBM Global.  Following each of those meetings, usually the next day, IBM Credit would relent and wire Datatec additional funds.

105.    At no time prior to July 3, 2003 or otherwise did Datatec's SEC filings disclose that the reason it had obtained written default waivers and additional borrowings from IBM

26

Credit (as set forth above) was because of its status as a subcontractor for IBM Global and IBM

Credit's interest in Datatec's performance on the IBM Global contract.

106.    Likewise, at no time did Datatec's SEC filings disclose that, once the Home

Depot job was concluded, it consequently would have no bargaining power with IBM Credit and

would therefore lose any possibility of obtaining more money under the Credit Facility.

107.    Because Datatec's cash needs were so acute, it required more money than it was

permitted to borrow under IBM Credit's formula.  Thus, as explained below, it resorted to a

variety of practices to inflate its accounts receivables and sales figures so that it could obtain

more cash than in reality it was entitled to under the Credit Facility.  As explained below, none

of these practices was ever disclosed in Datatec's SEC filings, nor was the fact that the Company

was much more leveraged than the public had been led to believe.

### iii.    The True Extent of Datatec's Debt Was Never Disclosed

108.    According to CW, Datatec utilized "advance invoicing" and "advance

purchasing" schemes to inflate the accounts receivable balances reported to IBM Credit and,

consequently, to obtain more money than it was properly permitted to borrow under the Credit

Facility.

109.    According to CW, documentation required by IBM Credit concerning Datatec's

accounts receivable—the basis for its lending—took the form of an internal accounts receivable

ledger reflecting invoices sent by Datatec to its clients.

110.    CW related that invoices posted to this internal accounts receivable ledger

included invoices that were not valid receivables either because, at best, they were premature

because they reflected work not yet performed (although ostensibly could later be performed) or,

at worst, they reflected work that might never be performed.  Some clients, like Lowe's, had

agreed to accept these, with the understanding that they would pay these invoices in advance and therefore have a credit with Datatec for work that would, in fact, later be performed.  Other clients disregarded them, as they had no obligation to pay for work not yet performed.

111.    Beginning no later than in spring 2003, in CW's presence, Gaon repeatedly instructed Datatec personnel, including Koch, to issue invoices to clients prior to actual work being performed for the sole purpose of increasing the accounts receivable numbers being submitted to IBM Credit.  Similarly, Gaon repeatedly instructed Datatec personnel, including Koch, to make purchases of materials well in advance of, or in addition to, those actually required for completion of Datatec's work on projects.  With respect to the materials purchases, Gaon specifically stated in July 2003 to Koch, in CW's presence, that he intended through such purchases to "make revenues."

112.    Similarly, in CW's presence, beginning no later than spring 2003, defendant Koch repeatedly instructed Datatec personnel to issue invoices to clients prior to actual work being performed, and to order materials well in advance of any anticipated usage.

113.    Because IBM Credit was lending Datatec money based on artificially inflated accounts receivables information, it had lent Datatec more than the 85% of its actual receivables.  Datatec, therefore, was far more debt-laden than it disclosed in its SEC filings.

114.    For advance invoices for work not yet performed, during the subsequent process of reconciliation of the financial statements, Datatec disregarded the unpaid "advance invoice" accounts receivable—that is, inclusion in the general ledger of advance-invoice receivables did not result in recognition of income that had not in fact been earned.  Instead, these receivables were generated and maintained to show IBM Credit as high a balance as was possible.  The

advance-invoicing scheme was used to obtain money to which Datatec was not entitled under the Credit Facility.

115.     As set forth next, however, for advance purchases of materials, particularly regarding such purchases designated for use on the Lowe's account, the inclusion of these receivables both enabled Datatec to borrow money in excess of the specified IBM Credit formula, and also to improperly recognize revenue.

    *iv.*    ***Datatec Improperly Recognized Revenue for Materials Purchases for Lowe's***

116.     One of Datatec's significant clients was Lowe's Companies, Inc.

117.     Datatec and Lowe's had an existing working relationship and a verbal commitment to continue that relationship.  However, the actual contracts, or official approvals of Datatec's proposals for Lowe's work, were awarded only on a quarterly basis.  That is, Lowe's had no official agreement to hire Datatec for longer than a three-month or quarter period at any point in time.  This fact is crucial in understanding the impropriety of the accounting treatment Defendants used with respect to materials purchases in connection with that work.

118.     Another significant fact underlying the accounting treatment is that the materials Datatec needed to perform its work for Lowe's were readily obtainable from suppliers. According to CW, Datatec's material suppliers for Lowe's work could provide materials on as little as a few days' notice to no more than 30 days' notice.  That is, there was no legitimate need to purchase more often than a month in advance, generally speaking.

119.     In addition, Datatec had no favorable buying power such as bulk discount arrangements for these materials; to the contrary—Lowe's possessed these discounts and easily could have more economically purchased these materials itself.  However, CW came to understand that because Datatec's prices for services were so much lower than other competitors,

Lowe's actually agreed to have Datatec take advantage of its bulk discounts and to pay Datatec 10% on top of the materials cost.

120.    Importantly, however, this arrangement had its genesis in Datatec's role as a service provider to Lowe's.  Datatec was not an independent materials "broker" who had nothing more to do than pick up the telephone, order materials, arrange for delivery and earn a fee before turning to its next client.  Instead, it and Lowe's understood that it would use the materials it purchased on the work it could expect to do for Lowe's; indeed, Datatec often stored or stockpiled these materials itself.  The 10% "fee" can be, and should have been, considered and treated as additional profit above that it would attempt to earn on its service contracts.

121.    Nonetheless, despite the facts that Datatec was not a materials broker for Lowe's, that Datatec had no bulk discounts of its own and that Datatec never had a contract to perform work for Lowe's longer than three months' in duration, Datatec repeatedly purchased and stockpiled far more materials than it required for its contracted-for work for Lowe's.   By the summer of 2003, Datatec had purchased at least *one and a half  years'* worth of materials for Lowe's but possessed a contract for only for a few months' work.  According to CW, there was no legitimate business purpose for these purchases.  The driving purpose for these purchases was to inflate its reported gross margins, revenues and profits (and to help obtain more money from IBM Credit).

122.    CW explained that the process worked as follows:  At the time a materials supplier accepted Datatec's order, Datatec would recognize 10% of the order total (which it attributed to the "administrative fee") as revenue.  Thus, on the acceptance of a $100,000 order, Datatec would book $10,000 as revenue.  Under GAAP, because it was not a broker, Datatec could properly recognize revenue only to the extent that it used those materials on an actual

Lowe's job and was paid by Lowe's for that work. Thus, absent performing work on a Lowe's store and using those materials, Datatec had not earned any revenue associated with those materials at the time of the order. Accordingly, at all times prior to actually using materials on Lowe's jobs, the recognition of any revenue on Lowe's materials purchases was improper and Datatec's revenues were overstated.

123. In the 2002 and 2003 fiscal years (while the precise amount of revenue overstatement attributable to this specific scheme is information in Defendants' exclusive possession), CW recalls that in 2003 Datatec's practice was to purchase, at Gaon and Koch's direction, approximately $1 million worth of materials each month—for a total of approximately $12 million per year. CW believes that at any given time the approximate unnecessary percentage of those purchases may have averaged around 25%, although factors such as seasonality may have caused that percentage to fluctuate.

124. In no later than July 2003, Gaon and Koch, in CW's presence, agreed to purchase materials in advance of their need on Lowe's projects expressly to "make revenues"; the practice had been underway well before then. Very often these purchases were ordered at the end of the month or quarter, at the time the Company's lower-than-desired results were starting to come in.

125. The manipulation of the Company's financial statements did not stop with this practice however; it occurred at the most fundamental level of revenue recognition for the Company's long-term contracts.

>    **v.    *Fraudulent Inflation of Revenue and Net Income and Understatement of Expenses and Losses***

126. In its SEC filings, Datatec stated that it recognized revenue under its long-term fixed revenue contracts—the vast majority of its operations—"utilizing the percentage of completion method of accounting by measuring a contract's percentage of completion as

determined by the percentage of total costs incurred to date to total estimated costs." (July 31, 2002 10-Q). Under proper application of that policy, for example, if a $5 million job originally was projected to have $3.75 million in costs (for an approximate 25% gross profit margin), and if at the end of a quarter $1.875 million in costs (50% of projected costs) had actually been incurred to date, Datatec could properly record $2.5 million in revenue (50% of the total value of the contract) for that job during that period.

127.    The potential for false reporting lies in two related areas. *First*, if Datatec underestimated costs at the outset of a contract, by definition it could not achieve the profit margin it projected on a fixed-price contract; such margin would have to be reduced. *Second,* but relatedly, if Datatec did not pass along its unbudgeted costs to its client by seeking additional, extra-contractual, payments, then it was assured to suffer from lower-than-expected profit margins throughout the life of the project or, even worse, an actual loss. According to CW, both of these failures occurred most dramatically with the Home Depot project, but had historically occurred for years at Datatec.

128.    Datatec estimated its gross profit margins and percentage of completion figures on each of its jobs at the end of each fiscal quarter and consolidated them into its reported financial statements for the purpose of calculating and recording revenues, expenses and income/losses. Koch was the person responsible for providing these figures to Datatec's finance department, who in turn after analysis provided them to Deloitte, for inclusion in the Company's financial statements to be filed with the SEC.

129.    In estimating the gross profit margins on the Home Depot contract, for example, Datatec and Deloitte repeatedly failed to reflect the fact that the substantial cost overruns incurred by Datatec were not going to be made up for by a matching increase in revenue on the

contract.  That is, if Datatec had invoiced IBM Global for these unbudgeted costs—and CW reports that although requested to do so several times in the spring and summer of 2003 Koch willfully failed to do so—IBM Global had no contractual obligation to pay Datatec any amount greater than $30 million.  Datatec should not have continued to use a profit margin that failed to reflect these facts.

130.    Thus, if the example above had been Home Depot after site re-visits had begun on a regular basis, the incurring of $1.875 million in costs for that quarter did make the job 50% complete, which would entitle Datatec to properly recognize $2.5 million in revenue that quarter and maintain a 25% profit margin.  Rather, because Datatec was incurring higher-than-expected costs and doing so much earlier in the life of the project than it estimated, and because IBM Global had no obligation to reimburse Datatec for those costs, it would have been improper to designate a job as being 50% complete, to therefore maintain a gross margin of 25% at that quarter-end and to recognize $2.5 million in revenue.  Yet that is exactly what happened again and again and again at Datatec.

131.    As explained below, this improper revenue recognition practice—which violated GAAP and the Company's stated policies—resulted in the historical fraudulently overstatement of gross profit margins, net income and understatement of expenses and losses of, according to one estimate following close examination, approximately $20 million over the fiscal years 2001, 2002 and 2003.

**D.**    **The True Picture At Datatec Begins To Emerge**

132.    In or about November 2003, Datatec finally completed its work (and re-work) on the Home Depot project.

133.   As Defendants all knew, upon the completion of that project, IBM Global would no longer be interceding for Datatec with IBM Credit and it would lose the only leverage it then had with IBM Credit.

134.   At the same time, because all the cost information for Home Depot was input and all the unbilled costs had not been—and now officially would not be—reimbursed by IBM Global—Datatec and Deloitte were forced to reveal that not only had the Company failed to achieve a 25% profit margin, but it actually had suffered a loss of almost 10%.

135.   As a result, on December 5, 2003, Datatec retracted its previously-announced earnings estimates for Fiscal Year 2004 and instead stated that it expected a net loss for the second quarter of Fiscal Year 2004 and an overall loss for all of Fiscal Year 2004.  (Form 8-K filed Dec. 5, 2003).

136.   On that same date, Datatec also unexpectedly announced that Gaon had stepped down as Chairman and CEO, and that Berenblut, Gaon's personal friend, had resigned from the Board.  (*Id.*).

137.   Datatec also announced that Raul Pupo would succeed Gaon as Chief Executive Officer.  Datatec disclosed that it was "finalizing the terms of [Pupo's] employment" (*id.*), thus implying that the executive search to replace Gaon had begun earlier.  In fact, according to CW, in or about September 2003, at Grossman's request, Pupo had begun doing a "business review" of Datatec's operations at Grossman's request.  At that time Gaon informed CW about the review, about Grossman's request for it and that Pupo was a potential investor in the Company.

138.   Datatec's stock priced dropped 34%, from $1.16 on December 4, 2003, to close at $0.77 on December 5, 2003.

139.    The news from there, however, only worsened.  On December 17, 2003, Datatec announced that it expected the loss for the fiscal quarter ended on October 31, 2003 to be approximately $10 million, and that it expected to take a restructuring charge of $4.5 million in the following fiscal year.

140.    Datatec also announced that it would delay the filing with the SEC of its quarterly report on Form 10-Q and that it had hired outside counsel to conduct an independent audit of the valuation of its long-term contracts.  As a result of the delay in filing its 10-Q, the registration statement that had been declared effective October 31, 2003, registering the stock underlying Palladin Investors' Notes was rendered ineffective.

141.    Datatec also disclosed on December 17, 2003 that IBM Credit had refused to provide another written waiver of default for Datatec's non-compliance with certain financial covenants of the Credit Facility for the quarter ended October 31, 2003.  (December 17, 2003 Form 8-K).

142.    Datatec's stock price dropped another 15% on the news from $0.68 in the prior day's trading to close at $0.58 on December 17, 2003.

143.    On December 23, 2003, Datatec announced that NASDAQ would delist its stock as of December 31, 2003 because Datatec had failed to file its quarterly report on Form 10-Q for the period ended on October 31, 2003.  NASDAQ delisted Datatec's stock as announced.

144.    As announced, in or about December 2003, the Audit Committee retained Arthur Aufses of the law firm Kramer Levin Naftalis & Frankel LLP ("Kramer Levin") to conduct an independent investigation into Datatec's revenue recognition procedures.  Mark Davis, the Deloitte audit-team partner, told CW that in Mr. Aufses' subsequent January 2004 oral report to

the Audit Committee, Kramer Levin opined that Datatec's process for calculating the basis for its revenue recognition, among other things, lacked certain internal controls.

145.    In or about April 2004, having never completed its review of Datatec's financial statements for the quarter ended October 31, 2003, Deloitte resigned as Datatec's auditors.

146.    Following this resignation, Datatec's Audit Committee retained Eisner LLP ("Eisner") as Datatec's independent auditor.

147.    Eisner was asked to review the Company's last three years' financials.  A team from Eisner, led by partner Robert Levine, worked at Datatec for two months to do so.

148.    Eisner reviewed the revenue recognition on Datatec's contracts for the periods ended October 31, 2003 and January 31, 2004.  (Form 8-K filed March 17, 2000).  Eisner prepared a report summarizing its conclusions in or about August 2004 ("Eisner Report").  In August 2004, the conclusions set forth herein were read over the telephone to various representatives from Datatec and Deloitte, including CW.

149.    According to CW, the Eisner report concluded that Datatec had improperly recognized revenue over the past three years and engaged in improper accounting manipulations, in the manner alleged below.  The resulting understatement of expenses and losses amounted to approximately $10 million for the three fiscal years ending April 31, 2003, up to and including the quarters ending October 31, 2003.  In addition, the Eisner report concluded that revenues for those three years had been overstated by approximately $10 million, for total cumulative misstatements of $20 million.

150.    According to CW, the Eisner report was very critical of Deloitte, and concluded that Deloitte improperly relied on defendant Koch's "percentage of completion" and "gross

profit margin" estimates and ignored various "red flags," which put Deloitte on notice that such estimates could not be relied upon.

151.    According to CW, the Eisner report also concluded that Deloitte approved and "signed off" on the gross misrepresentation of Datatec's contracts, net income and revenues without proper investigation.

