**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW JERSEY**

| | |
|---|---|
| Palladin Partners; Palladin Overseas Fund, Ltd.; Palladin Multi-Strategy Partners, LP; Cheyenne LLC; Palladin Opportunity Fund, LLC; and Palladin Oversees Multi-Strategy Fund, Ltd.; | 05-CV-3305 (WJM) |
| *Plaintiffs,* | **OPINION** |
| v. | |
| Isaac J. Gaon, Raymond R. Koch, Mark J. Hirshhorn, William J. Adams, David M. Milch, Robert H. Friedman, Walter Grossman, Mark Berenblut, Oliver Maggard, and Deloitte & Touche LLP, | |
| *Defendants.* | |

Jonathan W. Wolfe
Skoloff and Wolfe PC
293 Eisenhower Parkway
Livingston, NJ 07039
(*Attorneys for Plaintiffs*)

David Scott Goldstein
Morrison, Cohen, Singer & Weinstein
750 Lexington Avenue
New York, NY 10022
(*Attorneys for Defendants Gaon and Koch*)

Jack M. Kint, Jr.
Olshan Grundman, Frome, Rosenzweig and Wolosky
65 East 55th Street
New York, NY 10022
(*Attorneys for Defendants Adams, Milch, Friedman, Grossman, Berenblut, and Maggard*)

Eric Blumenfeld
Hughes Hubbard & Reed LLP
101 Hudson Street, Suite 3601
Jersey City, NJ 07302
(*Attorneys for Defendant Deloitte & Touche LLP*)

i

## TABLE OF CONTENTS

I.  BACKGROUND ................................................................................................1

    A.  Factual Background ..................................................................................1

    B.  Alleged Fraudulent Schemes ...................................................................3

            i.  Advance Invoicing and Purchasing Schemes .................................3

           ii.  Gross Profit Margin Inflating and Failure to Recognize Losses ....4

          iii.  IBM Credit and IBM Global Interrelationship .............................6

    C.  Alleged Misstatements and Omissions ....................................................7

    D.  Defendants' Liability ...............................................................................8


II.  ANALYSIS ....................................................................................................8

    A.  Standard of Review .................................................................................8

    B.  Service of Process ...................................................................................9

    C.  Section 10(b) Claims .............................................................................10

            i.  Confidential Witness .....................................................................12

           ii.  Failure to Plead Fraud with Particularity .....................................12

          iii.  Failure to Plead Misstatements or Omissions ..............................13

               a.  Executive Defendants ..........................................................14

                    1.  Impermissible Group Pleading ...............................14

                    2.  Misstatements Not Actionable ...............................15

               b.  Deloitte & Touche ...............................................................17

           iv.  Failure to Plead Reliance ..............................................................17

            v.  Failure to Plead Scienter with Particularity .................................18

                a.  Executive Defendants ..........................................................19

                b.  Director Defendants .............................................................20

                      1.  Actual Knowledge of Fraud ...................................21

                      2.  Inference of Scienter ..............................................22

                c.  Deloitte & Touche ...............................................................26

           vi.  Failure to Plea Loss Causation ......................................................27

                a.  Executive Defendants ..........................................................27

                b.  Deloitte & Touche ...............................................................28

    D.  Section 20(a) Claims .............................................................................29

    E.  Common Law Claims ............................................................................31

            i.  Martin Act Does Not Bar Claims .................................................31

            ii.  Breach of Fiduciary Duty .............................................................32

          iii.  Negligent Misrepresentation ........................................................34

           iv.  Fraudulent Conveyance .................................................................35


III.  CONCLUSION ...........................................................................................35

**WILLIAM J. MARTINI, U.S.D.J.**:

This matter comes before the Court on four motions to dismiss the Amended Complaint ("Complaint" or "Compl.") pursuant to Federal Rules of Civil Procedure 12(b)(6), 9(b), and the Private Securities Litigation Reform Act of 1995, 15 U.S.C. § 78u-(b)(1).  These motions have been filed by all Defendants.  There was no oral argument.  Fed. R. Civ. P. 78.  For the reasons set forth below, the motions are GRANTED in part and DENIED in part.

## I.  BACKGROUND

**A.    Factual Background**

Plaintiffs are five funds that provided secured financing in the amount of $4.9 million to Datatec Systems, Inc. ("Datatec" or "the Company"), a computer networking company that ultimately went bankrupt.  Datatec, a non-party, was a publicly traded Delaware corporation headquartered in New Jersey and provided services installing wiring for and configuring computer networking systems.

Pursuant to a Note Purchase Agreement and related agreements, on July 3, 2003, Plaintiffs collectively lent Datatec $4.9 million in return for Notes in that amount and 875,000 Warrants.  On July 28, 2003, Plaintiffs made an additional investment in Datatec, extending Datatec's time to repay the Notes, waiving various rights, and receiving an additional 700,000 Warrants.

Unfortunately, later that year, on December 5, 2003, Datatec retracted its previous earnings estimates for 2004 and announced an expected loss not simply for the second quarter of fiscal 2004 but for the year overall.  It further announced that Defendant Gaon, Datatec's CEO, had resigned and that Defendant Director Berenblut had stepped down from his position.  The price of Datatec's stock fell 34% following these disclosures.

Next, on December 17, 2003, Datatec quantified an expected second quarter loss of approximately $10 million and announced that it expected to take a restructuring charge of $4.5 million in the next fiscal year.  In addition, it disclosed that it had retained outside counsel to conduct an independent audit of the valuation of its long-term contracts.  Datatec additionally disclosed that IBM Credit, through which Datatec had been receiving loans, had refused to issue waivers for Datatec's most recent defaults.  Datatec's stock dropped another 15% following these disclosures, and its stock was de-listed by NASDAQ shortly thereafter for failure to file a 10-Q for the quarter ended October 31, 2003.

On August 12, 2004, Datatec announced that in the course of reviewing its revenue recognition policies, it found that it had overstated revenues by up to $18 million over prior periods, that up to $10 million in losses previously thought to occur in 2004 actually required recognition in earlier periods, and that its losses for those earlier periods had been understated by about $10 million.  The Company further stated that its previous SEC filings and financial statements for the periods ended 2003, 2002, and 2001—including 2002 and 2003 periodic, quarterly and annual reports—"should not be relied upon by investors."  (Form 8-K filed 8/12/04.)  In December 2004, Datatec filed for bankruptcy, defaulted on the Notes, and the Warrants Plaintiffs received for their investments were rendered worthless.

On June 30, 2005, Plaintiffs filed this suit under Sections 10(b) and 20(a) of the

Securities Exchange Act of 1934 ("the  Act"), 15 U.S.C. §§ 78j(b), 78t(a), 78r, and Rule 10b-5,

17 C.F.R. § 240.10b-5, promulgated thereunder.  Defendants are Isaac J. Gaon ("Gaon"),

Datatec's Chairman and CEO during the period in question; Raymond R. Koch ("Koch"),

Datatec's Chief Operating Officer during the period in question; Datatec's outside directors

William J. Adams, Jr. ("Adams"), David M. Milch ("Milch"), Robert H. Friedman ("Friedman"),

Walter Grossman ("Grossman"), Mark L. Berenblut ("Berenblut"), and J. Oliver Maggard

("Maggard"); and the Company's independent accountant Deloitte and Touche LLP ("D&T").

Hereinafter, Gaon and Koch are collectively referred to as "the Executive Defendants," and

Adams, Milch, Friedman, Grossman, Berenblut, and Maggard are collectively referred to as "the

Director Defendants."