152.    On August 12, 2004, Datatec announced that investors could not rely on *any* of Datatec's financial statements or SEC filings dating back to fiscal year 2001.  This announcement flew in the face of Datatec's specific representations to the Palladin Investors that Datatec's SEC filings during the three years prior to the Agreement, *i.e.*, documents filed with the SEC beginning July 3, 2000, "did not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary in order to make the statements therein . . . not misleading, " and that "financial statements of the Company included in the SEC Documents . . . fairly present in all material respects the financial position of the Company." (Note Purchase Agreement ¶ 4.5).

153.    In its press release, Datatec stated that:

In connection with completing the financial statements contained in these SEC filings, the Company has continued to review its accounting for recognizing revenue of its customer contracts.  As a result of this continuing review, the Company believes that the cumulative amounts of revenue previously recognized on certain contracts have been overstated by between approximately $11 million and $18 million.  Therefore, certain prior periods should instead reflect either a loss instead of a profit, or, a larger loss than what was previously reported, however the specific periods to be adjusted and the related amounts have not yet been determined.  Accordingly, based upon the current state of our continuing review, financial statements previously filed with the SEC and related financial data previously reported by the Company should not be relied upon by investors for the quarter ended July 31, 2003, the fiscal years ended April 30, 2003, 2002 and 2001 and for the fiscal quarters included therein.

The Company also previously announced that it expected the loss for the fiscal quarter ended October 31, 2003 to be substantially greater than $10 million.  As a result of the

Company's continuing review, the Company now believes that a significant portion of that loss should be reflected in prior periods.  (Form 8-K filed August 12, 2004).

154.    The closing price of Datatec's common stock on August 26, 2004 plummeted to $0.35—which was an approximate seventy percent decline from its $1.16 share price on December 4, 2003.

155.    On October 20, 2004, Datatec retained Traxi LLC ("Traxi") to review the Company's business and prepare financial information about Datatec for prospective buyers. On November 17, 2004, Traxi made a confidential presentation to IBM Credit and the Plaintiffs, which contained an "Adjusted Statement of Operations" covering Datatec's operations from 2001 through 2004, based on information in the Eisner Report.

156.    In the "Adjusted Statement of Operations," Datatec's revenue for 2004 was reduced by approximately $10 million to write off unbilled revenue at April 30, 2004, and Datatec's revenue for 2003 was reduced by approximately $15 million (to $109.8 million) "to reflect adjustments recorded in FY 2004 which are believed to relate to FY 2003."  Traxi's "Adjusted Statement of Operations" thus confirms that Datatec's revenues were materially overstated at the time of the Palladin investments.

157.    On December 14, 2004, Datatec filed voluntary petitions for bankruptcy under Chapter 11 of the Bankruptcy Code in the District of Delaware.  (Form 8-K filed December 15, 2004).

**E.    <u>Defendants' Specific Material Misrepresentations and Omissions</u>**

158.    As set forth above, in Datatec's SEC filings Defendants made false and misleading statements, or omissions of material facts necessary to make Defendants' statements not false and misleading when made.  Defendants' misstatements and omissions failed to disclose material adverse information and misrepresented the truth about Datatec and its

accounting, reporting, and financial condition, in violation of the federal securities laws and GAAP.

i.     *Datatec Was Overleveraged On The IBM Credit Facility*

159.    In Datatec's 10-Ks for the Fiscal Years 2002 and 2003, as well as in each 10-Q for the first, second and third quarters of 2003, Datatec represented that "[t]he borrowings under the [IBM Credit] revolving line of credit are based on a formula of 85% of eligible receivables and 25-35% of eligible inventory." (*E.g.,* April 30, 2002 10-K).  This formula remained the same and was consistently described in the same manner in each of these SEC filings.

160.    As alleged above, these representations were materially false and misleading because Datatec failed to disclose that the amounts IBM Credit lent the Company were well above the permitted formula limitations because, among other things, the information provided to IBM Credit included invoices for work not yet performed and materials or products not yet provided to clients and, thus, included improperly classified or invalid receivables.

161.    The representations were further materially misleading because they failed to disclose that Datatec's borrowings were much greater than the value of its accounts receivables and inventory balances.  Datatec's debt to receivables or assets ratio was therefore far greater than represented in its SEC filings, and the Company was therefore much more financially vulnerable than it represented.  For example, at the end of the quarter ended April 30, 2003, the Company in fact had borrowed over $25 million but recorded receivables of only $18 million: $25 million being well over 85% of those receivables.

162.    Similarly, Datatec's statements that "IBM Credit Corporation has granted the Company additional [borrowings] as the Company's accounts receivable and inventory have increased" (July 31, 2002 10-Q; October 30, 2002 10-Q) were also materially false and

misleading because Datatec failed to disclose that the "increased receivables" were based, for

example, on the Lowe's material purchases and Datatec's advance-invoicing scheme—which

were not valid receivables at all prior to work being performed—and the resulting artificially

inflated internal receivables balances. These statements and omissions were material because

they hid the true nature and extent of Datatec's liquidity, viability, prospects and debt burden.

> ii.     *IBM Global's Influence On The Operation Of The IBM Credit Facility Was a Material Omission*

163.    Datatec's SEC filings represented that IBM Credit repeatedly advanced funds

beyond the initial $16 million agreed to and that the Company had received written waivers of

compliance with one or more of the financial covenants of its credit facility. (*E.g.*, April 30,

2002 10-K; October 31, 2002 10-Q; July 31, 2002 10-Q; April 30, 2003 10-K). These statements

were materially false and misleading because they omitted the material fact that IBM Credit

provided these additional funds and waivers to the Company solely because of its role as a

subcontractor to the IBM Global on the Home Depot project and because IBM Global needed

that project to be finished by Datatec. They were also false and misleading because they failed

to disclose that Datatec's ability to perform its obligations to IBM Global—its largest and most

significant client—depended entirely on IBM Credit's willingness to fund its operations.

164.    Similarly, the MD&A in the 2003 Form 10-K stated that "The Company and IBM

Credit entered into an Acknowledgement, Waiver and Amendment to the Inventory and Working

Capital Financing Agreement as of the end of each quarter since January 31, 2001 by which IBM

Credit has waived the Company's defaults." A chart followed, purporting to summarize

Datatec's defaults in its financial covenants with IBM Credit during each fiscal quarter,

beginning in the fiscal quarter ended as of January 31, 2001, which IBM Credit had waived:

| Period | Covenant | Requirement | Actual |
|--------|----------|-------------|--------|
| April 30, 2002 | Net Profit Revenue | Equal to or greater than 0.1% | (10.7%) |
| | Debt Service Ratio | Equal to or greater than 2.0 to 1.0 | (2.5) to 1.0 |
| July 31, 2002 | Annual Revenue to working capital | Greater than 5.0 to 1.0 and equal to or less than 25.0 to 1.0 | (24.7) to 1.0 |
| | Tangible Net Work | Equal to or greater than $2.5 million | $2.1 million |
| October 31, 2002 | Annual Revenue to working capital | Greater than 5.0 to 1.0 and equal to or less than 25.0 to 1.0 | (86.0) to 1.0 |
| Jan. 31, 2003 | Annual revenue to working capital | Greater than 5.0 to 1.0 and equal to or less than 25.0 to 1.0 | (126.9) to 1 |
| Jan. 31, 2003 | Debt service ratio | Equal to or greater than 2.0 to 1.0 | 0.2 to 1 |
| Apr. 30, 2003 | Debt service ratio | Equal to or greater than 1.25 to 1.0 | (1.73) to 1 |
| Apr. 30, 2003 | Net profit to revenue | Equal to or greater than 0.10 percent | (3.38%) |

165.   The foregoing statements in the introduction and the chart were materially false and misleading when made because (a) the default ratios concerning revenues were

more severe than stated because Datatec had improperly inflated revenues (as previously alleged), and (b) the waiver information failed to disclose Datatec's inclusion of valid receivables to IBM.

166.    Moreover, Datatec failed to disclose that no later than early 2003 that IBM Credit considered the Credit Facility a non-performing loan that was being administered by IBM Credit's version of a "troubled loan division."  This was a material omission because, had it been disclosed, it would have contradicted Datatec's representations to the Palladin Investors that, among other things, it was in "good standing" with IBM Credit.

167.    These omissions also were material because they prevented the Palladin Investors from accurately assessing the Company's viability and capability of repaying their Notes, as they hid the true nature of the Company's liquidity, viability, prospects and debt burden.

### iii.    Datatec's SEC filings Contained Material and False Statements Concerning Revenue Recognition

168.    The 2003 10-K's MD&A disclosures contained the following statements regarding the Company's critical revenue recognition policies:

> Services from deployment activities are performed primarily under long-term contracts, but may be performed under short-term work orders or time and material arrangements.  The Company's typical long-term contract contains multiple elements designed to track the various services required under the arrangement with the customer.  These elements are used to identify components of progress billings, but are combined for revenue recognition purposes.  **The Company recognizes revenue earned under long-term contracts utilizing the percentage of completion method of accounting by measuring a contract's percentage of completion as determined by the percentage of total costs incurred to date to total estimated costs.**
>
> **Contracts are reviewed at least quarterly and if necessary, revenue, costs and gross margin are adjusted prospectively for revisions in estimated total contract value and total estimated contract costs.  Estimated losses are recognized when identified.**

Payment milestones differ according to the customer and the type of work performed. ***Generally, the Company invoices customers and payments are received throughout the deployment process and, in certain cases, in advance of work performed if a substantial amount of up front costs are required. In certain cases payments are received from customers after the completion of site installation. However, revenue and costs are only recognized on long-term contracts to the extent of the contracts' percentage of completion.*** [Emphasis added]

169.    Datatec's 2002 10-K contained identical language except for the following, which

reflects the method of accounting for long-term contracts prior to a change in 2003 ,which

required a restatement of 2002 revenues:

The Company recognizes revenue earned under long-term contracts utilizing the percentage of completion method of accounting by measuring direct labor costs incurred to total estimated labor costs. Under the percentage of completion method of accounting, revenue, costs and gross margin are recognized as work is performed based on the relationship between direct labor incurred and total estimated labor.

170.    Datatec's 10-Qs for the first, second and third quarters of fiscal year 2003 also

contained the following similar language:

The Company recognizes revenue earned under long-term contracts utilizing the percentage of completion method of accounting by measuring a contract's percentage of completion as determined by the percentage of total costs incurred to date to total estimated costs. Contracts are reviewed at least quarterly for percentage of completion analysis, and if necessary, revenue, costs and gross margin are adjusted prospectively for revision in estimated total contract value and total estimate contract costs. Estimated losses are recognized when identified. (*See, e.g.*, January 31, 2003 10-Q).

171.    The statement that "revenue and costs are only recognized on long-term contracts

to the extent of the contracts' percentage of completion" was materially false and misleading

because (i) it failed to disclose that Datatec (through, among others, Koch) and Deloitte were

causing Datatec to employ unreasonably overstated gross profit margins to significantly

understate operating costs and artificially inflate revenues, gross profits, and net income on long-

term contracts, (ii) failed to disclose that revenues and percentages of completion were materially and artificially inflated by employing the practice of purchasing excess materials and improperly recognizing revenues, gross profits, and net income on such purchases, and (iii) failed to disclose that Datatec's finances were so dire that the Company was meeting its semi-monthly payroll and its bills from Datatec's vendors by inflating the accounts receivable ledger it gave to IBM Credit by reflecting invoices for work and products that was not yet performed or delivered, which were not valid receivables.

172.    The statement that "Contracts are reviewed at least quarterly and if necessary, revenue, costs and gross margin are adjusted prospectively for revision in estimated total contract value and total estimate contract costs" is materially false and misleading because neither Datatec (through, among others, Koch) nor Deloitte timely adjusted the gross margin and revenue to reflect the required revision in estimated total contract value and total estimate contract costs when the need for such revisions was apparent.

173.    The statement that "Estimated losses are recognized when identified" is materially false and misleading because neither Datatec (through, among others, Koch) nor Deloitte adequately recognized losses when they were identified, particularly on the Home Depot contract (in which case such losses were capable of identification almost immediately, but certainly no later than January 2003 when site re-visits and the cost overruns became commonplace). Instead, when costs were running much higher than expected, CW reported that Deloitte and Datatec merely negotiated the gross profit margins on contracts downward only slightly, thus avoiding recognizing a loss when it should have been properly identified.

174.    The statement that "Generally, the Company invoices customers and payments are received throughout the deployment process and, in certain cases, in advance of work

performed if a substantial amount of up front costs is required"is materially misleading because it failed to disclose that Datatec and Gaon caused invoicing prior to the performance of work to occur solely to falsely inflate the accounts receivable ledger that was provided to IBM Credit, regardless of the amount of up-front costs required.

> ### iv.     *Datatec's SEC filings Falsely Reflected Its True Financial Condition*

175.     On June 26, 2003, Datatec issued a press release announcing the financial results of its fourth quarter of fiscal 2003 and revenue earnings guidance for fiscal year 2004.  The press release stated that for fiscal 2003, the Company would report $125.1 million in revenues and $1.4 in income, or $0.04 per share.

> With respect to fiscal 2004, Datatec stated:

> For fiscal 2004, Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 to $125 million and earnings per share will be between $0.14 and $0.16.  The Company expects to be profitable in all four quarters . . . .

176.     Further, Gaon stated that the "Company expects to achieve improvements to gross margins, profitability and cash flows by taking a more selective approach to project opportunities, adjusting its sales mix and continuing to focus on expense control."  (*Id.*).  Gaon stated that the Company would achieve this improved result because of Datatec's recent acquisition of Millenium Care, combined with Datatec's Asset Guardian software-enabled services.

177.     The statements setting forth Datatec's financial results for its fourth quarter of fiscal 2003 were materially false and misleading because they (i) failed to disclose that Datatec (through, among others, Koch) and Deloitte were causing Datatec to employ unreasonably overstated gross profit margins to significantly understate operating costs and artificially inflate revenues, gross profits, and net income on long-term contracts, (ii) failed to disclose that

revenues and percentages of completion were materially and artificially inflated by employing

the practice of purchasing excess materials and improperly recognizing revenues, gross profits,

and net income on such purchases, and (iii) failed to disclose that Datatec's finances were so dire

that the Company was meeting its semi-monthly payroll and its bills from Datatec's vendors by

inflating the accounts receivable ledger it gave to IBM Credit by reflecting invoices for work that

was not yet performed and products that were not yet delivered, which were not valid

receivables.

178.    The statements setting forth Datatec's positive revenue and earnings guidance for

Fiscal Year 2004 lacked any reasonable basis and were materially false and misleading because

they (i) failed to disclose that Datatec (through, among others, Koch) and Deloitte were causing

Datatec to employ unreasonably overstated gross profit margins to significantly understate

operating costs and artificially inflate revenues, gross profits, and net income on long-term

contracts, (ii) failed to disclose that revenues and percentages of completion were materially and

artificially inflated by employing the practice of purchasing excess materials and improperly

recognizing revenues, gross profits, and net income on such purchases, and (iii) failed to disclose

that Datatec's finances were so dire that the Company was meeting its semi-monthly payroll and

its bills from Datatec's vendors by inflating the accounts receivable ledger it gave to IBM Credit

by reflecting invoices for work that was not yet performed and products that were not yet

delivered, which were not valid receivables.

179.    Similarly in the 10-Q for the third quarter of 2003, Datatec stated: "As a result of

the increase in demand for the Company's services and the cost reduction measures initiated over

the past two years, the Company achieved profitability during the fourth quarter of fiscal 2002

and during each of the first three quarters of fiscal 2003." (January 31, 2003 10-Q; October 31, 2002 10-Q).