**B.     Alleged Fraudulent Schemes**

Plaintiffs generally allege three fraudulent schemes Defendants employed to portray the

Company as financially healthier than it in fact was.  All, Plaintiffs allege, contributed to the

false statements at issue in this case.

> *i.      Advance Invoicing and Purchasing Scheme*s

First, Plaintiffs allege advance purchasing and invoicing schemes whereby Datatec

inflated its revenue and accounts receivable figures by posting receivables for work that had not

yet been performed or for materials not used.  With regard to the advance purchasing scheme,

Plaintiffs allege Defendants conducted the scheme with specific regard to its contract with

Lowe's.  Plaintiffs allege that Datatec would regularly make advance materials purchases, ostensibly for future work to be performed for Lowe's, but would recognize the revenue from this future work in the present.  At times, Datatec allegedly purchased more than one and one-half years worth of materials pursuant to this scheme.  At the same time, Plaintiffs claim Datatec never had an agreement with Lowe's for longer than a three-month period at any point in time.  Thus, there was no business justification for these advance purchases.  Plaintiffs allege Gaon and Koch expressly ordered these purchases to "make revenues," and that these purchases were often ordered at the end of the month or quarter, when the Company's lower-than-desired results started to come in.  (Compl. ¶ 209.)

Plaintiffs further allege that Defendants engaged in an advance invoicing scheme whereby Datatec would issue invoices to its clients for work not yet done solely to inflate artificially the accounts receivable ledger provided to IBM Credit, through which the Company had been obtaining loans.  Defendants engaged in this scheme with respect to its long-term contracts.  It did so allegedly to obtain even more borrowings from IBM Credit., since Datatec's credit line was based on its accounts receivable balances.  Thus, Plaintiffs allege, the accounts receivable invoices upon which the loans were based were inflated such that the loans obtained were in excess of the amount entitled to on the actual receivables.

ii.     *Gross Profit Margin Inflation and Failure to Recognize Losses*

Second, Plaintiffs allege Defendants deliberately neglected to account for cost overruns and losses in one of its major contracts, the "Home Depot Project," so that it could maintain a high profit margin for the project, and therefore a rosier financial picture overall.  According to

-4-

the Complaint, Home Depot awarded a $250 million-plus multi-year contract to IBM Global Services ("IBM Global") to rewire the computer networking systems in approximately one thousand Home Depot stores.  Datatec was one of two subcontractors on the Home Depot job under IBM Global.  Each subcontractor would receive $15 million in return for servicing five hundred stores, regardless of the costs incurred.  According to Plaintiffs, Koch was responsible for Datatec's estimates and business modeling leading up to the bid submitted to IBM Global. Koch projected the gross profit margin on the Home Depot work to be 25-30%.

In or about August 2002, IBM Global asked Datatec to take over for the other subcontractor, so that Datatec would be the sole subcontractor for the wiring work on all one thousand Home Depot stores.  Datatec accepted, but according to Plaintiffs, the Company was unequipped to handle the new scale of the project.  Plaintiffs allege that, due to the massive amount of unanticipated and unbudgeted work the Home Depot Project ultimately required, Datatec's costs skyrocketed far beyond those originally estimated by Koch.

Allegedly, Datatec also encountered many unforeseen difficulties in installing the wiring and generally performing under its obligations.  As a result, many Home Depot stores required unanticipated "site re-visits," which Datatec began in January 2003.  (Compl. ¶ 91.)  As a result, Datatec allegedly needed to borrow money from IBM Credit in order to complete the project. According to the Plaintiffs, all of this unforeseen work was done without any extra-contractual payment from IBM Global.

In spite of these increases in costs, Plaintiffs allege, Defendants failed to recognize them in the Company's accounting and failed to adjust Datatec's profit projections accordingly. Plaintiffs also claim that although Defendants began adjusting the gross profit margin projections

in July 2003, by that time, Defendants knew the Company could not realize a profit on the project at all and should have recognized a loss, which it did not do.  Only in December 2003, long after Defendants allegedly knew Datatec could not profit from the project, did Defendants revise the gross profit margin to negative 6-10%.  In short, Plaintiffs claim Defendants knew of the rising costs of the project as early as January 2003 and should have adjusted the gross profit margin long before December 2003.

### iii.    IBM Credit and IBM Global Interrelationship

Third, Plaintiffs allege Defendants fraudulently succeeded in obtaining additional loans from IBM Credit beyond what they were contractually entitled to by threatening to default on the Home Depot Project, which was overseen by IBM Global.  Defendant then allegedly misrepresented that IBM Credit had authorized the additional loans because of the Company's strong financial performance.  In fact, Plaintiffs allege, Defendants needed these cash infusions to stay afloat.

IBM Credit and Datatec had entered into an Inventory and Working Capital Financing Agreement in November 2000 which provided for certain loans, one of which is referred to as the IBM Credit Facility.  The IBM Credit Facility permitted Datatec to make borrowings based on a formula of 85% of eligible receivables and 25-35% of eligible inventory.  Although Datatec had defaulted on certain financial covenants in the IBM Credit Facility, IBM Credit provided written waivers to Datatec for each of these defaults through July 2003.  IBM Credit also repeatedly increased the maximum amount available to Datatec and extended the Credit Facility's expiration date.  Thus, when as of January 2003, the initial maximum allowable loan was $16

million, IBM Credit agreed to increase Datatec's maximum amount of borrowing under the IBM

Credit Facility to $23 million.  Likewise, on or about April 14, 2003, IBM Credit agreed to

increase the available borrowings to $29 million and to extend the expiration date on the Credit

Facility from August 2003 to August 2004.  On or about June 3, 2003, IBM Credit allegedly

agreed to increase these limits again.

    According to the Complaint, Datatec stated publicly that IBM Credit issued these written

waivers and limit increases because the Company had been performing well and because "the

Company's accounts receivables and inventory ha[d] increased."  (Compl. ¶ 68.)  Plaintiffs

claim, however, that IBM Credit provided these additional funds and waivers to Datatec solely

because of Datatec's role as a subcontractor to IBM Global on the Home Depot Project and

because Datatec had threatened to default on the project without additional cash.  Plaintiffs also

claim that Gaon admitted repeatedly at board meetings that he had forced IBM Credit to lend the

Company more money by threatening to "close [Datatec's] doors" and default on the Home

Depot Project.  Gaon further allegedly stated that IBM Credit "would be crazy" to stop lending

money due to IBM Global's need to have Datatec finish the Home Depot work.  (*Id.* at ¶ 200.)


**C.    Alleged Misstatements and Omissions**

    The alleged misstatements and omissions at issue in this case stem from Datatec's SEC

filings (10-Ks, 10-Qs, 8-Ks) and press releases in 2002 and 2003.  Although for purposes of these

motions to dismiss it is unnecessary for the Court to repeat herein each alleged misstatement and

omission, it suffices to say that Defendants allegedly misrepresented in these documents the

extent of its indebtedness, its financial health, the nature of and reasons for the loans the

Company obtained from IBM Credit, as well as the Company's compliance with Generally Accepted Accounting Standards ("GAAS") and GAAP.

**D.      Defendants' Liability**

In their Complaint, Plaintiffs seek to hold Executive and Director Defendants liable for the alleged misstatements because each signed or authorized some or all of the various SEC filings and press releases at issue in this case and "had the power to control, influence, or in fact executed" the fraudulent schemes giving rise to the alleged securities violations.  (*Id.* at ¶ 190.) With regard to D&T, Plaintiffs allege D&T recklessly blinded itself to Datatec's improper practices and financial reporting, and falsely issued clean opinions on Datatec's financial statements.