180.    This statement was materially false and misleading because it (i) failed to disclose that Datatec (through, among others, Koch) and Deloitte were causing Datatec to employ unreasonably overstated gross profit margins to significantly understate operating costs and artificially inflate revenues, gross profits, and net income on long-term contracts, (ii) failed to disclose that revenues and percentages of completion were materially and artificially inflated by employing the practice of purchasing excess materials and improperly recognizing revenues, gross profits, and net income on such purchases, and (iii) failed to disclose that Datatec's finances were so dire that the Company was meeting its semi-monthly payroll and its bills from Datatec's vendors by inflating the accounts receivable ledger it gave to IBM Credit by reflecting invoices for work that was not yet performed and products that were not yet delivered, which were not valid receivables.

181.    Datatec's Form 10-K for Fiscal Year 2002 reported (i) assets equaling $34,619,000 and (ii) revenue of $70,277,000.

182.    Datatec's Form 10-Q for the 2003 first quarter reported (i) gross profit for the three months ended July 31, 2002 of $6,526,000; (ii) assets equaling $39,025,000; (iii) revenue for the three months ended July 31, 2002 of $23,072,000; and (iv) net income for the three months ended July 31, 2002 of $732,000.

183.    Datatec's Form 10-Q for the 2003 second quarter reported (i) gross profit for the three months ended October 31, 2002 of $7,758,000; (ii) assets of $55,682,000; and (iii) revenue for the three months ended October 31, 2002 of $33,203,000; and (iv) net income for the three months ended October 31, 2002 of $1,617,000.

184.    Datatec's Form 10-Q for the 2003 third quarter reported (i) gross profit for the three months ended January 31, 2003 of $7,009,000; (ii) assets equaling $61,287,000; and (iii) revenue for the three months ended January 31, 2003 of $35,275,000; and (iv) net income for the three months ended January 31, 2003 of $201,000.

185.    Datatec's Form 10-K for Fiscal Year 2003 reported (i) total assets of $64,727,000 (ii) revenue of $125,091,000; and (iii) net income of $1,417,000.

186.    All of the statements of financial condition in the preceeding five paragraphs were materially false and misleading because they (i) failed to disclose that Datatec (through, among others, Koch) and Deloitte were causing Datatec to employ unreasonably overstated gross profit margins to significantly understate operating costs and artificially inflate revenues, gross profits, and net income on long-term contracts, (ii) failed to disclose that revenues and percentages of completion were materially and artificially inflated by employing the practice of purchasing excess materials and improperly recognizing revenues, gross profits, and net income on such purchases, and (iii) failed to disclose that Datatec's finances were so dire that the Company was meeting its semi-monthly payroll and its bills from Datatec's vendors by inflating the accounts receivable ledger it gave to IBM Credit by reflecting invoices for work that was not yet performed and products that were not yet delivered, which were not valid receivables.

### vi.    Compliance With GAAP And GAAS

187.    In its Independent Auditors' Report for the 2002 10-K, Deloitte stated that it complied with GAAS in conducting its audit and that Datatec's financials complied with GAAP:

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America.  Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements.  An audit also includes assessing the accounting

principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation.  We believe that our audits provide a reasonable basis for our opinion.

In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of April 30, 2002 and 2001, the results of its operations and its cash flows for each of the three years in the period ended April 30, 2002, in conformity with accounting principles generally accepted in the United States of America.  (April 30, 2002 10-K).

188.    Deloitte's Independent Auditors' Report for the 2003 10-K made the same representation about 2003 and all relevant time periods.

189.    Each of the foregoing financial statements filed with the SEC did not conform with GAAP and were therefore presumptively materially false and misleading. Allegations concerning the specific manners in which Defendants violated GAAP (and, in Deloitte's case, GAAS) are set forth in Sections H and I, below.

## F.    **Additional Allegations Concerning Defendants' Role In The Fraud**

190.    As a result of all the allegations herein, the Executive and Director Defendants are liable as direct participants with respect to the wrongful acts alleged herein.  In particular, these Defendants had direct and supervisory knowledge of the wrongful acts alleged herein, and of the day-to-day operations of the Company and, therefore, had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

### i.    *Executive Defendants*

#### (a) *Gaon*

191.    Gaon participated in the preparation of, reviewed, caused to be issued, signed, and failed to correct numerous Datatec submissions filed with the Securities and Exchange Commission ("SEC") and Datatec public statements.

49

192.    According to CW, it was Datatec's policy no later than 2003 to distribute draft SEC filings and public statements such as press releases to each of the Defendants, including Gaon, several days before their deadline for filing.  These filings would be distributed by email at CW's direction for approval by Gaon, Koch and the members of the Board of Directors.

193.    For example, CW provided Gaon via email with the draft January 31, 2003 10-Q, the draft April 30, 2003 10-Q, the draft 2003 10-K, the June 26, 2003 press release and accompanying 8-K, in advance of the dates on which they were required to be filed.

194.    In addition, after having reviewed the then-current draft, defendant Gaon drafted language to be included in Datatec's 2003 10-K and provided it to Datatec's General Counsel, and such language was included in the filing, according to CW.

195.    Moreover, having reviewed these filings, and following the Board meetings, in his role as Chief Executive Officer Gaon specifically gave the approval to the CFO to cause the January 31, 2003 10-Q, the draft April 30, 2003 10-Q, the draft 2003 10-K, and the June 26, 2003 press release and accompanying 8-K and to be electronically filed with the SEC through Edgar.

196.    Defendant Gaon signed the following SEC filings:  the April 30, 2002 10-K, the certification accompanying the July 31, 2002 10-Q, the certification accompanying the October 31, 2002 10-Q, the certification accompanying the January 31, 2003 10-Q, the April 1, 2003 Form 14-A, the April 30, 2003 10-K, the May 2, 2003 8-K, and the June 26, 2003 8-K.

197.    Defendant Gaon also was required signed the Note Purchase Agreement and accompanying CEO Certification on or about July 3, 2003.

198.    At no time did Gaon correct representations made in Datatec's SEC filings or in the Note Purchase Agreement to the Palladin Investors.

199.    By virtue of his position as Chairman of the Board of Directors, Chief Executive

Officer and his former position as Chief Financial Officer of Datatec, as well as his tenure at the

Company, Gaon was personally familiar and aware of the nature and execution of Datatec's

operations, its financial and capital needs and operations, its financial performance, the manner

in which Datatec's financial statements were prepared and maintained, its growth and

development and its solicitation of and receipt of investment and lending funds.

200.    For example, according to CW, at all of the Board meetings that CW attended in

2003, Gaon held himself out to the Board of Directors, among others, as responsible for

developing and maintaining the Company's relationship with IBM Credit.  Also at every Board

meeting that CW attended, Gaon admitted to the Board that he had succeeded in causing IBM

Credit to lend the Company more money by threatening to "close its doors" and defaulting on

IBM Global's Home Depot project.  Gaon stated that IBM Credit "would be crazy" to stop

lending due to the needs of IBM Global in having Datatec finish the Home Depot work.

201.    As a result of his discussions with Datatec personnel and IBM Credit during the

meetings in 2003 as described above, Gaon knew that IBM Credit's decisions regarding

additional loans to Datatec were contingent on the operational needs of its sister company, IBM

Global, on the Home Depot project.

202.    Because of his role in convincing IBM Credit to continue lending the Company

money, as described above, Gaon knew that once the Home Depot job was concluded, Datatec

would have no leverage with IBM Credit and that IBM Credit's historical practice of waiving

Datatec's defaults likely would cease.

203.    Gaon was present during a June or July 2003 meeting of the Board of Directors

discussing the April 30, 2003 quarterly results (in or about June or July 2003) in which CW

stated that the Company was indebted to IBM Credit in excess of $25 million but had receivables of only $18 million.

204.    Prior to the Palladin Investors' Investments, on numerous occasions from January 2003 on, Gaon and CW discussed, in person and by telephone, the fact that Datatec had no cash assets and that without working capital from IBM Credit it would be unable to operate.

205.    By virtue of his various positions, including as former CFO of the Company, defendant Gaon was familiar with the provision to IBM Credit of the accounts receivable ledger for the purpose of substantiating the amounts lent to Datatec under the IBM Credit Facility.

206.    In order to ameliorate Datatec's cash flow crisis, in CW's presence, Gaon repeatedly instructed others, including Koch, to issue "advance invoices" to Datatec's clients for the sole purpose of artificially inflating the accounts receivable ledger provided to IBM Credit to obtain more borrowings.

207.    The Millenium Care acquisition was structured as a stock for stock exchange, as Datatec lacked any cash to do any other type of transaction.  If Datatec's stock had not been artificially inflated in value, it would have to have increased the amount of the stock paid to Millenium Care; if Datatec had gone out of business obviously it would have been unable to complete that acquisition at all, and Datatec (and in particular Gaon) wanted to move the Company in a direction away from mere "deployment" toward more advanced technology work, which Millenium Care would make possible.

208.    In addition, Datatec was receiving funds from investors, such as Palladin, in exchange for stock.  Thus, Gaon could obtain more cash for the Company to the extent that Datatec reported greater revenue and the price of the stock increased.

209.    In CW's presence and no later than in July 2003, Gaon repeatedly instructed others, including Koch, to make advance purchases of materials designated for the Lowe's account so that the Company could "make revenues."   On more than one occasion in 2003, Gaon asked Koch to order "a million dollars" in materials, which in Gaon's view would assist the Company's reported financial condition.

210.    By virtue of his training as a chartered accountant and his various positions, including as former CFO of the Company, and according to CW, Gaon was familiar with the Company's revenue recognition policies.

211.    In CW's presence, from at least March 2003 forward, defendant Gaon repeatedly reviewed COGNOS, a software application used by Datatec to track costs on its projects on a job-by-job basis.  Datatec's MIS department maintained a log showing which individuals accessed COGNOS, including the date and time information.

212.    The COGNOS system worked as follows: When Datatec entered into a contract with a customer, the estimated projected costs for that particular contract would be entered into COGNOS.  As Datatec began to perform on a contract, invoices for amounts owed by Datatec would be input into COGNOS by Datatec's accounts payable personnel.  A user of COGNOS could then open up the file for a particular customer and see all of the costs posted for that job to date, along with a percentage of completion number that was based on the costs-to-date versus total estimated cost ratio.

213.    According to CW, Gaon, Koch and Gretchen Kittel in the Company's finance department frequently accessed COGNOS, and Deloitte had access to it as well.  Thus, at the end of each quarter in 2003, Gaon, Koch and Deloitte were able to see in an instant the substantial

and accumulated costs incurred on the Home Depot project, for example, and the percentage of completion rate based on the relationship those costs had to Koch's estimated costs.

214.     In CW's presence in 2003, Gaon examined the costs being incurred on the Company's projects, including the Home Depot project.  He knew from COGNOS, among other sources, that the costs on the Home Depot project were escalating rapidly.

215.     In addition, at the end of the January 31, 2003, April 30, 2003 and July 31, 2003 quarters, Gretchen Kittel sent Gaon copies of her written comments and questions concerning the gross margin estimates provided to her by Koch, in which she challenged the maintenance of his robust margins in light of the significant costs already incurred on the Home Depot contract.

216.     Beginning no later than July 2003, in CW's presence Gaon discussed with Koch the fact that the unanticipated costs for the Home Depot project had not yet been billed—let alone reimbursed—by IBM Global.  Thus, unless IBM Global agree to pay for those costs, the contract could not be as profitable as originally forecast.

217.     In CW's presence, despite the foregoing, Gaon nonetheless agreed with Koch to continue to maintain an unrealistically high gross profit margin in the 10-Qs and 10-Ks for the periods January, April and July 2003.

218.     In or about June 2003, Gaon told CW that, at Grossman's repeated requests, he wanted to have prepared a preliminary budget and projected earnings and revenues for fiscal 2004 for the purpose of releasing them to the public.

219.     On or about June 26, 2003, Gaon, Koch and each of the Director Defendants, during a meeting at Datatec, reviewed the draft press release and projected forecast prepared at Grossman/Gaon's request.  Datatec's CFO stated that he was not comfortable at that time that the numbers could be substantiated sufficiently, in his view, for public dissemination because he had

only been at Datatec for a few months and he was not comfortable with a full-year projection. The CFO wanted additional time to work the numbers through and said it should not be problematic since there was not heavy trading of Datatec's stock, which would have put pressure to release such information.  The Director Defendants and Gaon expressed dissatisfaction with the CFO's suggestion.  Grossman in particular responded by criticizing the fact that Datatec did not have heavy trading because it had produced no numbers and was thus off of investors' radar. Gaon informed the group that he "was comfortable" with the forecast and stated that it was in the Company's "best interest" to issue number to the public at that time instead of waiting.  Koch also stated that he was comfortable with the numbers.

220.    Gaon and the Director Defendants agreed that they did not want to take the time the CFO had requested to substantiate and verify the numbers in the press release, overrode the CFO's stated concerns, and agreed to release the numbers as drafted.  Those numbers were disclosed in the Company's June 26, 2003 press release, filed in an 8-K of the same date.

221.    By virtue of his involvement in seeking and obtaining investment and capital from IBM Credit and other investors such as the Palladin Investors, defendant Gaon knew that the prospects of obtaining additional funds would be eliminated absent Datatec creating the appearance that it had become and would continue to be profitable.  As Gaon himself told IBM Credit and IBM Global, without such additional capital, the Company would "close its doors".

### (b) *Koch*

222.    As stated above, Koch oversaw and prepared gross margin and percentage of completion estimates for Datatec's projects on a quarterly basis, which were created for the purpose of generating the financial statements included in Datatec's SEC filings.

223.    He also reviewed and commented on the Company's SEC filings, including, for example, the MD&A disclosures in the 2003 10-K.  Defendant Koch failed to correct any of those filings or statements.

224.    By virtue of his position as Chief Operating Officer, Koch directed Datatec's operations and was therefore intimately aware its profitability on various projects, including Home Depot and Lowe's, the manner in which the estimates he provided on a quarterly basis would be used to calculate Datatec's revenue and the manner in which the invoices generated to clients would be used in the information provided to IBM Credit.

225.    For example, according to CW, Datatec's field managers and all of its field operations personnel reported to Koch concerning the status of Datatec's projects, including Home Depot project and the costs incurred to date.  Koch was Datatec's contact with IBM Global.

226.    In CW's presence, Koch also repeatedly accessed the cost information for Datatec's jobs which were maintained in the Company's COGNOS database.  Koch and Gaon, in CW's presence, often discussed specific cost information appearing in COGNOS (*i.e.*, Koch and Gaon were looking at COGNOS at the same time).

227.    After reviewing this status and cost information, Koch would generate the percentage of completion and gross profit margin numbers on each of the Company's projects and provide that information to Datatec's finance department for its analysis prior to providing Koch's numbers to Deloitte for review or audit.  Koch knew that his estimates would form the basis on which Datatec would report its results in its publicly filed financial statements.

228.    CW relates that Gretchen Kittel (a senior employee in Datatec's finance department) created and maintained spreadsheets showing, on a job-by-job basis, what the costs,

percentage of completion and profit margins were for each quarter.  Koch provided to her the percentage of completion and profit margin numbers; she obtained cost information from COGNOS.  Ms. Kittel also maintained a computer database with this information.

229.    At the end of the January 31, 2003 quarter, Ms. Kittel challenged defendant Koch orally and in writing about the percentage of completion numbers he provided, questioning their accuracy given the significant costs being incurred on several projects, including Home Depot. She stated that they appeared to be too high given the accumulated costs.  She sent her written concerns to Gaon as well.  On both occasions Koch disregarded her concerns, and stood by his numbers.  He refused to lower his gross profit margins or, after some repeated pressure, lowered them only slightly.  CW was present during such conversations between Ms. Kittel and Koch.