## II.  ANALYSIS

**A.      Standard of Review**

To survive a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6), a plaintiff must set forth sufficient information to outline the elements of its claims or to permit inferences to be drawn that these elements exist.  *See* Fed. R. Civ. P. 8(a)(2); *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).  A Court may dismiss a Complaint for failure to state a claim only if, after viewing the allegations in the Complaint in the light most favorable to the plaintiff, it appears beyond doubt that no relief could be granted under any set of facts which could prove consistent with the allegations.  *Hishon v. King & Spalding*, 467 U.S. 69, 73 (1984); *Zynn v. O'Donnell*, 688 F.2d 940, 941 (3d Cir. 1982).  In deciding such a motion, a Court must take as true and view in the

light most favorable to a plaintiff all allegations in the Complaint.  *See Warth v. Seldin*, 422 U.S. 490, 501 (1975).  A Court need not, however, accept legal or unsupported conclusions, unwarranted inferences, or sweeping legal conclusions cast in the form of factual allegations. *Morse v. Lower Merion Sch. Dist.*, 132 F.3d 902, 906 (3d Cir. 1997).

**B.      Service of Process**

Defendant Berenblut asks the Court to dismiss the Complaint as against him because Plaintiffs never perfected service of process.  Berenblut, who lives in Ontario, Canada, alleges Plaintiffs failed to comply with the Hague Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters ("Hague Convention"), because instead of leaving a copy of the Summons and Complaint with an adult at his residence, the process server gave the documents to Berenblut's wife on a public sidewalk.

Under the Hague Convention, Nov. 15, 1965, 20 U.S.T. 361, T.I.A.S. No. 6638, individuals located abroad may be served in accordance with applicable laws of that country– here, Canada.  Under Canadian law, an individual may be served by leaving a copy of the relevant documents with an adult at the place of residence and mailing a copy of the documents to the residence the same or the following day.  Ontario R. of Civ. P. 16, R.R.O. 1990, Reg. 194 s.1b.  Although Plaintiffs admit to having served Berenblut by giving the documents to Mrs. Berenblut, they take issue with Berenblut's characterization of Mrs. Berenblut's physical location when she received the documents.  They argue, and the process server similarly swears, that Mrs. Berenblut was not standing on a public sidewalk, but rather in the driveway of her house after having put out the trash.  Plaintiffs further point out that they used this mode of service only after

having made numerous unsuccessful good-faith attempts to serve Berenblut personally at his residence, vacation home, and place of work.  Also, in accordance with the applicable rules, Plaintiffs attest to having mailed the documents to the Berenblut residence the following day.

The Court will deny Berenblut's motion to dismiss for failure to effect service.  Berenblut does not argue he lacked notice of this action.  Instead, he hopes to avoid this litigation based on a technicality by arguing that his wife was standing a few feet beyond the confines of their property when she received the documents.  The Court first notes that Berenblut lacks personal knowledge of the facts at issue here since he was not at home at the time of service.  More importantly, even if the Court were to believe Berenblut, the process server's only mistake would have been not to wait a few more seconds until Mrs. Berenblut had stepped back onto her property.  The Court finds Berenblut's arguments unavailing.  The Court finds that Plaintiffs properly served Berenblut in accordance with the Hague Convention and applicable local rules, and denies Berenblut's motion to dismiss as to this ground.

## C.    Section 10(b) Claims

In order to state a valid Section 10(b) claim, Plaintiffs must establish that Defendants "made a materially false or misleading statement or omitted to state a material fact necessary to make a statement not misleading" in connection with the purchase or sale of a security.[1]  *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1417 (3d Cir. 1997).  Plaintiffs must also establish that Defendants acted with the required scienter, and that Plaintiffs' reliance on the

---

[1] Here, Section 10(b) applies because Plaintiffs received, in connection with their investment, Warrants for the purchase of Datatec stock.

misstatement caused injury.  *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 299 (D.N.J. 2001)

(*quoting* S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995 U.S.C.C.AN. 679, 683).  Finally, a

Section 10(b) claim must satisfy the heightened pleading standards of Fed. R. Civ. P. 9(b) and

the Private Securities Litigation Reform Act of 1995 (hereinafter "PSLRA").  *In re Party City,*

147 F. Supp. 2d at 298-99.

Rule 9(b) requires that all averments of fraud be stated with particularity.  Fed. R. Civ. P.

9(b); *see also In re Burlington,* 114 F.3d at 1417.  In an attempt "to 'curtail the filing of abusive

lawsuits' through the establishment of a 'uniform and stringent pleading requirement,'" *In re*

*Party City,* 147 F. Supp. 2d at 299 (*quoting* S. Rep. No. 104-98, at 4 (1995), *reprinted in* 1995

U.S.C.C.AN. 679, 683), the PSLRA also imposes a particularity requirement by demanding that

the Complaint set forth "each statement alleged to have been misleading [and] the reason or

reasons why the statement is misleading."  15 U.S.C. § 78u-4(b)(1).  The PSLRA further requires

Plaintiffs to allege with particularity facts that give rise to a strong inference of scienter with the

required state of mind for each act or omission.  *See* 15 U.S.C. § 78u-4(b)(2).  Although Rule

9(b) allows state of mind to be generally averred, the Third Circuit has concluded that the

PSLRA supercedes Rule 9(b) in the event of a conflict.  *In re Advanta Corp. Sec. Litig.*, 180 F.3d

525, 531 n.5 (3d Cir. 1999).

Defendants contend that Plaintiffs have failed to comply with the requirements of both

Rule 9(b) and the PSLRA and make a number of arguments in support of their motions to

dismiss: (1) failure to plead fraud with particularity; (2) failure to plead misstatements or

omissions; (3) failure to plead reliance; (4) failure to plead scienter with particularity; and (5)

failure to plead loss causation.

i.      *Confidential Witness*

Plaintiffs base many of their allegations on the statements of a confidential witness

("CW"), whom Plaintiffs identify as "a former high-ranking financial officer" of Datatec who has

personal knowledge regarding the various filings and press releases at issue, the relevant loans,

Datatec's financial results, operational performance, and statements made and actions taken by

each Defendant as alleged in the Complaint.  (Compl. ¶ 6.)  As set forth by the Third Circuit in

*Cal. Pub. Employees' Ret. Sys. v. Chubb Corp.*, 394 F.3d 126 (3d Cir. 2004), Plaintiffs may use

confidential sources to meet the requirements of the PSLRA, and "there is no requirement that

they be named, provided they are described in the Complaint with sufficient particularity to

support the probability that a person in the position occupied by the source would possess the

information alleged."  *Id.* at 146 (citing *Novak v. Kasaks*, 216 F.3d 300, 314 (2d Cir. 2000), *cert.*

*denied*, 531 U.S. 1012 (2000) (emphasis in original).  Defendants do not contend Plaintiffs have

failed to meet this requirement.


ii.      *Failure to Plead Fraud With Particularity*

All Defendants ask that the Court dismiss the Complaint on the ground that Plaintiffs

failed to plead fraud with the requisite particularity required by PSLRA.  Specifically, they argue

that Plaintiffs base their allegations of fraud impermissibly using "group pleading," and that the

Complaint fails to set forth particularized allegations of fraud.  Although Defendants are correct

that "group pleading" is impermissible after the passage of the PSLRA, *see, e.g., In re Cambrex*

*Corp. Sec. Litig.*, No. 03-CV-4896, 2005 WL 2840336 at *15 (D.N.J. October 27, 2005); *Winer*

-12-

*Family Trust v. Queen,* 2004 U.S. Dist. Lexis 19244 at *17-18 (E.D. Pa. September 27, 2004), the Court finds Plaintiffs' allegations of fraud sufficiently particularized.