230.    Ms. Kittel then presented her analyses of the costs, specifically these spreadsheets, and Koch's percentage of completion numbers and profit margins to Deloitte.

231.    According to CW, each quarter there was a negotiation between Datatec and Deloitte with respect to the gross margins particularly on the Home Depot job.  Deloitte asked Koch about the detail provided by Ms. Kittel (which appeared to be inconsistent with Koch's estimates), but Deloitte nonetheless accepted Koch's estimates, adjusted slightly downward. Once Deloitte signed off on the numbers, the gross profit margin numbers were incorporated into Datatec's financial statements and used to calculate Datatec's revenue and income.

232.    Thus, when the Home Depot costs began to skyrocket, no later than July 2003, in CW's presence, Koch and Gaon discussed whether the gross margins on the project could be maintained.  They agreed that they should be maintained despite the massive overruns and a failure to have received extra-contractual payments from IBM Global.

233.     Because Koch was the person responsible for submitting invoices to IBM Global, he knew that no invoices for unbilled but over-budget costs had been submitted to IBM Global. Eventually, in response to questions about whether those amounts would be paid, in the fall of 2003, Koch admitted to CW that they could not be recouped.

234.     As alleged above, Koch caused Datatec to order materials not necessary for the Company's work for Lowe's in order to "make revenues" that it was not entitled to record.

235.     As alleged above, Koch caused Datatec to issue "advance invoices" to clients for work not yet performed solely to increase the accounts receivable information provided to IBM Credit.

236.     As set forth above, Koch was present during at least two meetings with IBM Credit and IBM Global during which Gaon threatened to shut the Company down and stop work on the Home Depot project if IBM Credit did not lend more money to Datatec.

### ii.        *The Director Defendants*

237.     As described in greater detail below, each Director Defendant was knowledgeable about Datatec's operations and its financial condition and results, played a central role in Datatec's decision-making processes, reviewed and approved SEC submissions prior to their filing and decided what financial numbers would be released to the public.

238.     In 2003, if not earlier, it was the practice of Datatec's Board of Directors to meet approximately four times a year, on dates that usually coincided with the release of each of the Company's required SEC filings.  These meetings usually took place in person at Datatec's offices.

239.     In 2003, if not earlier, it was the practice of the Board's Audit Committee to meet, usually just prior to or following the full Board meeting, to review the Company's quarterly and/or year end results.

240.     Grossman and Berenblut stated that the Audit Committee:

held one meeting during Fiscal 2002.  In fulfilling its responsibilities, the Audit Committee recommended to the Board of Directors the selection of the Company's independent auditors.  The Audit Committee discussed with the independent auditors the overall scope and specific plans for the adequacy of the Company's internal controls.  During the Audit Committee meetings, the Audit Committee met with the independent auditors, without management present, to discuss the results of the audits, their evaluations of the Company's internal controls and the overall equality of the Company's financial reporting.  The Audit Committee has discussed the audited financial statements with the management of the Company.  The meetings also were designed to facilitate any private communication with the Audit Committee desired by the independent auditors . . . . Based on its review and discussions with management and the independent auditors, the Audit Committee has recommended that the audited financial statements of the Company be included in the Company's annual report on Form 10-K. (Form 14-A, dated April 1, 2003)

### (a) *Their Public Statements*

241.     As alleged above, Datatec's practice was to distribute its draft SEC and financial statements to each Board member, including each Director Defendant, for his review and comment several days in advance of the filing deadline.  For example, CW caused the following documents to be distributed by email to each Director Defendant several days before they were filed:  the January 31, 2003 10-Q (each Director Defendant except Maggard), the June 26, 2003 press release and 8-K, and the 2003 10-K.

242.     According to CW, the Board specifically approved the content of the 10-Q for the quarter ended January 31, 2003 (in a meeting held on or about March 14, 2003) and the 2003 10-K (in a meeting held on or about July 22, 2003 meeting) and the June 26, 2003 8-K (in a meeting held on or about June 26, 2003).

243.   Each Director Defendant, other than Maggard and Milch, signed Datatec's 2002 10-K.

244.   Each Director Defendant signed Datatec's 2003 10-K.

245.   At no time prior to July 28, 2003 did any Director Defendant correct any of Datatec's SEC filings.

### *(b)*   *Board's Knowledge of Datatec's Operations and Financial Performance*

246.   In the Board and Audit Committee meetings, the Director Defendants were informed about the specifics of Datatec's operational and financial results and prospects.  For example, in an Audit Committee meeting held by telephone on or about March 17, 2003, Mark Davis of Deloitte (attending by invitation), Grossman, Berenblut and CW, among others, reviewed the draft 10-Q for the January 31, 2003 quarter.  They also reviewed the Company's balance sheet and P&L statement, item by item.  The emphasis was on the extent of the accounts receivable, the collateral for the IBM Credit Facility, and the Company's borrowings under the Facility.  Specifically, the group discussed the progress on the Home Depot contract, noted that the site re-visits were continuing, and that Datatec had not been paid for  the ever-increasing costs rapidly accumulating on that contract.

247.   Audit committee members Grossman and Berenblut, if not the entire Board, were aware – because it had been disclosed publicly – that the Company's percentage of completion method required a change in 2002 to comport with its actual operations.  Thus, Datatec's revenue recognition policy had been inappropriate in 2002, and required a restatement of results in 2003.  Despite this necessity, in or about February 2003, Grossman told CW that he believed the reaudit by Deloitte to have been expensive and "unnecessary."

248.    Likewise, in a Board meeting held in person on or about April 30, 2003, attended by all Director Defendants except Maggard, and by Gaon, Koch and CW, the final, filed January 31 10-Q was distributed and the Board approved a preliminary budget for fiscal 2004.

249.    Each Director Defendant was told (in CW's presence), during Board meetings in April, June and July 2003 by the CFO that the Company had "no cash" and had exceeded its borrowing capacity.  Friedman, for one, stated that the Company had been in that situation many times before over the previous 10 years and expressed his lack of immediate concern.  The Director Defendants, therefore, were specifically informed that absent continued support from IBM Credit or other sources of capital, the Company could not operate, could not pay its debts or meet its obligations when due.

250.    In addition, following a Board meeting in the summer of 2003, CW and Maggard had a conversation during which CW explained specifically how Datatec would borrow from IBM Credit on a daily basis to cut its checks, and that it needed to show IBM Credit receivables under the formula to warrant additional funds.  CW explained that the Company would obtain cash from IBM Credit by invoicing customers, both when it performed work and when it could bill in advance of work performed.  CW showed Maggard the actual receivables balance compared against the much greater amount borrowed from IBM Credit—greater than 85% of the receivables balance.

251.    The status, results and profitability (and lack thereof) of the Home Depot job—particularly the significantly escalation in costs—were discussed at each Board meeting in the spring, summer and fall of 2003, according to CW.  Gaon, Koch and the CFO presented reports to the Director Defendants during those meetings and each discussed the Home Depot situation

from his particular vantage point.  The Board also discussed the Company's other clients and projects, such as Lowe's, CVS and AT&T during its meetings in mid-2003.

252.     On or about June 26, 2003, all Director Defendants, Gaon, Koch and CW attended a meeting at Datatec's offices (which may or may not have been an official full Board meeting, although CW believes that it was).  These Defendants received a copy of the draft 10-K for the year ended April 30, 2003, financial projections for fiscal 2004 and a document created by Koch which listed the Company's top 20 projects—showing which clients were expected to contribute to the Company's revenue growth in the next year.  This list included estimated gross margins and expected revenue levels on each contract – the Lowe's and Home Depot clients were the most significant.  The Director Defendants were informed, therefore, how important the Home Depot project was in terms of the Company's results.

253.     In addition, the Director Defendants also participated in decisions to release financial forecasts to the public.  As alleged above, on or about June 26, 2003, not withstanding the CFO's discomfort with the numbers generated for the 8-K, each Director Defendant approved of the release of the 8-K as written.  Grossman, in particular, expressed his desire to release numbers as soon as possible, to encourage analyst coverage and investment.

254.     During an Audit Committee meeting held on or about July 22, 2003, which was attended by Grossman, Berenblut, Maggard, Rich Davis, Mark Davis of Deloitte and CW, those Director Defendants expressed disappointment that Datatec had only broken even in the quarter ended April 30, 2003.  CW explained that the Home Depot contract had generated many unforeseen and unbilled costs, which at that time totaled approximately $500,000 to $1 million, and had been the cause of the non-profitability of the quarter.  Grossman stated that he was going

to take the issue up with Gaon at the Board meeting because "we should have made money and we didn't."

255.    As promised, at the Board meeting following the Audit Committee meeting on or about July 22, 2003, in which all Director Defendants participated and at which Koch and CW were also present, Grossman questioned Gaon about the rise in costs of the Home Depot job. Gaon stated that the Home Depot job was Datatec's largest job ever and that the increased costs were unforeseen.

256.    As alleged above, Gaon specifically informed the Board during 2003 meetings that IBM Credit would advance Datatec desperately needed cash under its Credit Agreement because, without the extra money, Datatec would not be able to perform on the Home Depot contract, for which IBM Global was the general contractor.  The Director Defendants, therefore, were specifically informed of the link between continued infusion from IBM Credit and the IBM Global Home Depot project.

257.    In or about July 2003, CW informed the Board that the Company would never be able to obtain financing as good as that from IBM Credit, because the Company's actual receivables were (at that time) approximately $18 million, yet the Company had borrowed much more than that, approximately $25 million.  CW mentioned these specific numbers to the Director Defendants, Koch and Gaon.  Thus, the Director Defendants were informed that the Company's receivables were far less than the amount lent it by IBM Credit and the Company was therefore far more leveraged than permitted under the IBM Credit Facility borrowing formula.

### (c) *The Board Had Personal Reasons to Make the Misrepresentations*

258.     On more than one occasion during a Board meeting the Director Defendants discussed the Company's stock price.

259.     For example, during at least one Board meeting that CW attended, Milch—who owned a little over one million shares of stock—stated ruefully that everyone should have sold their stock when it was trading at $16 a share.  The rest of the Director Defendants present agreed.  Milch also had expressed his disappointment with the stock price to CW in February 2003, and Gaon told CW subsequently that Milch expressed the same view to Gaon privately.

260.     Although Milch's stint as a part-time employee of the Company had come to an end, Gaon had told CW in April 2003 that Milch continued to request consulting contracts with the Company.  Datatec's viability, therefore, would personally benefit Milch.

261.     CW reported that Walter Grossman, for example, called Gaon "all the time" seeking explanations for movements in Datatec's stock price.  Grossman benefically owned 1.9% of the Company's stock.  CW was a participant on one of these phone calls in June or July 2003.  On that phone call, Grossman, who was familiar with the financials, inquired about the impact of the Home Depot job on Datatec's earnings, and asked detailed questions about the profitability of the Home Depot and Lowe's jobs.  In response, Gaon explained that the Home Depot contract had required unexpected site revisits and that cost overages needed to be resolved.  Gaon further stated that more financial flexibility was needed to meet the demands of both the Home Depot and Lowe's jobs and that he was working with IBM Credit to get more credit and flexibility.

262.     As eventually disclosed, a firm owned in part by Grossman, Eagle, purchased (through a designee) the assets of Datatec in the Bankruptcy Proceedings.  That firm is also

owned in part by Raul Pupo, who succeeded Gaon in December 2003 as CEO.  As early as September 2003, Grossman had brought Pupo in, describing him to Gaon as a "potential investor", to do a "business review" of Datatec's operations.

263.    Friedman's law firm served as Datatec's outside counsel for many years. Friedman and/or his firm were involved in almost every Datatec transaction over the past ten years and handled all of Datatec's SEC filings up to early 2003, when much of the work was transitioned in-house.  According to CW, his firm billed several hundred thousand dollars to Datatec every year.

264.    Adams is the President of WhiteSpace, Inc., a consulting firm specializing in marketing techniques for technology-based firms.  Datatec gave business to WhiteSpace, as publicly disclosed.  However, although Datatec disclosed that it did not anticipate giving WhiteSpace more business going forward, it was not for lack of Adams' attempts.  In a telephone call among Adams, Gaon and CW in the fall of 2003, Adams offered his company's assistance with Datatec's Asset Guardian product.  WhiteSpace benefited from Adams' role on the Board, quoting Gaon in its website's "testimonials" page.  (http://whitespaceinc.com/testimonials/htm).

265.    Adams was named interim CEO following Pupo's resignation in 2004, shortly before Pupo and Grossman decided to have their company bid for Datatec's assets.

266.    According to CW, Berenblut was Isaac Gaon's personal friend, and when the board of directors asked Gaon to step down in December 2003, Berenblut also resigned at that time.

267.    In addition, Berenblut solicited a consulting arrangement with the Company in connection with the Asset Guardian product during a Board meeting during mid-2003.

268.     Berenblut is affiliated with the Berenblut Consulting firm.  Berenblut is a chartered accountant and Certified Fraud Examiner.

269.     In addition to the foregoing personal interests advanced through their participation on the Board, the Director Defendants—at least those serving on committees—made their interest in remuneration from the Company more direct.  Although CW specifically stated at least twice during Board meetings prior to the release of the 2003 10-K that the Company had "no cash" and was operating solely through borrowings from IBM Credit, the Director Defendants nonetheless voted to pay themselves substantial sums for participating in various Board committees.

270.     Prior to this vote, each Board member was paid $1000 for his participation on the Board and had received stock options, as was publicly disclosed in both the 2002 and 2003 10-Ks.

271.     However, in the summer of 2003, the Board, on Grossman's motion, voted in favor of making the following payments:  an annual fee of approximately $20,000 for members of the Audit Committee (Grossman, Maggard and Berenblut), an annual fee of approximately $25,000 for the Chairperson of the Audit Committee (Grossman prior to Maggard's arrival), an annual fee of approximately $7000 for members of the Compensation Committee (Grossman, Berenblut), and an annual fee of approximately $10,000 for the Chairperson of the Compensation Committee (Grossman).  Grossman and Maggard therefore sought and obtained at lease $25,000 for their respective involvement with the Company.

272.     Thus, despite the well-known fact that the Company had "no cash," the Board voted to approve fees never before paid to directors, and thus ensure further the strained cash needs of the Company.

273.    Certain Board members, including at least Grossman, stated that these substantial fees should be deemed retroactive.  CW, for one, objected.  Ultimately the Board was convinced to make the generous fees prospectively.

274.    CW informed the Board that the Company would need to request additional funds from IBM Credit to pay the Board members their fees.  At the end of the meeting, Maggard asked CW whether he could have the check in hand or would CW mail it to him.  As the Company could only cut a check after calling IBM for money, CW told Maggard he would have to mail it to him.  Maggard gave CW his business card with the address to which the check should be mailed.  Shortly thereafter, CW called IBM to get money wired to cover the checks cut for each director and issued the checks.  At the next meeting, Grossman specifically asked CW for his check.

### iii.    The Executive and Director Defendants Acted With Scienter

275.    In making the misstatements set forth above, each of the Executive and Director Defendants acted with scienter.  Each made the statements in Datatec's SEC filings set forth above intentionally or recklessly, because he knew or had access to factual information that contradicted these statements and/or each had the motive and opportunity to commit fraud.

276.    For example, as detailed above, each of the Executive and Director Defendants knew that, contrary to the statements describing the extent to which the Credit Facility permitted the Company to borrow on the collateral (*i.e.,* the ratio that borrowings would not exceed 85% of eligible receivables and 25-35% inventory), the Company was far more leveraged than permitted, for at least the following reasons:

- CW informed Gaon, Koch and each of the Director Defendants during a Board meeting held in or about June or July 2003 that the Company was indebted in an

amount in excess of $25 million against collateral (receivables, for example) that was approximately $18 million—which obviously was well more than 85% of receivables.