Plaintiffs set forth in great detail the nature of the various alleged fraudulent schemes, outlining in painstaking detail the way in which Defendants allegedly instituted them and directed them.  Plaintiffs document when the alleged schemes took place, who participated in them, and how they operated to inflate revenue, assets, gross profit, net income, and profitability. Plaintiffs support their allegations with specific conversations that allegedly took place during board meetings as well as during the normal course of Datatec's business.

The Court does agree, however, that while Plaintiffs allege Defendants employed the advance invoicing and advance purchasing schemes with respect to many different contracts, the Complaint only specifically mentions the Lowe's account.  Plaintiffs have failed to allege with any degree of particularity the operation of the schemes as to any other contracts or projects.  For this reason, while Defendants' motions to dismiss are denied as to the alleged advanced invoicing and purchasing on the Lowe's contract, they are granted as to the other alleged but unidentified contracts.

iii.     *Failure to Plead Misstatements or Omissions*

Executive Defendants and D&T each argue that the Court should dismiss the Complaint because of a failure to plead misstatements or omissions as required for Section 10(b) liability.

a.     Executive Defendants

Defendants Gaon and Koch argue that Plaintiffs have failed to plead actionable

misstatements as to them and that Plaintiffs impermissibly use group pleading to support their claims.

### 1. Impermissible Group Pleading

The Court agrees with Executive Defendants that, with respect to Koch, Plaintiffs do not allege that Koch actually signed or approved any of the SEC filings at issue in this case. Instead, it appears they seek to hold Koch liable for the filings because of his substantial participation in their preparation. Such allegations, however, amount to little more than allegations that he aided and abetted the other Defendants in perpetuating the fraud. And as the Supreme Court held in *Cent. Bank of Denver, N.A., v. First Interstate Bank of Denver, N.A.*, 511 U.S. 164 (1994), private plaintiffs may not maintain an aiding and abetting suit under Section 10(b). *See also SEC v. Lucent Techs., Inc.*, 363 F. Supp. 2d 708 (D.N.J. 2005) (dismissing case alleging substantial participation in SEC filing because accusation of substantial participation essentially amounted to aiding and abetting).

With regard to the June 26, 2003 press release, on the other hand, Plaintiffs do allege that Koch specifically approved the figures contained therein. As such, while Koch may not be held liable for misstatements contained in other SEC filings, Plaintiffs may pursue this action against him for misstatements contained in the June 26, 2003 press release and the accompanying 8-K of the same date.

With respect to Gaon, the Complaint alleges Gaon signed and/or approved each of the SEC filings at issue in this case. Thus, Plaintiff may seek to hold him liable for any misstatements contained in them. For this reason, the Court will deny Gaon's motion as to this

ground.

## 2. Misstatements Not Actionable

Gaon and Koch next collectively argue that the alleged misstatements and omissions are not actionable because they were nothing more than statements of corporate optimism, or "puffery," protected under the law. Certain vague and general statements of optimism have been considered inactionable as a matter of law because they "constitute no more than 'puffery' and are understood by reasonable investors as such." *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1429 n.14 (3d Cir. 1997). "Such statements, even if arguably misleading, do not give rise to a federal securities claim because they are not material." *In re Advanta Corp. Sec. Litig.*, 180 F.3d 525, 538 (3d Cir. 1999).

Although Executive Defendants request dismissal for all alleged misstatements outlined in the Complaint, they only cite to two examples. As such, the Court limits its analysis to these two examples. First, the Executive Defendants identify as inactionable the statement contained in the June 26, 2003 press release: "For fiscal 2004, Datatec expects that sales, excluding potential sales from new government opportunities, will be in the range of $120 to $125 million and earnings per share will be between $0.14 and $0.16." The Court cannot comprehend how Defendants characterize this statement as nothing more than a vague statement of corporate optimism. Here, the announcement provides a very specific range of future sales as well as a specific range of per-share earnings for a specific time period. Statements such as these, articulating specific predictions of future growth and earnings can constitute an actionable misstatement. *Weiner v. Quaker Oats Co.*, 129 F.3d 310, 320 (3d Cir. 1997) (holding that where

an alleged forward-looking misstatement makes a specific prediction regarding "a particular, defined time," such statement is not merely a "vague expression of optimism"). And while such forward-looking statements can be protected under the safe-harbor provision of the PSLRA, forward-looking statements made with actual knowledge that the statement was false or misleading are not. *In re Advanta*, 180 F.3d at 535 (*citing* 15 U.S.C.A. § 78u-5(c)(1)(B)(I)). Because the Court finds, as further explained in the remainder of this Opinion, that Plaintiffs have sufficiently alleged with respect to the Executive Defendants that these Defendants had actual knowledge of the falsity of the statement, the Court finds it actionable.

Executive Defendants next identify as inactionable puffery the statement contained in the June 26, 2003 press release: "[the] Company expects to achieve improvements to gross margins, profitability and cash flows by taking a more selective approach to project opportunities, adjusting its sales mix and continuing to focus on expense control." The Court agrees that this statement, unlike the previous statement, amounts to little more than a vague prediction of corporate optimism. Plaintiffs argue the statement is nonetheless actionable because it was made without a reasonable basis. They contend that as of the date of the press release, Defendants had begun imploring IBM Credit for cash infusions on almost a daily basis and knew the Company was over-leveraged on the Credit Facility by at least $7 million. Nonetheless, the mere fact that Defendants knew the Company was not performing well does not make unreasonable promises to improve financial health. Indeed, that a company hopes to "do better" is not unreasonable regardless of the financial state it finds itself in at the time. The Court agrees with Executive Defendants that this statement is not actionable.

-16-

       b.     <u>Deloitte & Touche</u>

For its part, D&T also alleges the Complaint fails to plead with any degree of particularity misstatements contained in the fiscal 2002 and 2003 audited financial statements. Specifically, D&T claims Plaintiffs have not proffered any allegations identifying which aspects of the financial statements were misstated and by how much. The Court rejects this argument. Plaintiffs' specific allegations of fraud at Datatec, coupled with Datatec's warning in its August 12, 2004 8-K that it had overstated past revenues by up to $18 million and that investors should not rely on any of the previous three years' financial statements suffices to establish that at least aspects of these statements were misstated materially. And because D&T audited the financial statements, the Court denies D&T's motion as to this ground.[2]


       *iv.*    *Failure to Plead Reliance*

D&T next argues the Complaint against it should be dismissed because Plaintiffs have not demonstrated reliance on any of D&T's alleged misstatements. Confusingly, D&T once again argues in support of its position that Plaintiffs could not have relied on any misstatements contained in the 2002 financial statements because Plaintiffs have failed to identify any misstatements. As noted above, the Court has already rejected this argument.

D&T next argues that because Plaintiffs made their investments prior to the issuance of the 2003 audited financial statements, they could not have relied on them in making their investment decisions. The Court rejects this argument as well. With regard to the 2003 financial

---

[2] See *In re Suprema Specialties Inc. Sec. Litig.*, 438 F.3d 256 (3d Cir.) for the general proposition that auditors may be liable for audit opinions.

statements, D&T overlooks the fact that Plaintiffs agreed to modify the terms of the original Note

Purchase Agreement on July 28, 2003, *after* the 2003 financial statements were released.  For

this reason, the Court denies D&T's motion as to this ground.