- In fact, CW expressly informed Gaon, Koch and each of the Director Defendants in that meeting that the Company's debt was a multiple of more than one (1) times its receivables.  (In fact, it had borrowed between one and a half to two times the value of its collateral (the receivables).)

- CW informed Gaon, Koch and each of the Director Defendants during a June or July 2003 Board meeting that the Company had "no cash" and was looking for replacement financing but that, in CW's opinion, the Company could not get more favorable lending than it already had received, as it had borrowed far more than the amounts to which it was entitled and which its collateral would support; and

- In the first Board meeting after joining the Board in 2003, Maggard and CW discussed the fact that the Company provided ledger information containing invoices for work not yet performed to IBM Credit, and therefore, not proper receivables, in support of its borrowings.

277.    Likewise, as detailed above, each of the Executive and Director Defendants knew that, contrary to the statements describing the existence of the Credit Facility and the Company's standing thereunder, the reason IBM Credit had continued to increase the maximum borrowing limits and had continued to lend cash infusions on almost a daily basis to Datatec was because IBM Global needed Datatec to finish its work on the Home Depot project; without loans under the Credit Facility Datatec would have to "close its doors"; and IBM Credit was effectively financing the largest component of Datatec's revenues, for at least the following reasons:

- Gaon himself, and in Koch's presence, had participated in at least two meetings with IBM Credit and IBM Global during which Datatec threatened to "close its doors" if additional funds were not lent;

- Gaon repeatedly instructed Datatec finance personnel to make similar threats to IBM Credit;

- Gaon informed each of the Director Defendants, in a Board meeting held in or about June or July 2003, about his threats to IBM Credit and relayed his assurance that,

68

while the Home Depot project was underway, "IBM would be crazy" to stop the lending.

278.     Similarly, as detailed above, each of the Executive and Director Defendants knew that the financial results disseminated in Datatec's SEC filings were materially misstated, for at least the following reasons:

- Gaon and Koch participated and directed the advance purchases of materials for Lowe's work solely in order to "make revenues";

- All of the Executive and Director Defendants were aware that, upon Deloitte's re-audit of the Company's financial statements, the Company's accounting for costs in its percentage-of-completion calculation—which was critical to its overall revenue recognition—was inappropriate and required the Company to restate the recognition of its revenues.  Grossman expressed his view that the re-audit after which this restatement was made was expensive and unnecessary;

- Each of the Executive and Director Defendants, in Board meetings and, in Grossman and Berenblut's case, additionally in Audit meetings, during which the results from the April 30, 2003 quarter were reviewed, discussed the progress on the Home Depot project, including its accumulated expenses and cost overruns of $500,000 to $ 1 million; discussed the fact that such overruns had not been paid by IBM Global at that time; discussed the fact that the Company "should have made money and didn't", according to Grossman; knew that the contract was fixed in price; read Koch's list of significant contracts showing that Home Depot was the largest client of the Company; and knew, with only a few months to go, having not been paid for overages and running out of revenues to be earned, the Home Depot project could not possibly have been reflecting a profit, let alone a profit of close to 20%;

- On or about June 26, 2003, each Executive and Director Defendant was present during a meeting during which, in connection with the June 26 press release and 8-K, the CFO expressed his reluctance to issue the forecasted and budgeted figures to the public because they required additional time to be substantiated given his limited time at the Company and in which, rather than approving some additional time for such work, instead agreed that it was in the Company's "best interest" to aggressively attempt to influence investors with a forecast that ultimately proved to be materially misstated.

279.     In sum, the Director Defendants had the responsibility for reviewing the Company's financial reporting, external audits and internal controls and compliance.  The Audit Committee members—Berenblut, Grossman and Maggard—in particular, had access

to and did review the Company's business records, Deloitte's audit procedures, the Company's personnel and operations.  The fact that Datatec recognized significant and material amounts of revenue in violation of its own revenue recognition policies—the policies the Board and, in particular, the Audit Committee, was responsible for monitoring— also supports a strong inference of recklessness.

280.    In addition, each of the Executive and Director Defendants had the opportunity to commit fraud, as they were either senior executives and/or members of the Company's Board of Directors, who had knowledge of and access to non-public information concerning the Company's operations, results, and reviewed, approved and/or signed the SEC filings in which the misstatements were made.

281.    Each of the Executive and Director Defendants had the motive to commit fraud in connection with the Company's SEC filings because they wanted to ensure the Company's survival for the purpose of completing investments and acquisitions which were payable or paid in Datatec common stock or warrants relating thereto.  As the Company's stock price was artificially inflated, Datatec was better able to convince sources of investment and/or capital—including Plaintiffs—that it was a good opportunity for return. In the Palladin Investments, for example, the Company ensured that it would have the option to repay the investment in stock (or cash).  Further, because the Company could not afford to pay any cash in attempting to expand its products and/or service offerings, it structured the Millenium Care acquisition as a stock for stock exchange.

282.    Each of the Director Defendants would benefit in personal and concrete ways from committing the fraud set forth above because it would enable the Company to remain

operational and potentially the source of additional investment, which would permit the following:

- Each member of a Board Committee (*e.g.,* Berenblut, Maggard, Grossman) would continue to reap the annual reward of thousands of dollars they had given themselves for their participation;

- Berenblut, Adams and Milch would continue to press the Company to provide their consulting businesses with work and fees;

- Friedman's firm would continue to do work for the Company; and

- Grossman could continue gaining insights into reasons for movement of the Company's stock.

283.    Each of the Executive and Director Defendants, in committing the fraud outlined above, would of course continue to reap their other remuneration from the Company—salaries and/or bonuses, stock options, fringe benefits, etc., as detailed below.

### iv.    The Executive and Director Defendants Were "Controlling Persons"

284.    By virtue of their senior and high-level positions, their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the statements filed by Datatec with the SEC, the Executive and Director Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various statements that Plaintiffs allege are false and misleading.  These Defendants, as set forth above, reviewed, approved and were provided with or had unlimited access to copies of the Company's reports, press releases, public filings and other statements alleged by Plaintiffs to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

285.   In addition, on July 22, 2003, Gaon signed Section 302 certifications pursuant to Sarbanes-Oxley that, among other things, he had reviewed Datatec's 2003 Form 10-K, and that the financial statements, and other financial information included therein fairly presented in all material respects Datatec's financial condition, results of operations and cash flows, and that he was responsible for establishing and maintaining Datatec's disclosure controls and procedures.

## G.   Deloitte

286.   As an auditor for a publicly traded company regulated by the federal securities laws, including but not limited to the Exchange Act, Deloitte had a duty to comply with both GAAS and GAAP. 17 C.F.R. § 210.4-01(a)(1).  As set forth herein, Deloitte violated those duties, recklessly blinded itself to Datatec's improper practices and financial reporting, and falsely represented in the Company's 2002 and 2003 10-Ks that it had complied with GAAP and GAAS and improperly issued clean opinions on Datatec's financial statements.  Datatec's financial statements contained errors over a three-year period of anywhere between $15 and 20 million as a result.

287.   Datatec engaged Deloitte as its principal independent accountants on April 11, 2002 to replace Arthur Andersen.

288.   Al Pastino, Datatec's CFO at the time of the replacement and a former audit partner at Deloitte, told CW that he had brought Deloitte in to succeed Andersen.

289.    According to CW, the Deloitte audit team assigned to Datatec eventually consisted of audit partner Mark Davis, as well as accounting manager Nick Sankar, two senior accountants (one of whom was seconded from Deloitte's offices in Poland) and a first year staff member.  At the outset of Deloitte's engagement, however, the Deloitte audit team was led by a different audit partner.  Pastino told CW in or about February 2003 that Deloitte removed this

former audit partner by mutual agreement with Datatec because of "personality conflicts" with Gaon.

290.    In or about February of 2003, Mark Davis told CW that after Deloitte was brought in, Deloitte spent the summer performing a re-audit of Datatec's previous three years of financials.

291.    CW learned from Davis and Gretchen Kittel that in the course of the re-audit, extensive information was provided to Deloitte, and Deloitte became aware of Datatec's years of losses, borrowings in excess of available credit limits, continuing lack of cash and inability to reduce debt despite millions of dollars being infused into the Company through private placement offerings.

292.    Nonetheless, the audit team issued a clean opinion although it concluded that there had been errors in how the Company had accounted for its percentage-of-completion figures in its revenue recognition policy—the very policy and GAAP standards Datatec ultimately violated in the amount of approximately $20 million.  Thus, in 2002, Deloitte had actual notice that the Company had historical errors in its revenue recognition approach.

293.    In early 2003, Mark Davis told CW that while Datatec had lost money for nine out of the ten years that it had been operating, it now looked like it was about to make money. Davis stated that the Company was looking to turn to the software side of the business.  In response to questions from CW about the high turnover in Datatec's finance department, Davis said only that several former CFOs had left to pursue other opportunities.

294.    Moreover, in early 2003, Davis told CW that IBM Global Services was the general contractor for the new Home Depot job and that IBM Credit, its sister company, provided credit to Datatec.  Davis admitted to CW in early 2003 that the Home Depot job and the

credit provided by IBM Credit went **"hand in hand."** This significant fact, obviously known by Deloitte, was never included in the Company's public and SEC filings.  As a result, Davis knew or recklessly disregarded the fact that once IBM Global no longer needed Datatec, IBM Credit would have no reason to continue lending money to a defaulting debtor.

295.    Beginning as early as March 2003, CW called Deloitte several times and told Deloitte audit partner Mark Davis that the Company was in dire financial straits.  The Company had no cash, the IBM Credit line was over-extended at $28.5 million, and IBM Credit continually advised the Company that it would not lend the Company further sums.

296.    Deloitte was also aware that the Home Depot contract was, as were most of Datatec's contracts, fixed-price, the performance of which had required Datatec to double its workforce.  Deloitte was further aware that the Home Depot job was more complex than Datatec's previous jobs and ended up requiring Datatec to conduct costly site revisits.

297.    Deloitte was aware that costs associated with the Home Depot contract were rapidly increasing at an unsustainable rate, information accessible through COGNOS.

298.    No later than July 2003, Deloitte knew that the cost overages on the Home Depot fixed-price contract had not yet been paid.

299.    In violation of GAAS, Deloitte did not independently verify that the overages were in fact collectible either by conducting a site visit to IBM Global, receiving a confirmation letter of outstanding amounts due to the Company or otherwise.

300.    CW and Mark Davis discussed several times beginning in March 2003 that the Company was unable to meet its payroll obligations or pay its other bills without almost daily loans from IBM Credit.

301.     CW and Mark Davis also discussed in the spring and summer of 2003 the fact that IBM Credit agreed to lend the Company more money only after being told by the Company that without such money it would not be able to perform its obligations to IBM Global; as Davis had described it to CW earlier, the credit and the Home Depot job went "hand in hand".

302.     In March 2003, Chris Bengyak gave Deloitte a memo written by IBM Credit auditing the internal accounts receivable information on which IBM Credit based its loans (these IBM audits were done each calendar quarter, according to CW).  That memo concluded that, due to Datatec's inclusion of invoices that were not actual, valid receivables, Datatec was not in compliance with IBM Credit's loan covenants, specifically with the 85% ratio formula.

303.     CW gave a similar IBM Credit audit report to Deloitte staff at their audit room at Datatec in July 2003.

304.     At least twice, therefore, Deloitte was handed written information confirming that the receivables provided to IBM Credit were inflated, that the Company had been lent money to which it was not entitled under the applicable debt to assets ratio and thus was over-leveraged and that components of Datatec's receivables ledger were not, in fact, proper receivables but were advances to the Company that should have been recognized as such by recording a liability.

305.     Also in March 2003, CW questioned Deloitte about the propriety of the Company's accounting treatment of the advance invoices issued to Lowe's in connection with the Company's advance materials purchases.  Davis responded by immediately producing a two to three page memo in Deloitte's work papers which purported to justify the accounting treatment.  Deloitte's position at the time the memo was written was that it would treat Datatec as a materials broker, who could take advantage of bulk discounts or favorable pricing, such that

Datatec could properly recognize revenue merely upon a vendors' acceptance of its order for supplies.

306.    The memo utterly ignored the fact that Datatec was not a broker—it was a service provider that intended, at least with respect to some of the materials, to use them in connection with its work.  It also ignored the fact that Datatec did not possess any favorable pricing and, in fact, lacked its own cash to pay for these advance purchases.  It further ignored the fact that Lowe's did not officially hire Datatec for longer than a quarter's worth of work at a time.

307.    Deloitte permitted the Company to recognize revenues for its materials purchases up to one and a half years' in advance, in the total amount of about $12 million per year, without having any Lowe's contracts in hand that would justify that amount of materials stockpiled, and knowing that the Company had borrowed the cash—either from Lowe's or IBM Credit—to pay for those materials.

308.    CW told Mark Davis that the Board had approved of the June 26, 2003 press release in which the Company announced expected positive earnings for Fiscal Year 2003 over strenuous objections by the CFO that the results were not ready for public release.  Davis told CW that he understood the Company's interest in getting numbers out to the public without waiting for the type of substantiation proposed by CW.

309.    In September 2003, CW shared with Mark Davis his discomfort about the gross profit margin and percentage of completion estimates being maintained by Koch.  Davis dismissed CW's concerns, and Deloitte failed to change the scope of its review of the Company's quarterly results or its audit.  CW had five or six more conversations over the next couple of months with Mark Davis on the same subject, with the same result.

310.     Deloitte was also aware of Koch's historical trend of overstating gross profit margin because each quarter the Deloitte audit team had to negotiate the gross profit margin downwards.

311.     Koch's gross profit margin estimates were always the last numbers to be given to the finance department and then to Deloitte.  Often Deloitte only had 72-96 hours to review the estimates—which were the lynchpin of Datatec's financial statements—prior to the filing deadline.  Deloitte never asked for more time to review these vital estimates.

312.     Upon receipt of Gretchen Kittel's spreadsheets containing the gross profit margins, Deloitte discussed Koch's numbers with her.  Each time, Deloitte noted that Koch's numbers did not appear to comport with her cost information.

313.     Each quarter, Deloitte would ask Koch how the gross margin estimate could be maintained when it was often running 25% lower than the estimate.  Each time Deloitte accepted Koch's assurances as to the propriety of that number with little or no investigation.  Deloitte and Koch repeatedly would agree, after negotiation, to lower the margin only slightly.

314.     Thus, despite the information in Deloitte's possession that Koch had a history of providing grossly over-estimated gross profit margin percentages, Deloitte failed to lower the margin adequately.

315.     Deloitte never set up a reserve to allow for the aggressive gross margins that Koch provided.

316.     Deloitte's failure to properly challenge Koch's unrealistic estimates is even more egregious when considering that, in reviewing the July 31 quarter financials, Mark Davis told CW that "I'm not sure Ray [Koch] is on top of his numbers."  He made this statement in

Deloitte's audit room at Datatec in the presence of the senior auditor in or about September 2003.