> v.       *Failure to Plead Scienter With Particularity*

The Court must next determine whether Plaintiffs adequately plead scienter in order to

sustain the Section 10(b) claims.  The PSLRA requires that a securities fraud complaint, as to

each act or omission, "state with particularity facts giving rise to a strong inference that the

defendant acted with the required state of mind."  *GSC Partners CDO Fund v. Washington*, 368

F.3d 228, 237 (3d Cir. 2004); *see* 15 U.S.C. § 78u-4(b)(2).  The "strong inference" requirement

under the PSLRA supercedes the more relaxed scienter standard under Rule 9(b).  *GSC Partners*,

368 F.3d at 237.  A plaintiff may establish a strong inference of scienter by alleging both motive

and opportunity to commit fraud or alleging conscious misbehavior or recklessness.  *Oran v.

Stafford*, 226 F.3d 275, 288-89 (3d Cir. 2000).

Plaintiffs base their Complaint expressly on a recklessness theory.  (Pls.' Br.  2.)  "A

reckless statement is one 'involving not merely simple, or even inexcusable negligence, but an

extreme departure from the standards of ordinary care, and which presents a danger of misleading

buyers or sellers that is either known to the defendant or is so obvious that the actor must have

been aware of it.'"  *In re Advanta*, 180 F.3d at 535 (*citing McLean v. Alexander*, 599 F.2d 1190,

1192 (3d Cir. 1979)).  A plaintiff may establish scienter by pleading contemporaneous facts

constituting strong circumstantial evidence of reckless behavior.  *Wilson v. Bernstock*, 195 F.

Supp. 2d 619, 639-40 (D.N.J. 2002).  A refusal to acknowledge the obvious or to investigate the

doubtful may also give rise to an inference of scienter.  *In re Nice Sys., Ltd. Sec. Litig.*, 135 F.

Supp. 2d 551, 585 (D.N.J. 2001).  To this end, Plaintiffs maintain Defendants recklessly made

misrepresentations and omitted material information regarding Datatec's financial results and

forecasts.


        a.    <u>Executive Defendants</u>

Executives Defendants Gaon and Koch argue that Plaintiffs do not support the allegations

in the Complaint with specific, contemporaneous facts showing fraudulently or recklessly made

false or misleading statements.  The crux of their argument is that Plaintiffs' Complaint contains

allegations so general they require the Court to infer knowledge of facts contradicting the

statements based simply on Executive Defendants' positions within the Company and on their

ability to access information.  (Koch's Br. 23.)  The Court disagrees.

The Complaint is replete with allegations detailing Executive Defendants' actual

knowledge of the fraud and/or knowledge of information concerning the Company that should

have alerted them to the fraud.  For instance, Plaintiffs claim that Koch generated financial

information on, and Gaon regularly reported to the Board operational results of, the Company's

major projects.  They state that both Gaon and Koch directed the fraudulent advanced purchases

of Lowe's materials, particularly at the end of monthly and quarterly periods to meet or beat

earnings estimates.  Both executives were allegedly the primary contacts with IBM Credit and

IBM Global, and, allegedly, Gaon personally directed the financial personnel to threaten IBM

Credit with default on the Home Depot Project if the Credit Facility did not provide more cash.

The Complaint states that both Executives directed that accounts receivable balances be inflated

and ignored the warnings of Datatec's CFO in authorizing the release of aggressive earnings and revenue forecasts for the fourth quarter of fiscal 2003 and for fiscal 2004.  Additionally, both were allegedly told the Company had borrowed far more than the IBM Credit's borrowing formula technically permitted.

Further, the Complaint states that, in 2003, Datatec's finance department employee Gretchen Kittel repeatedly approached both Gaon and Koch about discrepancies between the gross margin estimates and costs on the Home Depot contract, but that neither would reduce the estimates.  These allegations, among others, provide sufficient backing for Plaintiffs' argument that Executive Defendants were reckless, in light of their knowledge, in issuing the statements involved in this case.

b.    Director Defendants

Director Defendants also argue that Plaintiffs have failed to allege scienter.  In response, Plaintiffs note that they rely on alternative theories for proving recklessness.  First, Plaintiffs submit that they have adequately plead Defendants' actual knowledge of facts that directly contradicted their public statements.  In the alternative, Plaintiffs allege that where directors are involved in day-to-day operations of a company and the fraud involves the company's core business, knowledge or recklessness can be inferred from Defendants' positions in the company and access to information concerning the fraud.  The Court finds that, with regard to the former theory, Plaintiffs have sufficiently alleged actual knowledge on the part of each Director Defendant of the fraud concerning the Home Depot Project and the interrelationship between IBM Credit and IBM Global.  With regard to the Lowe's advance purchasing scheme, the Court

-20-

finds that Plaintiffs have failed to allege either actual knowledge or sufficient facts to allow an inference of scienter for any Director Defendant except Grossman.

### 1. Actual Knowledge of Fraud

To survive dismissal, as previously stated, it is sufficient for Plaintiffs to allege that Defendants had knowledge of facts or access to information contradicting their public statements. *In re Party City Sec. Litig.*, 147 F. Supp. 2d 282, 315 (D.N.J., 2001). To this end, Plaintiffs allege that CW informed "each of the Director Defendants during a Board meeting held in or about June or July 2003 [prior to issuance of the 2003 10-K] that the Company was indebted in an amount in excess of $25 million against collateral (receivables, for example) that was approximately $18 million." (Compl. ¶ 257.) The Complaint further alleges that in the same Board meeting, CW informed each of the Director Defendants "that the Company had 'no cash' and was looking for replacement financing but that, in CW's opinion the Company could not get more favorable lending than it already had received, as it had borrowed far more than the amounts to which it was entitled and which its collateral would support." (Compl. ¶ 269.)

Moreover, according to the Complaint, "[e]ach Director Defendant was told (in CW's presence), during Board meetings in April, June and July 2003 by the CFO that the Company had 'no cash' and had exceeded its borrowing capacity [under the IBM Credit Facility]." (Compl. ¶ 249.) In addition, during each of the April, June and July 2003 Board meetings, Gaon allegedly told the Directors that Datatec could not finish the Home Depot job or even keep its doors open without cash from IBM Credit. Plaintiffs also allege that Gaon told the Directors he threatened to default on the Home Depot Project for IBM Global if IBM Credit did not step in to lend more

-21-

money to Datatec.

Plaintiffs argue the Directors knew the losses Datatec was suffering on the Home Depot contract were substantial and climbing because the problem was specifically discussed at "each Board meeting in the spring, summer and fall of 2003," (Compl. ¶ 251). Grossman, Berenblut and Maggard also allegedly discussed the issue during Audit Committee meetings. Further, at Audit Committee and full Board meetings held on or about July 22, 2003, CW allegedly quantified the losses incurred on the Home Depot Project to be up to $1 million. Plaintiffs allege that all of the Directors knew IBM Global had not reimbursed Datatec for these cost overruns and that, because the contract was for a fixed-price, such lack of reimbursement would necessarily reduce or eliminate profits. Under these facts, the Court finds, at least with respect to the Home Depot Project and the IBM Credit and IBM Global interrelationship, Plaintiffs have adequately plead actual knowledge on the part of Defendant Directors that the SEC filings and press releases they approved and/or signed contained material misstatements and omissions.