317.     Thus, Deloitte had in its possession all of the information necessary to prevent improper revenue recognition:

- Deloitte was aware of the discrepancy between gross profit margin numbers and percentage of completion figures and the costs incurred on Datatec's contracts;

- Deloitte was aware that Koch provided the gross profit margins at the last minute, giving Deloitte only 72-96 hours to review the most significant components of the Company's reported revenue;

- Deloitte knew that Koch had a history of providing overstated gross margin estimates. Deloitte had quarterly negotiations with Koch to bring the margins down, but did so only slightly;

- Deloitte knew that Datatec had no working capital and that it was relying on IBM Credit for daily cash infusions to cover its bills;

- Deloitte knew that Datatec had borrowed beyond its credit line, that IBM Credit was continually expressing misgivings about advancing Datatec further funds, and that funds were advanced solely to allow Datatec to continue performing on the Home Depot contract for which IBM Global was general contractor;

- Deloitte was aware that the Home Depot contract was a changed circumstance, that the fixed-price contract required Datatec to double the size of its work force, that site revisits were occurring and that costs were skyrocketing as a result, and that IBM Global had not reimbursed Datatec for those costs;

- Deloitte was aware that it had not received a confirmation letter from Home Depot and that it had engaged in no information-gathering process (other than to ask Koch) to establish that the cost overages were collectible, as Datatec claimed they were; and

- Deloitte knew that Lowe's approved work only once every quarter and that Datatec was stockpiling inventory for up to a year and a half out, despite its lack of cash resources to purchase such large quantities of materials.

318.     Despite Deloitte's knowledge of Datatec's precarious financial situation as evidenced by lack of cash, heavy borrowings and rapidly increasing costs, Deloitte never issued a "going concern" opinion for Datatec.

319.     Instead, Deloitte issued a clean audit opinion to the public for Datatec for the fiscal years 2002 and 2003.  In its Independent Auditors' Report, filed with Datatec's 2002 Form 10-K filed on October 4, 2002 Deloitte stated:

> We conducted our audits in accordance with auditing standards generally accepted in the United States of America. Those standards require that we plan and perform the audit to obtain reasonable assurance about whether the financial statements are free of material misstatement. An audit includes examining, on a test basis, evidence supporting the amounts and disclosures in the financial statements. An audit also includes assessing the accounting principles used and significant estimates made by management, as well as evaluating the overall financial statement presentation. We believe that our audits provide a reasonable basis for our opinion.
>
> In our opinion, such consolidated financial statements present fairly, in all material respects, the financial position of the Company as of April 30, 2002 and 2001, and the results of its operations and its cash flows for each of the tree years in the period ended April 30, 2002, in conformity with accounting principles generally accepted in the United States of America. Also, in our opinion, such financial statement schedule, when considered in relation to the basic consolidated financial statements taken as a whole, presents fairly in all material respects the information set forth therein.

320.     With the exception of the dates, Deloitte's Auditors' Report filed with Datatec's 2003 10-K, contained the same language.

321.      Contrary to Deloitte's statements in its 2002 and 2003 audit opinions, Deloitte did little to test the evidence supporting the amounts and disclosures in Datatec's financial statements.  Indeed, CW reported that Deloitte's audit for the fiscal year 2003 took place in June and July and was "mechanical".  Deloitte seemed unconcerned with Datatec's lack of working capital and massive borrowing from IBM Credit, and ignored the fact that the Home Depot contract had a similar effect on Datatec as would an acquisition, according to CW.  In one year, Datatec doubled its work force and its costs were skyrocketing.  Though Deloitte knew of these facts, it did not conduct a rigorous inquiry into the history of declining margins or adequately question Datatec's ability to continue as a going concern.

322.     While starting to put together materials for Datatec's 10-Q for the period ending October 31, 2003 (which was ultimately never filed), Deloitte, Gaon, Koch and other Datatec officers began discussing the lack of any possible profit on the Home Depot project, and were aware that the expectations for gross profit would not be realized.

323.     On approximately December 1, 2003, Deloitte met with the Audit Committee to discuss the Company's results.  CW arranged a phone call with Mark Davis from Deloitte, Datatec's General counsel, Friedman, Maggard, Berenblut and Grossman.  During the call, CW stated that Datatec would have a significant loss, rather than the gain that Defendants had led investors to expect.

324.     Later that month, Mark Davis presented a work paper to CW on which Deloitte analyzed historical data in its possession regarding Datatec's gross profit margin.  The work paper showed severe deterioration in gross profit margin on every one of approximately 20 major Datatec contracts, from the time the estimated gross profit margin was established at the outset of each contract, through completion.  The work paper charted, on a client-by-client basis, the gross profit margin at the time it was originally estimated (at the beginning of each contract) for each fiscal quarter, and at the conclusion of the contract (the actual profit margin).  The chart showed that the estimated gross profit margin percentages steadily deteriorated over time during the course of the contracts – and the ultimate actual profit margins were far below the estimates.

325.     For example, the estimated gross profit margin employed to calculate income recognition on the Home Depot contract was originally set at 25% to 30%.  In March 2003 – long after revisit notices started pouring into the Company – the estimated gross profit margin employed was still 25%.  From March to December 2003, the estimated gross margin was gradually reduced from 25% to 22% (in approximately July 2003) to 19% to 15% to 6% (in

October 2003)—and ultimately was actually determined to be negative 6% or 10% (in December 2003).

326.    Upon showing this analysis to CW, Mark Davis expressed concern as to whether Datatec's past financial statements were incorrect because of Deloitte's inappropriate reliance on Koch's numbers.  At that time CW opined that, given this information, there was no question that prior financial statements contained major errors.

327.    In January 2004, CW again spoke with Davis and told him that Deloitte should resign because of the material misstatements in Datatec's financials caused by Deloitte's failure, among other things, to substantiate Koch's overstated gross margins.  Davis responded cavalierly that Deloitte did not need to resign, and that the best situation would be if Datatec filed for bankruptcy, so that Deloitte would not need to worry about being criticized for its role in the misstatements.  Davis repeated this sentiment – that it would be best for Deloitte if Datatec filed for bankruptcy – to CW in a telephone call in late February 2004.

328.    The Eisner Report that was issued subsequent to Deloitte's departure criticized Deloitte for relying on Koch's percentage of completion and gross profit margin estimates and for ignoring various red flags which put Deloitte on notice that such estimates were unreliable.

329.    The Eisner Report further criticized Deloitte for approving and "signing off" on the presentation of Datatec's accounting for long-term contracts, net income and revenues without proper investigation.

330.    As a result of the subsequent review of Datatec's SEC filings dating back to fiscal year 2001, Datatec announced that "the cumulative amounts of revenue previously recognized on certain contracts has been overstated by between approximately $11 and $18 million".  (August 12, 2004 8-K).  In addition, the Company announced that the previously announced loss of

greater than $10 million for the fiscal quarter ended October 31, 2003 should have been reflected in prior periods.  (*Id.*).

331.    In addition, according to CW, the Eisner Report concluded that Datatec's financial statements reflected  total cumulative misstatements of $20 million for the fiscal years ended April 30, 2003, 2002 and 2001.

**H.     Deloitte's Violations of GAAS**

> ***i.     Deloitte's Failure To Adequately Audit Material Management Estimates***

332.    To perform an audit that complies with GAAS, Deloitte was responsible:

> for evaluating the reasonableness of accounting estimates made by management in the context of the financial statements taken as a whole. As estimates are based on subjective as well as objective factors, it may be difficult for management to establish controls over them. Even when management's estimation process involves competent personnel using relevant and reliable data, there is potential for bias in the subjective factors. Accordingly, when planning and performing procedures to evaluate accounting estimates, the auditor should consider, with an attitude of professional skepticism, both the subjective and objective factors.

AICPA Professional Auditing Standard ("AU") 342.04.

333.    Moreover, in evaluating the estimates' reasonableness, Deloitte needed to consider historical experience and other factors:

> In evaluating the reasonableness of an estimate, the auditor normally concentrates on key factors and assumptions that are—
>
> a.      Significant to the accounting estimate.
>
> b.      Sensitive to variations.
>
> c.      Deviations from historical patterns.
>
> d.      Subjective and susceptible to misstatement and bias.
>
> ***The auditor normally should consider the historical experience of the entity in making past estimates*** as well as the auditor's experience in the industry. However, changes in facts, circumstances, or entity's procedures may cause

factors different from those considered in the past to become significant to the
accounting estimate.

AU 342.09 (emphasis added).

334.    In evaluating reasonableness, Deloitte was required to gain an

understanding of how management developed the estimate.  Based on such

understanding, Deloitte should have used one or a combination of the following

approaches:

    a.    Review and test the process used by management to develop the estimate.

    b.    Develop an independent expectation of the estimate to corroborate the
reasonableness of management's estimate.

    c.    Review subsequent events or transactions occurring prior to completion of
fieldwork.

AU 342.10.

335.    In assessing the reasonableness of an accounting estimate by testing the

process used by management used to make that estimate, an auditor may use the

following procedures:

    a.    Identify whether there are controls over the preparation of accounting
estimates and supporting data that may be useful in the evaluation.

    b.    Identify the sources of data and factors that management used in forming
the assumptions, and consider whether such data and factors are relevant,
reliable, and sufficient for the purpose based on information gathered in
other audit tests.

    c.    Consider whether there are additional key factors or alternative
 assumptions and factors.

    d.    ***Evaluate whether the assumptions are consistent with each other, the
supporting data, relevant historical data, and industry data.***

    e.    Analyze historical data used in developing the assumptions to assess
whether the data is comparable and consistent with data of the period

under audit, and consider whether such data is sufficiently reliable for the purpose.

f.      Consider whether changes in the business or industry may cause other factors to become significant to the assumptions.

g.      Review available documentation of the assumptions used in developing the accounting estimates and inquire about any other plans, goals, and objectives of the entity, as well as consider their relationship to the assumptions.

h.      Consider using the work of a specialist regarding certain assumptions (section 336, Using the Work of a Specialist).

i.      Test the calculations used by management to translate the assumptions and key factors into the accounting estimate.

AU 342.11 (emphasis added).

336.    Deloitte violated the foregoing standards, among other things, by failing to properly evaluate Defendants' accounting "estimates" and consider historical experience and data relating to the percentage-of-completion estimates, which were the lynchpins of Datatec's financial statements.

337.    As stated above, Deloitte failed to consider Koch's long history of overestimating gross profit margins on long-term contracts when conducting its audits.  Indeed, not only did Deloitte fail to develop an independent expectation of what the estimate gross profit margin profit should be, Deloitte failed to even test the process used by Koch to develop his estimates as required by AU 3442.10.  Instead, Deloitte merely spent a few hours each quarter questioning Koch about these crucial numbers and repeatedly accepted Koch's representations about their accuracy without so much as conducting a cursory investigation into, for example, whether cost overages could be recouped on the Home Depot contract by ensuring that IBM Global Services returned its confirmation letter.

ii.     *Deloitte's Improper Reliance On Management Representations*

338.    AU § 333 provides that while representations from management are part of the evidential matter that an auditor obtains, they are not a substitute for the application of auditing procedures considered necessary to provide a reasonable basis for an opinion.  AU § 333.02.

339.    Moreover, GAAS requires that, if other audit evidence contradicts a representation made by management, an auditor should use professional skepticism in investigating the circumstances and consider the reliability of the representations made.  GAAS also provides that based on the circumstances, the auditor should consider whether reliance on management's representations concerning other aspects of the financial statements is justified. AU § 333.04.

340.    In violation of these standards and as related above, Deloitte improperly relied on the gross profit margin estimates provided by defendant Koch, despite Koch's history, contained in Deloitte's work papers, of continually providing excessive gross profit margins.

341.    Deloitte failed to independently verify Koch's representations that gross profit margins, though currently running much lower than estimated, would be met because the contract in question involved heavy up front costs or that Datatec would be able to recoup those costs.  Deloitte did not take the simple steps of collecting confirmation letters from Datatec's second largest client, IBM Global Services—the primary source of revenue and expenses, and it never conducted on-site visits to verify that any of Koch's historically overstated profit margins were accurate.  The Eisner Report criticized Deloitte for this serious lapse.

342.    In light of Deloitte's improper reliance on Koch's historically excessive estimates, Deloitte also failed to adequately evaluate the competence and sufficiency of the evidential matter.

343.    GAAS requires the auditor to evaluate evidential matter obtained to ensure that the specific audit objectives are achieved, to design audit procedures recognizing the possibility that financial statements may not be fairly presented in conformity with generally accepted accounting principles, and to consider relevant evidential matter.  AU §326.25.

344.    Moreover, "[t]o the extent the auditor remains in substantial doubt about any assertion of material significance, he or she must refrain from forming an opinion until he or she has obtained sufficient competent evidential matter to remove such substantial doubt, or the auditor must express a qualified opinion or a disclaimer of opinion."  (*Id.*)

### iii.    *Deloitte's Failure To Adequately Consider Indicia Of Fraud*

345.    Deloitte was required, under GAAS, to plan its audits to obtain reasonable assurance that Datatec's financial statements were free of material misstatement, whether caused by error or fraud and, further, to specifically assess the risk that Datatec's financial statements could be materially misstated as a result of fraud.  *E.g.*, AICPA-SAS No. 99.

346.    SAS No. 99 provides examples of factors that may indicate fraud or motive to commit fraud at an audit client—"red flags".

347.    Some of the red flags listed in SAS No. 99 existed at Datatec.  For example, one example of an incentive to commit fraud that SAS 99 lists is that the financial stability or profitability of a company is threatened by economic conditions.  Examples of indicia of such precarious financial condition include (i) "[r]ecurring negative cash flows from operations or an inability to generate cash flows from operations while reporting earnings and earnings growth"; (ii) "[r]apid growth or unusual profitability, especially compared to that of other companies in the same industry."  AICPA-SAS No. 99, ¶ 85 A.2.

348.     As detailed above, Datatec exhibited both of these behaviors.  Although Datatec had reported a profit in the fourth quarter of Fiscal Year 2002 and in the first and second quarters for the Fiscal Year 2003, Datatec also reported that:

> Although the Company realized net income of $2.4 million for the six months ended October 31, 2002, took dramatic measures to cut costs and continues to manage its cash aggressively, it is still experiencing a significant strain on its cash resources. The primary reason for the strain on resources is the increased requirements for expenditures for field personnel, job expenses and materials related to the increased revenue.  As a result, the Company's working capital financing line regularly remains at or close to its maximum allowable levels and the average days outstanding on its trade payables have extended beyond normal credit terms granted by vendors.  (10-Q, Second Quarter 2003).

349.     Thus, Datatec's rapid growth and negative cash flows, despite over six months of reported profitability, were red flags to Deloitte that Datatec may have been engaging in fraud.  Despite the prevalence of these conditions, however, Deloitte did not conduct an even bare-bones audit of Datatec's financial statements by independently verifying management estimates or creating its own expectations of gross profit margins against which it could compare those provided by Koch.

350.     SAS 99 also listed as a risk factor for fraud the existence of pressure on management to meet the requirements or expectations of third parties.  Indicia of this risk factor includes the "[m]arginal ability to meet exchange listing requirements or debt repayment or other debt covenant requirements."  SAS 99, *id.*

351.     As described herein, Datatec had no ability to pay its debts as they came due without receiving cash from IBM Credit on a daily basis.  There was therefore incredible pressure on Datatec to somehow make sure that IBM Credit continued to lend it money. This pressure resulted in the numerous schemes to inflate accounts receivables so that IBM Credit would advance money based on its formula of lending $0.85 on every $1.00 of

receivables. Deloitte was aware of the pressure on Datatec to simply meet payroll and of its heavy reliance on IBM Credit to pay its bills, because Datatec had "no cash".

352.    In addition, Deloitte was directly provided several times with IBM Credit's internal audit report, which stated outright that Datatec's borrowings were based on an inflated accounts receivables ledger and that, therefore, Datatec's borrowings were in excess of the 85% formula outlined in the IBM Credit Agreement. Not only did Deloitte fail to scrutinize the circumstances surrounding this indicia of fraud, it failed to report it all together so that the public could be made aware of the situation.