### 2. *Inference of Scienter*

On the other hand, with regard to the advance purchasing scheme for Datatec's contract with Lowe's, Plaintiffs failed to plead any facts establishing actual knowledge on the part of any of the Director Defendants. As such, the Court must determine whether Plaintiffs have demonstrated for the purposes of this motion that Defendant Directors were so intimately involved in Datatec's day-to-day operations that the Court may infer knowledge or recklessness.

Where fraud involves a company's core business, knowledge or recklessness can be inferred from a defendant's position in the company and related exposure and access to

-22-

information revealing the fraud.  *E.g., Cosmas v. Hassett*, 886 F.2d 8, 12-13 (2d Cir. 1989)

(allegations that sales to China were significant to company's business gave rise to strong

inference that directors knew of Chinese import restrictions); *In re Campbell Soup Co. Litig.,* 145

F. Supp. 2d 574, 599 (D.N.J. 2001) (finding defendants' involvement in approval of public

disclosures sufficient to impute to them knowledge of falsity of disclosures concerning the

company's "core business").  Moreover, "[w]here [ ] accounting irregularities relate to

accounting practices that are sufficiently critical to the core operations of the company,

knowledge of the accounting improprieties may be imputed to the company's officers and

directors who are involved in the day-to-day operations of the company."  *In re Veeco*

*Instruments, Inc. Sec. Litig.*, No. 05 MD 1695(CM), 2006 WL 759751, at *11 (S.D.N.Y. March

21, 2006) (*citing In re Atlas Air Worldwide Holdings, Inc. Sec. Litig.*, 324 F. Supp. 2d 474, 497

(S.D.N.Y. 2004)).

Plaintiffs submit that the Court may infer knowledge of falsity and material omissions in

the statements at issue because they involved improper accounting and revenue recognition with

respect to Datatec's largest contracts, e.g., Lowe's.  To this end, Plaintiffs allege all six outside

directors had sufficient involvement in the day-to-day operations of the Company so as to create

a strong inference of knowledge of the fraud.  In support of this argument, Plaintiffs note that

these Directors reviewed and approved Datatec's operating budgets, monitored its performance

on its contracts, and reviewed memoranda showing the expected profitability of Datatec's largest

clients, including Home Depot and Lowe's.  They also allegedly reviewed Datatec's financing,

including the level of current borrowings under the Credit Facility and discussed Datatec's need

to obtain a replacement for the Credit Facility.  Plaintiffs further note, with regard to Grossman,

-23-

Berenblut and Maggard that their membership on the Audit Committee exposed them to information that would have alerted them to the fraud.

As an initial matter, Plaintiffs' examples of day-to-day involvement as cited above do not amount to anything more than routine tasks of outside directors.  Further, mere membership on an audit committee is "insufficient to establish a strong inference of scienter unless plaintiffs could plead that the audit committee was given information that should have alerted [defendant] to the fact that the company's financials were false."  *In re Atlas Air Worldwide Holdings Inc. Securities Litigation*, 324 F. Supp. 2d 474 (S.D.N.Y. 2004)*; see also Jacobs v. Coopers & Lybrand, LLP,* No. 97 Civ. 3374 (RPP), 1999 WL 101772, at *17 (S.D.N.Y. Feb. 21, 1999) ("[J]ust because a defendant is a director and member of the company's audit committee does not lead automatically to an inference that the person acted with conscious disregard of a known risk as opposed to with gross negligence or even negligence.")  Plaintiffs have not done so.

In addition to the above-mentioned allegations, Plaintiffs have set forth examples of day-to-day involvement specific to Grossman, Milch, Friedman, and Adams.  Except as to Grossman, the Court finds these examples still insufficient to allow for an inference of knowledge of the fraud.

With regard to Milch, Plaintiffs point to the fact that he co-founded Datatec, served as a director, and beneficially owned 2.7% of Datatec's stock.  Milch's mere status as a co-founder, Director, and shareholder of Datatec is insufficient to demonstrate his involvement in the day-to-day operations of the Company.  Further, while Plaintiffs point out that Milch was also employed in Datatec's Chairman's office for a period of two years, they fail to allege any activities he may have engaged in while serving in this position that suffice to show day-to-day operational

involvement.

Similarly, with regard to Friedman, Plaintiffs simply allege that he served as a Director for over ten years, and that he and his law firm served as outside counsel for "almost every Datatec transaction" throughout most of that time.  (Pls. Mem. in Opp'n to Dir. Defs.' Br. 20.) With regard to Adams, Plaintiffs claim that he was familiar with Datatec's operations because Datatec was one of his company's clients and he served as interim CEO of Datatec in 2004 following the bankruptcy.  The Court finds these allegations insufficient evidence of day-to-day operational involvement.

With regard to Grossman, on the other hand, Plaintiffs have sufficiently plead enough facts to show that Grossman had day-to-day involvement in the management of the Company. First, Plaintiffs claim he telephoned Gaon "all the time" seeking information about the Company. (Compl. ¶ 261.)  Plaintiffs also allege he demanded explanations for movements in Datatec's stock price, and demanded that the Company create analyst interest in covering Datatec's stock by issuing aggressive earnings forecasts.  He expressed concern about the impact of the Home Depot and Lowe's jobs on Datatec's earnings, and in the fall of 2003, brought in Raul Pupo, a co-executive of Grossman's company Eagle, to conduct a "business review" of Datatec's operations.  (Compl. ¶ 262.)  Later, in December 2003, he installed Pupo as Gaon's successor. Plaintiffs further point out that Grossman and Pupo arranged to have Eagle purchase Datatec's assets in bankruptcy.  All of these facts, the Court finds, suggests a significant amount of control by Grossman over Datatec.  The Court finds these allegations suffice to create a strong inference of knowledge on the part of Grossman of the misstatements and omissions contained in the various SEC filings.  Thus, Plaintiffs have demonstrated scienter regarding the Lowe's advanced

purchasing scheme with regard to Grossman.  However, they have failed to do so for any other

Director Defendant.

          c.    <u>Deloitte & Touche</u>

The Court also finds Plaintiffs have plead scienter on the part of D&T.  The Complaint

alleges that as early as March 2003, CW told D&T's audit partner Mark Davis that the Company

was in "dire financial straits," had no cash, could not meet its payroll obligations, and was

overextended on its credit.  (Compl. ¶ 295.)  CW also allegedly told Davis that IBM continued

lending Datatec money only so Datatec could finish the Home Depot job.  Further, around the

same time, CW allegedly questioned D&T about the propriety of the Lowe's advance purchasing

scheme, and D&T is said to have received at least two memos written by IBM that found some of

Datatec's invoices were not "actual."  (Compl. ¶ 302-03.)  In the summer and fall of 2003, CW

allegedly told Davis he was not comfortable with the June 2003 press release announcing

positive earnings for the fiscal year and that he was not comfortable with Koch's gross profit

margins and percentage of completion calculations.  Plaintiffs claim D&T also discussed with

Datatec's finance department employee Kittel its observation that Koch's gross profit margin

estimates did not comport with the finance department's cost information.  Davis also allegedly

commented he was "not sure" whether Koch was "on top of his numbers."  (Compl. ¶ 316.)