353.    SAS 99 further listed an unstable organizational structure as a risk factor for fraud. As indicia of such an unstable organizational structure, it lists "[h]igh turnover rates of senior management [or]. . . . of accounting, internal audit, or information technology staff". As stated herein, Datatec had a high turnover of CFOs as well as of the controller and employees working in accounts payable and treasury. Despite this high turnover, which Mark Davis acknowledged in early 2003, Deloitte conducted only a "mechanical" audit of Datatec. SAS 99, *id.*

354.    SAS 99 also lists "[u]nreasonable demands on the auditor, such as unreasonable time constraints regarding the completion of the audit or the issuance of the auditor's report" as a risk factor for the existence of fraud in a company. *Id.* Koch typically provided the most significant piece of data for purposes of estimating the financial health of the Company, the gross profit margin and percentage of completion estimates, between only 72 and 96 hours prior to the date on which any particular filing was due. Not only was this a scheduling issue for Deloitte in completing its review or audit, but more importantly it

constituted a "red flag" indicating possible fraud.  Yet it failed to alter its audit procedures accordingly.

> ### iv.     *Deloitte's Failure To Obtain And Evaluate Sufficient Competent Evidential Matter*

355.    Deloitte also violated GAAS by violating the third standard of field work which states: "Sufficient competent evidential matter is to be obtained through inspection, observation, inquiries, and confirmations to afford a reasonable basis for an opinion regarding the financial statements under audit."  AU 326.01.  Most of the auditor's work in forming an opinion on a Company's financial statements consists of obtaining and evaluating evidential matter concerning the assertions in such financial statements.

356.    Furthermore, in evaluating the competency of evidential matter, the standard states:

> To be competent, evidence, regardless of its form, must be both valid and relevant. The validity of evidential matter is so dependent on the circumstances under which it is obtained that generalizations about the reliability of various kinds of evidence are subject to important exceptions. If the possibility of important exceptions is recognized, however, the following presumptions, which are not mutually exclusive, about the validity of evidential matter in auditing have some usefulness:
>
> a.     When evidential matter can be obtained from independent sources outside an entity, it provides greater assurance of reliability for the purposes of an independent audit than that secured solely within the entity.
>
> b.     The more effective the internal control, the more assurance it provides about the reliability of the accounting data and financial statements.
>
> c.     The independent auditor's direct personal knowledge, obtained through physical examination, observation, computation, and inspection, is more persuasive than information obtained indirectly.

AU 326.21.

357.     Deloitte violated the foregoing standard by failing to obtain competent evidential matter with regard to, *inter alia*, Datatec's estimates of gross profit margin and percentage of completion, as well as the fictitious receivables.  For example, Deloitte personnel admitted to CW in their 2003 audit work (in July 2003) that they had failed to obtain returned "confirmation letters" from IBM Global—the most significant client of the Company—and had been given an incomplete letter from Lowe's, another significant client.

        ***v.***    ***Deloitte's Failure To Properly Evaluate Datatec's Ability To Continue As A Going Concern, And To Issue A "Going-Concern" Opinion***

358.     GAAS requires the auditor to evaluate whether there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. The professional standards state the following:

a.     The auditor considers whether the results of his procedures performed in planning, gathering evidential matter relative to the various audit objectives, and completing the audit identify conditions and events that, when considered in the aggregate, indicate there could be substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. It may be necessary to obtain additional information about such conditions and events, as well as the appropriate evidential matter to support information that mitigates the auditor's doubt.

b.     If the auditor believes there is substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time, he should (1) obtain information about management's plans that are intended to mitigate the effect of such conditions or events, and (2) assess the likelihood that such plans can be effectively implemented.

c.     After the auditor has evaluated management's plans, he concludes whether he has substantial doubt about the entity's ability to continue as a going concern for a reasonable period of time. If the auditor concludes there is substantial doubt, he should (1) consider the adequacy of disclosure about the entity's possible inability to continue as a going concern for a reasonable period of time, and (2) include an explanatory paragraph (following the opinion paragraph) in his audit report to reflect his

conclusion. If the auditor concludes that substantial doubt does not exist,
he should consider the need for disclosure.

AU 341.03

359.    Deloitte violated the foregoing standard by failing to properly obtain information
and evaluate whether there was substantial doubt about Datatec's ability to continue as a going
concern for a reasonable period of time, and by failing to issue a "going-concern" opinion.
Given the facts that, *inter alia*, (i) Datatec had recorded losses for nine of its ten years of
operations; (ii) that the Company continually lacked sufficient working capital to meet its daily
needs to pay its bills; (iii) that the agreement to perform the Home Depot job alone would force
Datatec to double the size of its workforce, thus drastically increasing costs over a short period
of time; and that IBM Credit funds, being "hand in hand" with the pendency of the Home Depot
work, would dry up once that work was finished -- Deloitte had an obligation to seriously
evaluate whether Datatec would be able to continue as a going concern.

360.    According to AU 341.03, these facts should have prompted Deloitte to, at a
minimum, obtain information about Datatec's plans that were intended to mitigate the effect of
such conditions or events and assess the likelihood that such plans could be effectively
implemented.  Deloitte, however, did neither of these things and instead simply accepted
Datatec's blanket and unsupported assertions that gross profit margins would be met and that
Datatec would be profitable.

## I.    Violations of GAAP and SEC Reporting Rules

361.    Defendants were required to present Datatec's financial statements in accordance
with GAAP.  17 C.F.R. § 210.4-01(a)(1).  Financial statements filed with the SEC that do not
comply with GAAP are presumed to be misleading and inaccurate.  Regulation S-X, 17 C.F.R
§ 210.4-01(a)(1), 65, Accounting Series Release ("ASR") 4, codified at SRA 34.

362.    Datatec's financial statements for the fiscal years 2002 and 2003 were not presented in accordance with GAAP because, for example, they:

- included material misstatements of gross profit margins on long-term contracts and thus vastly overstated revenue;

- failed to disclose the relationship between the loan from IBM Credit and Datatec's continued work on the Home Depot contract for which IBM Global Services was the general contractor;

- improperly recorded revenue relating to Datatec's advance materials purchases for Lowe's; and

- failed to disclose that IBM Credit based its lending on an artificially inflated internal accounts receivables ledger that included receivables based on invoices for work not yet performed and materials or products not yet provided to clients.

*i.*        ***Improper Accounting For Contracts***

363.    AICPA Statement of Position ("SOP") 81-1, "Accounting for Performance of Construction-Type and Certain Production-Type Contracts," sets forth the GAAP requirements concerning the accounting for long-term contracts.  It describes the percentage-of-completion method as follows:

> The percentage-of-completion method recognizes the legal and economic results of contract performance on a timely basis. Financial statements based on the percentage-of-completion method present the economic substance of a company's transactions and events more clearly and more timely than financial statements based on the completed-contract method, and they present more accurately the relationships between gross profit from contracts and related period costs. The percentage-of-completion method informs the users of the general purpose financial statements of the volume of economic activity of a company.

SOP 81-1.22.

364.    Likewise, Accounting Research Bulletin ("ARB") No. 45: Long-Term Construction-Type Contracts states in relevant part:

> The percentage-of-completion method recognizes income as work on a contract progresses.  The committee recommends that the recognized income be that percentage of estimated total income, either: (a) that incurred costs to date bear to

estimated total costs after giving effect to estimates of costs to complete based upon most recent information, or (b) that may be indicated by such other measure of progress toward completion as may be appropriate having due regard to work performed.

365.    The percentage-of-completion method depends on the dependability of the

estimates used.  SOP 81-1.23 and 81-1.24 provide:

Circumstances Appropriate to the Method

.23    The use of the percentage-of-completion method **_depends on the ability to make reasonably dependable estimates._**  (Emphasis added).  For the purposes of this statement, "the ability to make reasonably dependable estimates" relates to estimates of the extent of progress toward completion, contract revenues, and contract costs. The division believes that the percentage-of-completion method is preferable as an accounting policy in circumstances in which reasonably dependable estimates can be made and in which all the following conditions exist:

•    Contracts executed by the parties normally include provisions that clearly specify the enforceable rights regarding goods or services to be provided and received by the parties, the consideration to be exchanged, and the manner and terms of settlement.

•    The buyer can be expected to satisfy his obligations under the contract.

•    The contractor can be expected to perform his contractual obligations.

.24    For entities engaged on a continuing basis in the production and delivery of goods or services under contractual arrangements and for whom contracting represents a significant part of their operations, the presumption is that they have the ability to make estimates that are sufficiently dependable to justify the use of the percentage-of-completion method of accounting.  Persuasive evidence to the contrary is necessary to overcome that presumption. **_The ability to produce reasonably dependable estimates is an essential element of the contracting business. For a contract on which a loss is anticipated, generally accepted accounting principles require recognition of the entire anticipated loss as soon as the loss becomes evident. An entity without the ability to update and revise estimates continually with a degree of confidence could not meet that essential requirement of generally accepted accounting principles._**  (Emphasis added).

Further, Datatec's 2002 and 2003 10-Ks stated that:

The preparation of financial statements in conformity with accounting principles generally accepted in the United States requires management to make estimates and assumptions that affect the reported amounts of assets and liabilities and disclosure

of contingent assets and liabilities at the date of the financial statements and the reported amounts of revenues and expenses during the reporting period. ***Significant estimates underlying the accompanying consolidated financial statements include estimated revenues under long-term contracts, estimated costs to complete long-term contracts, recoverability of intangibles and other long-lived assets, allowance for doubtful accounts and inventory carrying values. Actual results could differ from those estimates***. (Emphasis added).

Defendants violated SOP 81-1.23 and 81-1.24 because Koch and Deloitte repeatedly failed to make reasonably dependable estimates on which the percentage-of-completion numbers for its long-term contracts were based. As a result, losses on long-term contracts were not recognized as soon as they became evident, and revenues were grossly overstated in violation of GAAP.

### ii.    *Improper Revenue Recognition*

366.    GAAP requires that revenue should not be recognized until it is both earned and collectible. SFAC No. 5, ¶¶ 83-84 provide:

> 83.    Further guidance for recognition of revenues and gains is intended to provide an acceptable level of assurance of the existence and amounts of revenues and gains before they are recognized. Revenues and gains of an enterprise during a period are generally measured by the exchange values of the assets (goods or services) or liabilities involved, and recognition involves consideration of two factors (a) being realized or realizable and (b) being earned, with sometimes one and sometimes the other being the more important consideration.
>
> a.    Realized or realizable. Revenues and gains generally are not recognized until realized or realizable. Revenues and gains are realized when products (goods or services), merchandise, or other assets are exchanged for cash or claims to cash. Revenues and gains are realizable when related assets received or held are readily convertible to known amounts of cash or claims to cash. Readily convertible assets have (i) interchangeable (fungible) units and (ii) quoted prices available in an active market that can rapidly absorb the quantity held by the entity without significantly affecting the price.
>
> b.    Earned. Revenues are not recognized until earned. An entity's revenue-earning activities involve delivering or producing goods, rendering services, or other activities that constitute its ongoing major or

central operations, and ***revenues are considered to have been earned when the entity has substantially accomplished what it must do to be entitled to the benefits represented by the revenues.*** Gains commonly result from transactions and other events that involve no "earning process," and for recognizing gains, being earned is generally less significant than being realized or realizable.

84.   In recognizing revenues and gains:

a.    The two conditions (being realized or realizable and being earned) are usually met by the time product or merchandise is delivered or services are rendered to customers, and revenues from manufacturing and selling activities and gains and losses from sales of other assets are commonly recognized at time of sale (usually meaning delivery).

b.    If sale or cash receipt (or both) precedes production and delivery (for example, magazine subscriptions), revenues may be recognized as earned by production and delivery.

c.    If product is contracted for before production, revenues may be recognized by a percentage-of-completion method as earned—as production takes place—***provided reasonable estimates of results at completion and reliable measures of progress are available***.

SFAC No. 5, ¶¶ 83-84 (emphasis added).

367.   For services companies like Datatec, GAAP permits revenue to be recognized when Datatec's clients receive and accept its services and have an obligation to pay for such services.

368.   Datatec's own revenue recognition policy emphasized this as well. *See e.g.,* April 30, 2003 Form 10-K ("[R]evenue and costs are only recognized on long-term contracts to the extent of the contracts' percentage of completion.").

369.   As set forth herein, Defendants repeatedly caused Datatec to violate both GAAP and its own revenue recognition policies. *First*, Datatec continually overestimated the percentage of completion of long-term contracts, underestimated the costs and inflated the gross profit margin on the contracts. Thus, in violation of SFAC No. 5, Datatec did not provide

reasonable estimates of completion of long-term contracts and thus did not provide an acceptable level of assurance of the existence and amounts of revenues before they were recognized.

370.    *Second,* Datatec and Defendants violated GAAP's revenue recognition rules by recognizing revenues when Datatec purchased and stockpiled materials for Lowe's in advance of being hired for jobs.  Datatec was not a materials broker and therefore had not, as required by SFAC No. 5, "accomplished what it must do to be entitled to the benefits represented by the revenues" when it simply purchased materials in advance of performance of its jobs on Lowe's contracts.  Thus, such recognition of revenue violated GAAP.

371.    Indeed, such revenue recognition was particularly inappropriate under GAAP because the Lowe's materials purchases should have been represented as a *liability*, not an earnings activity on which revenues could be recognized, since all the work on the contract – including being formally awarded the contract – had yet to be performed.

372.    Moreover, the practice of recording Lowe's advance materials purchases as assets violated SFAC No. 5, the SEC's Staff Accounting Bulletin No. 101 and SFAC 6 ¶¶ 25-26.

373.    SFAC 6 ¶¶ 25-26 describes assets as follows:

25.    Assets are probable future economic benefits obtained or controlled by a particular entity as a result of past transactions or events.

**Characteristics of Assets**

26.    An asset has three essential characteristics: (a) it embodies a probable future benefit that involves a capacity, singly or in combination with other assets, to contribute directly or indirectly to future net cash inflows, (b) a particular entity can obtain the benefit and control others' access to it, and (c) the transaction or other event giving rise to the entity's right to or control of the benefit has already occurred. Assets commonly have other features that help identify them—for example, assets may be acquired at a cost and they may be tangible, exchangeable, or legally enforceable. However, those features are not essential characteristics of assets. Their absence, by itself, is not sufficient to preclude an item's qualifying as an asset. That is, assets may be acquired without cost, they may be intangible, and although not exchangeable they may be usable by the entity in producing or distributing other goods or services. Similarly, although the ability of an

entity to obtain benefit from an asset and to control others' access to it generally rests on a foundation of legal rights, legal enforceability of a claim to the benefit is not a prerequisite for a benefit to qualify as an asset if the entity has the ability to obtain and control the benefit in other ways.

SFAC ¶¶ 25-26.

374.    The Lowe's advance materials purchases were far from assets because they did not "[embody] a probable future benefit that involves a capacity . . . to contribute directly or indirectly to future net cash inflows" since much of the materials were purchased well before Lowe's actually hired Datatec to perform on the jobs.

375.    In addition, assets were improperly recognized because performance on the future jobs had yet to begin.  Thus, "the transaction or other event giving rise to the entity's right to or control of the benefits" had *not* occurred, as required by SFAC 6 Emphasis original).

### iii.    *Regulation S-K Violations*

376.    Datatec's April 30, 2002 10-K and Item 7 of Datatec's April 30, 2003 10-K's MD&A required Defendants to furnish information required by Item 303 of Regulation S-K, 17 C.F.R. § 229.303.

377.    Pursuant to Item 303 of Regulation S-K, in discussing operational results Datatec must:

> Describe any known trends or uncertainties that have had or that the registrant reasonably expects will have a material favorable or unfavorable impact on net sales or revenues or income from continuing operations.  17 C.F.R. §229.303(a).

In addition:

> The discussion and analysis shall focus specifically on material events and uncertainties known to management that would cause reported financial information not to be necessarily indicative of future operating results. . . . Instruction 1 to Paragraph 303(a).