All told, based on these allegations, the Court finds Plaintiffs have alleged specific facts

which could establish scienter under Section 10(b) at least with respect to misstatements made

from March 2003 onward.  *See, e.g., In re Suprema Specialties*, 438 F.3d at 279 ("[C]ourts have

recognized that allegations of GAAS violations, coupled with allegations that significant 'red

-26-

flags' were ignored, can suffice to withstand a motion to dismiss.")  However, as D&T rightly points out, Plaintiffs have failed to allege any knowledge on the part of D&T prior to this date. As such, the Court finds inactionable as against D&T any misstatements pre-dating March 2003.

      *vi.*    *Failure to Plead Loss Causation*

Executive Defendants and D&T each submit that Plaintiffs' claims must fail because they failed to plead adequately loss causation.  For the reasons cited below, the Court finds these arguments without merit.

      a.    <u>Executive Defendants</u>

Executive Defendants argue the Complaint fails to plead loss causation because it does not show that Datatec's stock price dropped after the alleged fraud was revealed, which Executive Defendants argue is now required under *Dura Pharm., Inc. v. Broudo*, 544 U.S. 336 (2005).  Executive Defendants contend that, even though there were two significant drops in stock price following the Company's announcements in December 2003, none of the announcements disclosed the falsity of any of the alleged misrepresentations.  However, as Plaintiffs rightly point out, the holding in *Dura* only applies to cases in which a general, as opposed to a private, investor pleads a fraud-on-the-market theory of loss causation.  *See Livid Holdings Ltd. v. Salomon Smith Barney, Inc.*, 416 F.3d 940, 949 n.2 (9th Cir. 2005); *McCabe v. Ernst and Young, LLP*, 2006 WL 42371 at *7 (D.N.J. Jan. 6, 2006).  In cases such as this, where private investors do not rely on a fraud-on-the-market theory, Plaintiffs need only establish that Defendants' misrepresentations were directly related to the actual economic loss suffered.  *See*

-27-

*McGonigle v. Combs*, 968 F.2d 810, 821 (9th Cir. 1992).  The Court finds Plaintiffs have sufficiently met this standard.

        b.  <u>Deloitte & Touche</u>

Next, D&T argues the Complaint fails to plead loss causation because Plaintiffs cannot attribute Datatec's failure to file its quarterly report for the third quarter 2003, which resulted in Datatec's failure to register the Warrants, to any statement made or omission by D&T.  D&T also submits that the Complaint fails to state how anything in D&T's October 4, 2002 report or in the 2002 audited year end financial statement caused the loss suffered.  Finally, although the Complaint alleges that D&T's July 23, 2003 report and the 2003 audited year-end financial statements contained misstatements, D&T argues Plaintiffs could not have relied on these since they post-dated the Note Purchase Agreement.

Contrary to D&T's characterization, the Court does not read Plaintiffs' Complaint so narrowly.  Plaintiffs ground their claims against D&T in the fact that D&T erroneously represented that Datatec's financial statements contained no material misstatements and complied with GAAP.  After the Company disclosed the nature of the misstatements in December 2003, the Company lost its credit line, could not file its 2003 third-quarter 10-Q, and soon thereafter went into bankruptcy.  All of these, Plaintiffs claim, combined to cause Datatec to default on the Notes and render the Warrants worthless.  Under this reading of the Complaint, Plaintiffs have sufficiently plead loss causation against D&T, which issued clean audit opinions on Datatec's financial statements prior to Plaintiffs' initial and subsequent investments.

**D.     Section 20(a) Claims**

Executive and Director Defendants argue that Plaintiffs have not adequately plead a violation of Section 20(a) of the Exchange Act.  Section 20(a) imposes liability on individuals who control any person liable under any provision of the Act.  *See* 15 U.S.C. § 78t(a).  Section 20(a) is a derivative liability section, requiring evidence of a separate violation under the Act.  *In re Advanta*, 180 F.3d at 541.  In order to state a claim under Section 20(a), Plaintiffs must plead with particularity: "(1) an underlying violation by a controlled person or entity, (2) that the Defendants are controlling persons, and (3) that they were 'in some meaningful sense culpable participants in the fraud.'"  *In re Cendant Corp. Sec. Litig.*, 76 F. Supp. 2d 539, 548 (D.N.J. 1999) (*quoting Lanza v. Drexel & Co.*, 479 F.2d 1277, 1299 (2d Cir. 1973).

Plaintiffs' Section 20(a) claim against Executive and Director Defendants is based on an underlying violation of Section 10(b).  A corporate officer or director can be liable under Section 20(a) for exercising control over a corporation that has committed securities fraud.  *In re Mobile Media Sec. Litig.,* 28 F. Supp. 2d 901, 940 (D.N.J. 1998).  Executive and Director Defendants initially contend that Plaintiffs' Section 20(a) claim must be dismissed because Plaintiffs' Section 10(b) claim fails.  *See In re Cendant Corp.*, 76 F. Supp. 2d at 549 (dismissing a Section 20(a) claim because the necessary predicate Section 10(b) claim had been dismissed).  Because the Court has sustained the Section 10(b) claims, this argument fails.

Director Defendants next argue that Plaintiffs have failed to plead adequately that any of the Outside Directors were "controlling persons," as required by Section 20(a).  To establish that a defendant is a control person, "a plaintiff must demonstrate that 'the defendant had actual power or influence over the allegedly controlled person.'"  *In re Mobile Media,* 28 F. Supp. 2d at

-29-

940.  "The pleading of facts that 'support a reasonable inference that [defendants] had the potential to influence and direct the activities of the primary violator' will survive a motion to dismiss."  *In re Loewen Group Inc. Sec. Litig.*, No. 98-6740, 2004 WL 1853137, at *26 (E.D. Pa. Aug.18, 2004) (citing *In re Health Mgmt. Inc. Sec. Litig.,* 970 F. Supp. 192, 205 (E.D.N.Y.1997)).

Status as directors, standing alone, is insufficient to establish control for purposes of Section 20(a).  *See Food & Allied Serv. Trades Dep't, AFL-CIO v. Millfield Trading Co.*, 841 F. Supp. 1386, 1391 (S.D.N.Y. 1994).  However, the Complaint does not simply allege that Director Defendants served as directors, but that they signed the SEC filings at issue in this case. The Court finds that these two factors suffice to establish control so as to survive a motion to dismiss.  *See In re Philip Servs. Corp. Sec. Litig.*, 383 F. Supp. 2d 463, 485 (S.D.N.Y. 2004) ("it 'comport[s] with common sense to presume that a person who signs his name to a report has some measure of control over those who write the report.'") (*citing Jacobs v. Coopers & Lybrand,* 97 CIV. 3374, 1999 WL 101772, **17-18, (S.D.N.Y. Feb. 26, 1999)).  Director Defendants' motion is thus denied as to this ground.

Director Defendants next argue that Plaintiffs have failed to allege that the individual Directors engaged in "culpable conduct" within the meaning of Section 20(a).  However, although Director Defendants are correct that Plaintiffs will have to prove culpable participation at trial, it does not have to be plead in order to survive a motion to dismiss.  *See Jones v. Intelli-Check, Inc.*, 274 F. Supp. 2d 615, 645 (D.N.J. 2003)*; In re NUI Sec. Litig.*, 314 F. Supp. 2d 388,

-30-

400 n.3 (D.N.J. 2004).[3]  Therefore, the Court denies Director Defendants' motion as to this ground as well.

### E.       Common Law Claims

Executive and Director Defendants argue that the Court should dismiss Plaintiffs' common-law claims of breach of fiduciary duty, negligent misrepresentation, and fraudulent conveyance.  For the reasons below, the Court finds Plaintiffs' may proceed with the claims.