378.    A known trend or uncertainty must be included in the MD&A disclosure when:

> A disclosure duty exists where a trend, demand, commitment, event or uncertainty
> is both presently known to management and is reasonably likely to have material
> effects on the Registrant's financial condition or results of operations.

May 18, 1989 Interpretive Release No. 33-6835.

379.    Defendants knew or recklessly disregarded that they failed to disclose that Datatec's viability was dependent on its profit on the Home Depot job and that a loss on this job was reasonably likely to have a material adverse effect on Datatec's operating results. Disclosure of this information was necessary for a proper evaluation of Datatec's operating performance and in making an informed investment decision.

380.    Moreover, Defendants knew or recklessly disregarded that IBM Credit's willingness to lend money to Datatec depended on its performance of the Home Depot contract, and that once that contract was complete it would be extremely likely that IBM Credit would cease to provide Datatec with waivers of the Credit Facility's financial covenants.

381.    Further, Defendants knew or recklessly disregarded that Item 303 of Regulation S-K required Datatec to disclose that it lacked internal controls necessary to prevent revenue recognition abuses, and that the absence of such internal controls was reasonably likely to have a material adverse effect on the Company's operating results. Disclosure of this information was necessary for a proper understanding evaluation of Datatec's operating performance and in making an informed investment decision.

### iv.    Other GAAP Violations

382.    Datatec's financial statements also were required to comply with the following GAAP principles, and for the reasons set forth above Defendants failed to do so:

  (a)    the principle that a conservative approach be taken to ensure that uncertainty and risks inherent in business situations are adequately considered, and that errors in measurement be in the direction of

understatement rather than overstatement of net income and net assets. (*See* SFAC No. 2, ¶¶ 91-97);

(b) the principle that the financial information presented should be complete. (*See* SFAC No. 2, ¶¶ 79-80);

(c) the principle of  representation faithfulness ("presents fairly"). (*See* SFAC No. 2, ¶ 33);

(d) the principle of adequacy and fairness of disclosure. (*See* SFAC No. 2, ¶ 34 ¶¶ 77-80);

(e) the principle of materiality concerning information that is significant enough to affect the judgment of a reasonable person. (*See* SFAC No. 2, ¶ 132);

(f) the principle that the financial statements contain and disclose relevant and timely information for the economic decisions of the user. (*See* SFAC No. 2, ¶¶ 47, 48, 52, 56);

(g) the principle that the financial statements provide reliable financial information that represents the economic conditions or events that it purports to represent. (*See* SFAC No. 2, ¶¶ 58, 62);

(h) the principle that financial information should be comparable and consistent with similar information about other enterprises and with similar information about the same enterprise for some other period or some other point in time. (*See* SFAC No. 2 ¶¶ 111, 115, 117, 120);

(i) the principle that financial information should be neutral, or free from bias towards a predetermined result. (*See* SFAC No. 2 ¶¶ 98, 99);

(j) the principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events, and circumstances that change resources and claims to those resources. (*See* SFAC No. 1 ¶ 40);

(k) the principle that financial reporting should provide information that is useful to users of the financial statements in making rational investment, credit, and similar decisions. (*See* SFAC No. 1 ¶ 34);

(l) the principle that accounts receivable must be reported in the financial statements at net realizable value. (*See* ARB 43, Chapter 3A, ¶49); and

(m) the principle that disclosure of an entity's accounting policies should identify and describe the accounting principles followed by the reporting

99

entity and the methods of applying those principles that materially affect the determination of financial position, changes in financial position, or results of operations because information about the accounting policies adopted by a reporting entity is essential for financial statement users. (*See* ARB 22, ¶¶ 8, 12).

### J.  **Deloitte Acted With Scienter**

383.    As set forth above, Deloitte's actions were highly unreasonable, and constituted an extreme departure from the standards of ordinary care, which presented a danger of misleading the public that was known or so obvious that Deloitte must have been aware of it. Indeed, Mark Davis acknowledged as much when he repeatedly told CW that it would be best for Deloitte if the Company filed for bankruptcy so that this would all go away.  Deloitte's scienter is further evidenced by the magnitude of the misstatements (between $15-20 million) and the various "red flags" it willfully ignored and the knowledge of facts contradicting statements in Datatec's SEC filings, including:

- Datatec's restatement arising from the way in which it recognized revenue on its long-term contracts—the very principles at issue here;

- IBM internal audit letters confirming that Datatec had borrowed well over the Credit Facility's borrowing formula limits and that Datatec's assets were far exceeded by its assets, which were handed personally to Deloitte's audit staff on at least two occasions;

- Deloitte's admission that it knew that the IBM Credit and the Home Depot job for IBM Global went "hand in hand";

- Deloitte knew—and was told repeatedly—that the Company had "no cash", that it had exceeded its borrowing capacity, that it funded daily operations by imploring IBM Credit for daily wire transfers;

- Deloitte knew that, despite various private investments (including those of the Palladin Investors), the Company nonetheless had not reduced its debt, thus indicating operational problems and an inability to remain viable;

- Deloitte knew that it had not received complete confirmation letters from Lowe's and any confirmation letter from IBM Global—the two most significant sources of revenue for the Company;

- Deloitte knew that the vital gross profit margin numbers were generated and provided only a few days before the Company's filing deadlines, so that the most important component of the Company's financial results had the least amount of time to review and analyze;

- Deloitte's admission that Koch "was not on top of his numbers";

- Deloitte knew that the Company's costs did not match up with the percentage-of-completion and gross profit margin numbers at the end of the January and April 2003 quarters yet remained content to negotiate the numbers to be publicly disclosed;

- Deloitte knew that as of July 2003 IBM Global had not paid the significant escalating costs on the Home Depot project; and

- Deloitte used the information in its possession to confirm that the Company's gross profit margins historically had gone down consistently from the start of its projects through completion.

**K.    <u>No Safe Harbor</u>**

384.    The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this complaint. The specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, Defendants are liable for those false forward-looking statements because at the time each of those forward-looking was made the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Datatec who knew that those statements were false when made.

101

## COUNT I

### Violation of Section 10(b) of the Exchange Act and
### Rule 10b-5 Promulgated Thereunder
### <u>(Against All Defendants)</u>

385.     Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

386.     Plaintiffs have brought this claim within two years of discovery of the violations alleged herein, and within five years of the violations alleged herein.

387.     As alleged, Defendants and Datatec directly and indirectly, by the use and means of instrumentalities of interstate commerce and of the mails, knowingly or recklessly engaged and participated in a continuous course of conduct to conceal adverse material information about Datatec, including its true financial position, as specified herein.  In violation of Rule 10b-5, Defendants knowingly or recklessly employed devices, schemes, or artifices to defraud Plaintiffs, engaged in acts, practices, or courses of business which operated as a fraud or deceit upon Plaintiffs and directly or indirectly employed manipulative or deceptive devices or contrivances.

388.     Defendants and Datatec acted with scienter in that the facts pled herein give rise to a strong inference of conscious misbehavior or recklessness.  Specifically, Defendants prepared, drafted, reviewed and/or approved Datatec's SEC filings and press releases that, as detailed above, materially overstated revenue, and engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the Palladin Investors in an effort to maintain artificially high market prices for Datatec's securities in violation of Section 10(b) of the Exchange Act, 15 U.S.C. §78j(b), and Rule 10b-5, 17 C.F.R. §240.10b-5, promulgated thereunder.

389.    Each Defendant made materially false misrepresentations or omissions in statements filed with the SEC because they signed a filing containing such misrepresentation and/or committed a manipulative or deceptive act in furtherance of the scheme to defraud the public.

390.    The Palladin Investors relied on the accuracy of the SEC filings filed by Datatec of statements therein, as evidenced by the warrants that Datatec made in Sections 2.1(e)(iii), 2.1(e)(xv), 4.33 and 4.5 of the Note Purchase Agreement.  Palladin's reliance on Datatec's SEC filings was reasonable.

391.    As a direct and proximate result of Defendants' and Datatec's wrongful conduct, the Palladin Investors suffered damages.  In connection with their purchases of Datatec's Notes and Warrants at artificially inflated prices.

**COUNT II**

**Violation of Section 20(a) of the Exchange Act**
**(Against The Executive and Director Defendants)**

392.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

393.    Each Defendant, by reason of his Datatec stock ownership, management position and/or membership or representation on Datatec's Board of Directors, and his signature on and preparation and dissemination of the false and misleading statements, including SEC filings, was a controlling person of Datatec and had the power to influence, and exercised such power and influence, to cause Datatec to engage in the violations of law complained of herein.

394.    Each Defendant had the power, influence and authority to direct or cause the direction of management and policies of Datatec, and, therefore, to cause or prevent the wrongful conduct and practices complained of herein, and, in fact, directed and caused, in whole or in

material part, such management and policies of Datatec, so as to cause, and fail to prevent, the wrongful conduct alleged herein.

395.    As a direct and proximate result of the Defendants' wrongful conduct, Plaintiffs were damaged in connection with their purchase of convertible notes and warrants.

396.    By reason of the conduct alleged above, the Defendants are liable jointly and severally for the wrongful conduct alleged herein, and are liable to Plaintiffs for the substantial damages they suffered in connection with their purchases of Datatec's Notes and Warrants at artificially inflated prices as a result of Datatec's violations of the Exchange Act.

## COUNT III

### Breach of Fiduciary Duty
### (Against Gaon and the Director Defendants)

397.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

398.    At all relevant times, Datatec was insolvent in that its liabilities exceeded its assets and it was unable to pay its debts as they became due.  Prior to and when the Palladin Investors signed the Note Purchase Agreement and through and including the Petition Date, Datatec remained insolvent, and its financial condition worsened.

399.    During the period of insolvency, Defendants, as officers and directors of Datatec, owed a fiduciary duty: (a) to exercise due care to the Palladin Investors, (b) to act in the best interest of the Palladin Investors, (c) to preserve the assets of Datatec for the Palladin Investors, and (d) exercise due care and loyalty.

400.    In connection therewith, the Defendants had a fiduciary duty not to allow Datatec to report false financial information to the Palladin Investors, to the SEC, to the investing public,

and to trade creditors.  By allowing the wrongful conduct set forth above, the Defendants breached their fiduciary duty, duty of care and duty of loyalty to the Palladin Investors.

401.    Defendants further breached their fiduciary duty to the Palladin Investors by failing to carry out their duties with due care and prudence.

402.    Not only did Defendants fail to preserve the assets of Datatec, but they breached their duties of loyalty and due care by engaging in self-dealing, such as, for example, awarding themselves unprecedented fees for the participation on various committees despite knowledge that Datatec lacked the ability to pay those fees without borrowing the funds from IBM Credit.

403.    As a consequence of their violations of fiduciary duty to the Palladin Investors during the period of insolvency, the Palladin Investors entered into a transaction that they otherwise would not have entered and suffered damages in an amount to be determined at trial. Defendants further caused damage to the Palladin Investors by failing to exercise due care and due loyalty in the management and operations of Datatec.

## COUNT IV

### Negligent Misrepresentation
### (Against The Executive and Director Defendants)

404.    Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

405.    Defendants acted recklessly and/or negligently in connection with their oversight of Datatec's business and in the creation and dissemination of financial statements and data to the public and to the Palladin Investors.

406.    As is evident from the Note Purchase Agreement, Defendants knew and intended that the Palladin Investors would rely on Datatec's statements of financial health in order to

decide whether to enter in to the Note Purchase Agreement.  Moreover, Defendants knew or should have known that those statements were materially false and misleading.

407.    Defendants had a duty to ensure that the disclosure to the Palladin Investors were not misleading.  Defendants breached that duty.

408.    In particular, Defendant Gaon made numerous representations, including those set forth in and made pursuant to the Note Purchase Agreement (Agreement at ¶ 2.1(e)(iii), (xv)), about the financial condition of Datatec for the purpose of inducing the Palladin Investors to enter into the Agreement.  Additionally, Defendant Gaon was required to execute a certificate stating that "Since April 30, 2002, (i) no Material Adverse Effect has occurred or exists with respect to the Company, except as disclosed in any SEC documents filed at least five (5) days prior to the Closing Date . . . , and (ii) the Company has not taken any steps, and does not currently expect to take any steps, to seek protection pursuant to [the Bankruptcy Code]".  *Id.* at ¶ 2(e)(xv).  Defendant Gaon knew at the time he made these representations that they were false, that they would be delivered to the Palladin Investors, and that the Palladin Investors would rely on these statements to determine whether to enter into the Note Purchase Agreement.  Defendant Koch was aware of and facilitated and/or caused the forgoing statements to be made.  All Defendants knew or should have known that such statements were being made, and approved of them.

409.    The Palladin Investors relied on Datatec's financial statements and, based on these representations, entered into the Note Purchase Agreement whereby the Palladin Investors agreed to invest $4.9 million in Datatec, and later agreed to modify the terms of the investment at Datatec's request.  This reliance was reasonable.

410.     Had the Palladin Investors known of the true financial condition of Datatec, they would not have agreed to invest in Datatec.  The Palladin Investors suffered damages as a result of Defendants' misrepresentations, in an amount to be determined at trial.

**COUNT V**

**Fraudulent Conveyance**
**(Against Gaon and Director Defendants)**

411.     Plaintiffs repeat and reallege all of the allegations set forth above as if fully set forth herein.

412.     At all relevant times, Datatec was insolvent in that its liabilities exceeded its assets and it was unable to pay its debts as they became due.  Prior to and when the Palladin Investors signed the Note Purchase Agreement and through and including the Petition Date, Datatec remained insolvent, and its financial condition worsened.

413.     During the period of insolvency and prior to the issuance July 23, 2003 filing of the 2003 10-K, in violation of N.J.S.A. 25:2-27, after the Palladin Investors' claims against Datatec arose, the Board voted unanimously to award an annual fee of approximately $20,000 for members of the Audit Committee, an annual fee of approximately $25,000 for the Chairperson of the Audit Committee, an annual fee of approximately $7000 for members of the Compensation Committee, and an annual fee of approximately $10,000 for the Chairperson of the Compensation Committee.

414.     The Board knew at the time of the vote that the Company had no cash, that it had to borrow money from IBM Credit just to make payroll, along with all its other debts, and that the Company would have to borrow money from IBM Credit to pay Board members their fees.

415.    Datatec incurred the obligations to pay these fees without receiving a reasonably equivalent value in exchange.  Shortly after the meeting, and in violation of the N.J.S.A. 25:2-27, Company called IBM to get money to cover the checks cut for each director and issued the checks.  These amounts belonged to the Palladin Investors, not Defendants.

416.    Plaintiffs have been damaged as a result of Defendants' conduct, in an amount to be determined at trial.

## PRAYERS FOR RELIEF

417.    WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, as follows: (a) awarding Plaintiffs compensatory and punitive damages to the extent permitted by law, including interest; (b) awarding Plaintiffs their costs and expenses incurred in this action, including reasonable attorney's and expert's fees and other costs and disbursements; and (c) such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

418.     Plaintiffs hereby demand a trial by jury on all claims triable by jury.


Dated: December 2, 2005
        Livingston, N.J.

                                                        **SKOLOFF & WOLFE, P.C.**


                                                        /s/  Jonathan W. Wolfe
                                                        Jonathan W. Wolfe (JW-7070)
                                                        293 Eisenhower Parkway
                                                        Livingston, N.J.  07039
                                                        (973) 992-0900

                                                        *Attorneys for Plaintiffs Palladin*
                                                        *Investors*

OF COUNSEL:
**DEWEY PEGNO & KRAMARSKY LLP**
Thomas E. L. Dewey
Keara A. Bergin
Tamara L. Bock
220 East 42nd Street
New York, New York 10017
(212) 943-9000