### i.       Martin Act Does Not Bar Claims

Executive and Director Defendants first argue that New York's Martin Act bars the claims for breach of fiduciary duty and negligent misrepresentation.  These Defendants base their argument on the fact that the choice of law clause contained in the Note Purchase Agreement provided for New York law to govern the agreement.[4]  Although it does appear that the parties intended for New York law to govern the agreement, the Court finds the language of the provision is not so broad as to cover Plaintiffs' common-law tort claims.  The provision limits itself to issues relating to the contract itself.  For this reason, the Court finds the choice of law

---

[3] The Court recognizes that there is disagreement among the courts as to whether Section 20(a) requires "culpable conduct" to be plead as an element of the offense.  Because the plain language of this section does not support a culpable conduct requirement but rather provides for an affirmative defense of good faith and non-inducement, 15 U.S.C. § 78t(a), the Court declines to impose this requirement.

[4] The provision reads: "This Agreement shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made in New York by persons domiciled in New York and without regard to its principles of conflict of laws.  The corporate laws of the State of New York shall govern all issues concerning the relative rights of the Company and its stockholders."  (Note Purchase Agreement at 28, § 10.1.)

clause does not apply to Plaintiffs' tort claims.  Further, given that the Company was

headquartered and the wrongs took place in New Jersey, the Court holds these claims are

governed by New Jersey law.  *Veazey v. Doremus*, 510 A.2d 1187, 1189 (N.J. 1986) (applying a

governmental interest analysis to tort claims).


    ii.     *Breach of Fiduciary Duty*

Director Defendants next argue that Plaintiffs lack standing to pursue their breach of

fiduciary duty claim because the cause of action belongs to "the corporate debtor's estate"

because the debtor, Datatec, filed for bankruptcy.  The Court disagrees.  While true that all

interests that a debtor possesses in property, including causes of action, pass to the estate upon

the filing of a bankruptcy petition, *see, e.g., Patrick T. Frawley and Assocs. v. City Fed. Sav.

Bank*, Civ. A. No. 90-2060, 1990 WL 63546, at *3 (E.D. Pa. May 9, 1990), Defendants err in

characterizing Plaintiffs' claims as those of Datatec.  Here, the common-law claims asserted by

Plaintiffs resulted from an agreement executed between Plaintiffs and the debtor corporation

Datatec.  As such, the claims do not belong to Datatec but rather to Plaintiffs in their capacity as

creditors.  And where claims such as these belong to creditors qua creditors, it is the bankruptcy

trustee who has no standing to sue.  *See Mediators, Inc. v. Manney* (*In re Mediators, Inc.*), 105

F.3d 822, 826 (2d Cir. 1997); *Shearson Lehman Hutton Inc. v. Wagoner*, 944 F.2d 114, 118-19

(2d Cir. 1991).  The Court finds Plaintiffs have standing to bring a breach of fiduciary duty

claim.

Defendant Gaon next argues that the claim for breach of fiduciary duty must fail because

Plaintiffs cannot establish the "fiduciary relationship" between themselves and himself.

Plaintiffs counter that under Delaware law, officers and directors owe creditors a fiduciary duty when the corporation enters a "zone of insolvency." *Geyer v. Ingersoll Publ'ns Co.*, 621 A.2d 784 (Del. Ch. 1992). Plaintiffs submit that Delaware law applies here because the laws of the state of incorporation generally apply to matters concerning "internal affairs" of a corporation. This "internal affairs" doctrine, "is a conflict of laws principle which recognizes that only one State should have the authority to regulate a corporation's internal affairs–matters peculiar to the relationships among or between the corporation and its current officers, directors, and shareholders–because otherwise a corporation could be faced with conflicting demands." *Edgar v. MITE Corp.*, 457 U.S. 624, 645 (1982).

The Court notes that breach of fiduciary duty claims are typically subject to the internal affairs doctrine. In the instant case, however, the claims are brought by creditors not by officers, directors, or shareholders of Datatec. For this reason, the Court finds that this claim is not subject to the internal affairs doctrine and that New Jersey law applies.

Under New Jersey law, a debtor typically owes no extracontractual duties to a creditor unless the debtor is insolvent. *See Francis v. United Jersey Bank,* 87 N.J. 15, 36 (1981) (stating that, while directors may owe a fiduciary duty to creditors when insolvent, the obligation does not arise absent insolvency). Here, Plaintiffs allege that at all relevant times, Datatec was insolvent and that, therefore, Executive and Director Defendants owed them a fiduciary duty. While Plaintiffs must prove the allegation of insolvency at trial, their claims suffice to survive this motion to dismiss.

iii.     *Negligent Misrepresentation*

Executive and Director Defendants also submit that Plaintiffs' negligent

misrepresentation claim must fail because Plaintiffs cannot establish any misrepresentation or

"special relationship" as required by the claim.  The Court first notes that these Defendants are

mistaken in grounding their argument in New York case law.  As held above, New Jersey rather

than New York law governs Plaintiffs' common law claims.  Under New Jersey law, a plaintiff

need not prove "a special relationship" but may prevail on a negligent misrepresentation claim by

showing that "the defendant negligently made an incorrect statement, upon which the plaintiff

justifiably relied."  *Alexander v. CIGNA Corp.*, 991 F. Supp. 427, 440 (D.N.J. 1998).  The Court

also finds, in keeping with the reasoning set forth in this Opinion, that Plaintiffs have adequately

plead misstatements on the part of both Executive and Director Defendants insofar as the Note

Purchase Agreement incorporated statements made in the SEC filings, which contained material

misstatements made by these Defendants.  As such, the Court denies the motions as to this

ground.


iv.     *Fraudulent Conveyance*

Director Defendants next argue that Plaintiffs have not stated a valid fraudulent

conveyance claim.  Plaintiffs base their fraudulent conveyance claim on the Board's decision to

award annual fees of between $7,000 and $25,000 to various Board and Audit Committee

members in July 2003, allegedly when Datatec was already insolvent.  Under New Jersey law, a

plaintiff states a claim for fraudulent conveyance upon a showing that "(1) the creditor's claim

arises before the transfer; (2) the transfer is made without receiving full value; and (3) at the time

-34-

of transfer, the debtor is insolvent." *Boardwalk Regency Corp. v. Burd*, 262 N.J. Super. 162, 164 (N.J. Super. App. Div. 1993); N.J.S.A. 25: 2-27(a).  Director Defendants argue that Plaintiffs have failed to plead either that their claim arose before the transfer or that the transfer was made without receiving full value.

The Court finds that Plaintiffs have appropriately alleged fraudulent conveyance.  First, the Complaint makes clear that Plaintiffs' claim arose on July 3, 2003, when they first entered into the Note Purchase Agreement with Datatec.  Second, the alleged transfer occurred shortly afterward, in late July 2003, when the Board voted to increase compensation to various members of the Audit and Compensation Committees.  At this time, according to the Complaint, the Board knew that the Company had no cash.  Finally, Plaintiffs allege that, given these members' neglect of their duties in authorizing unreliable SEC filings, they could not have merited these large increases in compensation.  These allegations suffice to state a claim for fraudulent conveyance.


### III.  CONCLUSION

For the foregoing reasons, Defendants' motions are **GRANTED** in part and **DENIED** in part in accordance with this Opinion.  An appropriate Order follows.


_____     s/William J. Martini
                                  **William J. Martini, U.S.D.J.**